IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

| | |
|---|---|
| KIM RHEIN and DAVID RHEIN, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 13 C 843 |
| v. ) | |
| ) | JUDGE FEINERMAN |
| AGENT PRYOR, Star Number 4816, an ) | |
| Illinois State Police Officer, in his ) | MAGISTRATE JUDGE KIM |
| individual capacity; AGENT SUMMERS, ) | |
| Star Number 5706, an Illinois State Police ) | |
| Officer, in his individual capacity; ) | |
| LIEUTENANT JOHN COFFMAN, an ) | |
| Illinois State Police Officer, in his ) | |
| individual capacity; HIRAM GRAU, ) | |
| Illinois State Police Director, in his official ) | |
| capacity; and LISA MADIGAN, Illinois ) | |
| Attorney General, in her official capacity, ) | |
| ) | |
| Defendants. ) | |

---

**DEFENDANT JOHN COFFMAN'S MEMORANDUM IN SUPPORT OF HIS
MOTION FOR SUMMARY JUDGMENT**

Defendant John Coffman ("Defendant"), a retired Illinois State Police ("ISP") lieutenant, by and through his attorney Lisa Madigan, the Illinois Attorney General, hereby moves this Honorable Court to grant him summary judgment on Plaintiff's remaining claims against him, and dismiss those claims with prejudice. In support, Defendant states as follows:

**BACKGROUND**

Defendant was formerly employed as the Bureau Chief of the Firearm Services Bureau of the ISP. (Def. SOF 1). Plaintiff David Rhein possessed a valid Firearm Owners Identification ("FOID") card. (Def. SOF 2). On February 3, 2011, Plaintiff's FOID card was revoked for repeatedly threatening Illinois State Representative Anthony DeLuca and his staff. (Def. SOF

1

20). At issue in this case is the process Defendant provided Plaintiff prior to revoking Plaintiff's FOID card in February 2011, and the process provided to allow Plaintiff to seek reinstatement of his FOID card after revocation.

**REVOCATION OF PLAINTIFF'S FOID CARD**

In early February of 2011, Defendant received information from regional ISP officers, detailing the threats made by Plaintiff to Donna Fanning, the District Manager for Illinois State Representative Anthony DeLuca. (Def. SOF 4-5). Fanning spoke with Plaintiff on the phone on March 22, 2010 and Plaintiff asked her whether she had received a packet of documents containing Plaintiff's questions about why the Constitution had been violated. (Def. SOF 6). According to Fanning, Plaintiff threatened during that conversation that he was "ready to start shooting people." (Def. SOF 7).

On August 3, 2010, Plaintiff stopped by Representative DeLuca's office and dropped off a second packet that included a picture of a sign in front of Plaintiff's house that read "THE BRITISH ARE BACK. THE REDCOATS ARE NEXT." (Def. SOF 8). On these documents, Plaintiff had written that Representative DeLuca had not protected Plaintiff's constitutional rights and, therefore, he should "hang for treason for allowing this state and federal government to piss and shit all over we the people's individual rights." (Def. SOF 8). Approximately two months later, Plaintiff called Fanning and screamed, "Why are the only ones with any rights the niggers? Why doesn't Representative DeLuca answer my petition? I wanna know why from his cracker ass." (Def. SOF 9).

Fanning next interacted with Plaintiff in January 2011, when he left another packet with Fanning at Representative DeLuca's office. (Def. SOF 10). On the front of the packet, Plaintiff wrote, "WHATS [sic] IN THIS ENVELOPE ARE FACTS NOT FICTION," "LEARN TO

READ THE TRUTH THE WHOLE TRUTH AND NOTHING BUT THE TRUTH SO HELP YOU (GOD)," "IT ALSO EXPLAINS WHY THERE ARE SO MANY FATASS & LAZYASS PEOPLE IN THIS COUNTRY AND STATE," "1812 – 2012?," "WHAT MITE [sic] THESE TWO DATES HAVE IN COMMON?" "NEED A HINT." (Def. SOF 10). Inside the packet were various documents, including excerpts from the Declaration of Independence, the Constitution, and a biography of Illinois Attorney General Lisa Madigan. (Def. SOF 11). On these documents, Plaintiff wrote, "Now you know why so many of your people or [sic] going to be shot because your [sic] too selfish too [sic] understand the truth." (Def. SOF 11). He also wrote, "Constitutional Convention—Artical [sic] XII State Second Amendment Fed" and "Now you know why you may be next." (Def. SOF 11). Below this was a drawing of a crosshairs (a circle with a cross in the middle). (Def. SOF 11, *see* image to right). Also included within this packet was a document on which Plaintiff wrote, "You all need to take a step back and take a look at what you are doing to this state. Befor[e] we the people go Second Amendment on your asses." (Def. SOF 12).

Fanning's next interaction with Plaintiff was on January 25, 2011, when he called to advise her that he is a member of the Illinois State Militia. (Def. SOF 13). Plaintiff asked Fanning whether she was aware that the purpose of the militia was to overthrow the government. (Def. SOF 13). Plaintiff later met with Fanning at Representative DeLuca's office the same day. (Def. SOF 14). Plaintiff stood over Fanning and ranted for about an hour; and during this conversation, Plaintiff's hands shook, his body language was animated, he waved his arms and raised his voice, and also lunged at Fanning as she sat behind her desk. (Def. SOF 14). Several

times during this conversation Plaintiff referred to himself as a sacrifice lamb. (Def. SOF 15). Plaintiff told Fanning that 2012 would be a year of great significance because it would involve a revolution overthrowing the government. (Def. SOF 15). Fanning relayed that Plaintiff also stated, "I have never shot anybody in my life, and I never would shoot anyone, unless I am forced to—to protect my constitutional rights." (Def. SOF 16). Fanning also recounted that Plaintiff stated, "We the people are organizing a militia. I hope the Rep. [DeLuca] is ready for what is coming." (Def. SOF 16).

Although Defendant does not recall whether he read every document provided to Fanning and Representative DeLuca, he reviewed many of them. (Def. SOF 18). Based on the information related by Fanning, Defendant made the decision on February 3, 2011, to revoke Plaintiff's FOID card pursuant to section 8(f) of the FOID Card Act, 430 ILCS 65/8(f), which allows ISP to revoke a FOID card of "[a] person whose mental condition is of such a nature that it poses a clear and present danger to the applicant, any other person, or persons or the community."

**FOID CARD REINSTATEMENT PROCESS**

Defendant made clear in a February 3, 2011 letter to Plaintiff the steps necessary for reinstatement of the FOID card. (Def. SOF 29-30). Between February 2011 and September 2011, Plaintiff did not request reinstatement of his FOID card from ISP. (Def. SOF 34). Instead, Plaintiff was searching for a psychologist/therapist who would attest that Plaintiff no longer possessed a mental condition that posed a clear and present danger, as required by ISP for purposes of reinstatement of a FOID card. (Def. SOF 34). Around September 19, 2011, Plaintiff hired an attorney, who wrote a letter to ISP on September 23, 2011, requesting reinstatement of Plaintiff's FOID card. (Def. SOF 36). The first time Defendant learned that Plaintiff sought

4

reinstatement of his FOID card was after he received the September 23 letter. (Def. SOF 36). A file on Plaintiff's reinstatement request was opened, but due to understaffing at ISP, it was common for it to take months or even a year before ISP could consider a reinstatement request. (Def. SOF 25). Specific to Plaintiff's case, Defendant received information from Representative DeLuca's office that Plaintiff had continued to make threats even after he sought reinstatement of his FOID card. (Def. SOF 37-38). Plaintiff's FOID card reinstatement therefore could not be considered until ISP received all relevant information concerning Plaintiff's continuing conduct from Representative DeLuca's office and local law enforcement. (Def. SOF 39).

On January 16, 2012, Plaintiff, through his counsel, for the first time formally requested a hearing on his FOID card reinstatement request. (Def. SOF 40). Upon receiving the request, Defendant advised ISP staff to make formal contact with Plaintiff's attorney and to forward the request for a hearing to ISP's legal department (Def. SOF 41); ISP's in-house legal department ultimately makes the final decision as to whether an applicant is entitled to an in-person hearing (Def. SOF 28). Defendant forwarded Plaintiff's counsel's request for a hearing to move Plaintiff's reinstatement process forward. (Def. SOF 41).

In February 2012, however, Defendant was transferred from his position with ISP's Firearm Services Bureau to ISP's Division of Operations, leaving Plaintiff's case in the hands of Defendant's job successors. (Def. SOF 42). Defendant did not have the authority in his new role to ensure that Plaintiff would be afforded a hearing on his FOID card reinstatement request. (Def. SOF 42). Because Defendant was no longer employed within ISP's Firearm Services Bureau—the bureau that handles FOID card revocations and reinstatements (Def. SOF 27-28)—he did not follow up with Plaintiff's request for a hearing after his transfer. (Def. SOF 43). ISP, however, reinstated Plaintiff's FOID card on June 5, 2012. (Def. SOF 44).

**PLAINTIFF'S CLAIMS**

The sole remaining claim in this case is Plaintiff's Section 1983 as-applied due process claim, alleging that Defendant improperly denied Plaintiff both pre- and post-FOID card revocation hearings. (Doc. 64). Plaintiff's claim must fail because Defendant is entitled to qualified immunity.

**STANDARD OF REVIEW**

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits or declarations show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a), (c). Summary judgment is warranted where no rational trier of fact could find for the non-moving party. *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406 (7th Cir. 2009).

**ARGUMENT**

**DEFENDANT IS ENTITLED TO QUALIFIED IMMUNITY.**

Qualified immunity shields governmental actors from liability when performing discretionary functions as long as they do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Berman v. Young*, 291 F.3d 976, 983 (7th Cir.2002) (internal citation omitted). To determine whether qualified immunity is appropriate, this Court should consider whether a "'reasonable officer could have believed that [his] conduct was constitutional in light of the clearly established law and the information [the officer] possessed at the time the incident occurred.'" *Jones v. Webb*, 45 F.3d 178, 183 (7th Cir.1995) *quoting Ellis v. Wynalda*, 999 F.2d 243, 246 (7th Cir.1993). Two inquiries drive the qualified immunity analysis: whether (1) the plaintiff suffered a constitutional deprivation and, if so, (2) the constitutional right that was violated was "clearly established" such

that the public official had "fair and clear warning" that his conduct was unconstitutional. *Whitlock v. Brueggemann*, 682 F.3d 567, 586 (7th Cir. 2012). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law" because police officers should not sidestep their law enforcement duties for fear of being sued. *Humphrey v. Staszak*, 148 F.3d 719, 727 (7th Cir. 1998).

### A. PLAINTIFF'S PRE-DEPRIVATION DUE PROCESS CLAIM

Defendant is entitled to qualified immunity on Plaintiff's due process claim, alleging that he was not afforded a hearing prior to revocation of his FOID card, because it was not clearly established that Plaintiff was entitled to such a hearing. Procedural due process is a flexible concept which "calls for such procedural protections as the particular situation demands." *Buttitta v. City of Chicago*, 9 F.3d 1198, 1201 (7th Cir. 1993) *quoting Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The Due Process Clause does not compel a pre-deprivation hearing where impracticable, such as where quick action by the State is necessary. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) (stating that pre-deprivation hearing constitutionally required absent "quick action by the State or the impracticality of providing any pre-deprivation process"). Where a pre-deprivation remedy is impracticable due to the necessity of quick action by the State, due process may be satisfied with the availability of an adequate post-deprivation remedy. *See Zinermon v. Burch*, 494 U.S. 113, 132 (1990). Thus, courts have upheld summary action without a pre-deprivation hearing where necessary to protect the environment and public safety, *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 298-303 (1981), to protect the integrity of horse racing and protect the public, *Barry v. Barchi*, 443 U.S. 55, 64-65 (1979), and to avoid the importation of illegal guns, *Gun South, Inc. v. Brady*, 877 F.2d 858, 867-68 (11th Cir. 1989). And relevant here, one appellate court has held that "[t]he revocation of

7

a firearms license . . . without a predeprivation hearing is justified by concerns as to public health and safety." *Hightower v. City of Boston*, 693 F.3d 61, 85 (1st Cir. 2012).

In determining whether a pre-deprivation hearing is constitutionally required, the Supreme Court has developed a three-part analysis that balances the following: (1) the nature of the private interest; (2) the risk of an erroneous deprivation of that interest; and (3) the government's interest in taking its action, including the burdens any additional procedural requirement would entail. *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976). ). In light of the substantial evidence of Plaintiff's escalating threats to an elected official's office, Defendant's interest in ensuring the safety of an elected official and the public at large plainly justified revocation of Plaintiff's FOID card without a prior hearing under this test.

Beginning with the third factor, Defendant had a very strong interest in regulating the use of firearms as mandated by section 8(f) of the FOID Card Act. The threat to the public safety posed by Plaintiff was well-documented. In February 2011, Defendant received information that Plaintiff had made threats to Fanning and Representative DeLuca spanning from March 2010 to January 2011. (Def. SOF 6-16). Plaintiff had stated that he was "ready to start shooting people" (Def. SOF 7), had written that he would go "Second Amendment" on people (obviously referring to using his firearms on people) (Def. SOF 12), stated that Representative DeLuca should be hung for treason (Def. SOF 8), referred to himself as a sacrifice lamb (Def. SOF 15), and repeatedly referenced that he was a member of the Illinois Militia and that 2012 would be a year of revolution involving the overthrow of the government (Def. SOF 15). Importantly, only days before Defendant revoked Plaintiff's FOID card, Fanning reported that Plaintiff stated, "I have never shot anybody in my life, and I never would shoot anyone, unless I am forced to—to protect my constitutional rights." (Def. SOF 16). These threats scared Fanning enough for her to report

the matter to ISP. Even Plaintiff's own treating psychiatrists agree that it was appropriate to revoke his FOID card based upon these threats. (Def. SOF 23).

Quickly revoking Plaintiff's FOID card—given the threats that he made, which posed a clear and present danger to him and others—was the only sound option. Or at the very least, Defendant is entitled to qualified immunity because he did not act in a "plainly incompetent" manner in making the decision to revoke Plaintiff's FOID card without a pre-deprivation hearing, especially where the FOID Card Act provided for adequate post-deprivation remedies. *See Humphrey*, 148 F.3d at 727 (stating qualified immunity protects all by the plainly incompetent).

Finding that the absence of a pre-deprivation hearing is constitutionally permissible here is consistent with *Waltier v. N.Y. Police Dep't*, 856 F. Supp. 196 (S.D.N.Y. 1994). There, the court considered whether due process required a pre-deprivation hearing prior to revocation of the plaintiff's firearms permit. *Id.* at 197. The State of New York revoked the plaintiff's permit after he was arrested for shooting another individual. *Id.* The court held that, after analyzing the *Mathews* factors, a pre-deprivation hearing was unnecessary. *Id.* at 200-01. The court stressed that the significant governmental interest in ensuring public safety outweighed the plaintiff's interest in his permit, especially given the minimal risk of a permanent deprivation due to adequate post-deprivation procedures. *Id.* Because quick action by the State was necessary to dispossess a potentially dangerous firearms owner of the weapon, the court held that a pre-deprivation hearing was not constitutionally required. *See id.* at 200.

Providing a pre-deprivation hearing prior to revocation of a FOID card pursuant to section 8(f) of the FOID Card Act would have been impracticable under the circumstances here. After receiving the information related to Plaintiff's threats, Defendant had to take quick action.


What if Defendant had waited to afford Plaintiff a pre-deprivation hearing and Plaintiff had carried out the threats? Had Defendant waited to act on the information that he received, the risk to Plaintiff and the public, especially Fanning and Representative DeLuca, could have been significant, for Plaintiff possessed a mental condition that presented a clear and present danger. *See Potts v. City of Philadelphia*, 224 F. Supp. 2d 919, 943 (E.D. Pa. 2002) (holding that pre-deprivation process unnecessary where potential consequences of allowing plaintiff to carry firearm outweighed plaintiff's interest in possessing firearm).

As for the remaining two factors, the individual interest in possessing a FOID card does not outweigh the strong governmental interest of ensuring the public safety, particularly given the minimal danger of an erroneous permanent deprivation. A revocation of a FOID card does not constitute a deprivation of a basic means of sustenance, which generally would compel a pre-deprivation hearing. *Compare Mathews*, 424 U.S. at 340-41 (holding that termination of disability payments under Social Security Act did not require pre-deprivation hearing, where payments were non-subsistence payments and post-deprivation hearing was adequate), *and Potts*, 224 F. Supp. 2d at 943 ("holding that "personal interest in . . . gun permit . . . does not constitute a necessity of life, such as income, or even employment, that would strongly militate in favor of a pre-deprivation hearing"), *with Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (holding that termination of welfare benefits requires pre-deprivation hearing because "welfare provides the means to obtain essential food, clothing, housing, and medical care"). Moreover, the FOID Card Act provides for adequate post-deprivation procedures to ensure that an erroneous permanent deprivation will be avoided. *See* 430 ILCS 65/10-11. Indeed, Plaintiff's FOID card ultimately was reinstated. (Def. SOF 44). The revocation of Plaintiff's FOID card without pre-deprivation process thus was constitutional. *See Hightower*, 693 F.3d at 85 ("The revocation of a firearms

license . . . without a predeprivation hearing is justified by concerns as to public health and safety.").

At the very least, it was not "clearly established" that revoking Plaintiff's FOID card without a pre-deprivation hearing violated due process under the circumstances here. It is, of course, Plaintiff's burden to show that, under the facts involved here, a right to a pre-deprivation hearing was clearly established. *See Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1174 (7th Cir. 1997). Plaintiff clearly cannot satisfy this burden. There are no cases in this judicial circuit that have considered whether a pre-deprivation hearing was constitutionally required under a similar fact pattern— where an officer revokes a firearms license on information establishing a clear and present danger on the part of the plaintiff. *See Conner v. Reinhard*, 847 F.2d 384, 388 (7th Cir. 1988) (requiring closely analogous case involving clearly established constitutional right to defeat qualified immunity defense). In fact, denying qualified immunity under the facts here would place all police officers having to make difficult and swift discretionary decisions at their peril for a suit for damages by plaintiffs who will second-guess them later; this is precisely what qualified immunity is designed to prevent. *See Sutterfield v. City of Milwaukee*, 751 F.3d 542, 559 (7th Cir. 2014) ("'[W]hen police are acting in a swiftly developing situation . . . a court must not indulge in unrealistic second-guessing.") *quoting Leaf v. Shelnutt*, 400 F.3d 1070, 1092 (7th Cir. 2005).

Importantly, whether a pre-deprivation hearing is required involves balancing competing interests—the interests of the State in taking quick action without a hearing, the interest of the public, and the interest of the plaintiff. *Mathews*, 424 U.S. at 334-35. The Seventh Circuit has stated that, "It would appear that, whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is

11

subject to liability . . . . Qualified immunity typically casts a wide net to protect government official from damage liability whenever balancing is required." *Benson v. Allphin*, 786 F.2d 268, 276 (7th Cir. 1986) *abrogated on other grounds*; *Sherman v. Four County Counseling Center*, 987 F.2d 397, 409 (7th Cir. 1993). Here, because a balancing of interests is required to determine whether a pre-deprivation hearing was constitutionally required, it could not be clearly established that, under the facts and circumstances in this specific case, that such a hearing was indeed required. Accordingly, Defendant is protected by qualified immunity, and Plaintiff's pre-deprivation hearing due process claim should be dismissed with prejudice.

### B. PLAINTIFF'S POST-DEPRIVATION DUE PROCESS CLAIM

Defendant similarly is entitled to qualified immunity on Plaintiff's post-deprivation due process claim, alleging that Defendant denied him constitutionally adequate process in seeking reinstatement of the FOID card. The summary judgment record, however, establishes that Defendant had limited involvement with Plaintiff's reinstatement request. And given the clearly established law on post-deprivation due process, Defendant acted in an objectively reasonable manner. *See McDonald v. Haskins*, 966 F.2d 292, 293 (7th Cir. 1992) (holding that qualified immunity depends on whether officer acted objectively reasonable under the circumstances).

The first time that Defendant even learned that Plaintiff sought reinstatement of his FOID card was around September 23, 2011, when Defendant received a letter from Plaintiff's counsel. (Def. SOF 36). Lack of resources at ISP, however, resulted in FOID card reinstatement applications not being considered for months or sometimes as long as a year. (Def. SOF 25). But even putting aside the issue of resources, relevant here was the fact that Defendant had received information that Plaintiff had continued to make threats after revocation of his FOID card. (Def. SOF 37-38). And Defendant was awaiting further information related to these additional threats

12

from Representative DeLuca's office, as well as from local law enforcement, before considering Plaintiff's request for reinstatement of his FOID card. (Def. SOF 39). This further caused reasonable delay in considering Plaintiff's reinstatement request.

Moreover, Plaintiff did not actually request a hearing on his FOID card reinstatement request until January 16, 2012. (Def. SOF 40). Immediately upon receiving a request for a hearing, Defendant advised his staff to contact ISP's legal counsel to set up a hearing. (Def. SOF 41).

The undisputed evidence thus demonstrates that Defendant took proper steps to move Plaintiff's reinstatement request toward a hearing. The fact that Plaintiff did not receive a hearing between the time that he requested a FOID card reinstatement—September 23, 2011—and when Defendant no longer worked in the Firearms Services Bureau (and, therefore, was no longer personally involved in the FOID card reinstatement process)—February 2012, does not support a due process claim. Plaintiff's argument, essentially, is that, by not hearing Plaintiff's reinstatement request within this four-month period, he was denied adequate post-deprivation process. Whether such a short delay actually constitutes a due process violation, however, has to be considered on an ad-hoc basis, involving an examination of factors such as (1) the length of the delay; (2) the reason assigned by the government for the delay; (3) whether or when the claimant asserted the right to a hearing; and (4) the prejudice to the claimant. *United States v. Eight Thousand Eight Hundred and Fifty Dollars*, 461 U.S. 555, 564 (1983). It certainly was not clearly established law in February 2012 that, given the facts of this case where Defendant was awaiting further information regarding threats made by Plaintiff, a short, four-month delay in providing a hearing on Plaintiff's FOID card reinstatement request violated post-deprivation due process rights. *See*, *e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547 (1985)

(holding that nine-month delay of post-deprivation hearing constitutional). Indeed, the length of the delay was minor, considering the reasons articulated by Defendant for the delay, that is, awaiting further information regarding Plaintiff's threats and understaffing at ISP to process reinstatement requests. (Def. SOF 25, 39). And Plaintiff asserted his right to an actual hearing only in mid-January 2012, just a few weeks before Defendant's involvement with the reinstatement process ceased. (Def. SOF 40, 42-43). Finally, any prejudice in the delay was slight, for Plaintiff's FOID card was reinstated shortly thereafter, in June 2012. (Def. SOF 44).

Nor can Plaintiff count the time between February 2012 and June 2012 as part of any alleged denial of due process by Defendant. Plaintiff's due process claim has been brought pursuant to 42 U.S.C. §1983, which requires that the defendant be "personally involved" in the alleged constitutional deprivation. *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003); *Hildebrandt v. Ill. Dep't of Natural Resources*, 347 F.3d 1014, 1039 (7th Cir. 2003). Thus, to be held liable for a constitutional violation under section 1983, the plaintiff must adequately plead that the defendant "participated directly in the constitutional violation." *Hildebrandt*, 347 F.3d at 1039. It is undisputed here that Defendant did not have any personal involvement in Plaintiff's FOID card reinstatement process starting in February 2012. (Def. SOF 42-43).

In the end, delaying a hearing on Plaintiff's FOID card reinstatement request for approximately four months was not unconstitutional under the circumstances. Defendant was awaiting further information related to alleged threats made by Plaintiff. Manpower issues also constrained ISP's ability to consider Plaintiff's reinstatement request any sooner. And after February 2012, Defendant had no more personal involvement with the reinstatement process, so any delay after that time cannot be imputed to Defendant.

**Wherefore**, Defendant retired ISP Lieutenant John Coffman respectfully requests that this Court award him summary judgment on Plaintiff's due process claim, dismiss the Amended Complaint in its entirety with prejudice, and provide any other relief that is just and proper.

LISA MADIGAN
Attorney General of Illinois

Respectfully submitted,

/s/ *Sunil Bhave*
Sunil Bhave
Assistant Attorney General
Office of the Illinois Attorney General
100 West Randolph Street, 13th Floor
Chicago, Illinois 60601
(312) 814-4450

## CERTIFICATE OF SERVICE

I, Sunil Bhave, hereby certify that I have caused true and correct copies of the above and foregoing Memorandum of Law in Support of Motion for Summary Judgment to be sent via e-filing to all counsel of record on September 12, 2014, in accordance with the rules on electronic filing of documents.

/s/ *Sunil Bhave*
Sunil Bhave
Assistant Attorney General