**IN THE UNITED STATES DISTRICT COURT,
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DAVID RHEIN** | ) | |
| | ) | No. 13 C 843 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Hon. Judge Gary Feinerman |
| | ) | |
| **LIEUTENANT JOHN COFFMAN** | ) | Hon. Mag. Judge Young B. Kim |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S LOCAL RULE 56.1(a)(3)
STATEMENT OF UNDISPUTED MATERIAL FACTS**

**Local Rule 56.1(a)(1) Filing Exhibit Index**

1. Plaintiff's Deposition – Exhibit A

2. Plaintiff's Affidavit – Exhibit B

3. Defendant Coffman's Deposition Group Exhibit No. 3 – Exhibit C

4. Agent Summers' Deposition – Exhibit D

5. Agent Pryor's Deposition – Exhibit E

6. Defendant Coffman's Deposition – Exhibit F

7. Defendant Coffman's Answers to the Plaintiff's Interrogatories – Exhibit G

8. Defendant Coffman's Deposition Group Exhibit No. 2 – Exhibit H

**Description of the Parties**

1. At all relevant times pertinent to this occurrence, the Plaintiff, David Rhein, was residing in the Northern District of Illinois, at his home in Sauk Village, Cook County, Illinois. First Am. Compl. ¶ 3 (Dkt. 29).

2. At all relevant times pertinent to this occurrence, the Defendant, Illinois State Police Lieutenant John Coffman (hereinafter "Defendant Coffman"), was acting within the scope

of his employment with the Illinois State Police, and was acting under color of law. First Am. Compl. ¶ 4; Def. Answer ¶ 4 (Dkt. 44).

### Plaintiff's Firearms

3. The Plaintiff owned several firearms at the time of the events that gave rise to this lawsuit. Ex. A, Pl. Dep. 148-150; First Am. Compl. ¶ 10; Def. Answer ¶ 10; Ex. B, Pl. Affidavit[1] ¶ 1.

4. The Plaintiff used the weapons for hunting and recreation. Ex. A, Pl. Dep. 150-51.

5. The Plaintiff and his wife kept firearms in the home for the purpose of self-defense and he has used at least one of those weapons for self-defense and the defense of his wife in their home. Ex. B, Pl. Affidavit ¶ 1.

### Plaintiff's Political Beliefs

6. The Plaintiff believes that counties have no right to collect any taxes (Ex. A, Pl. Dep. 19-21), and specifically that Cook County has no right to collect property taxes (Ex. A, Pl. Dep. 64-65).

7. He believes the state and federal governments "keep each other in check." Ex. A, Pl. Dep. 55.

8. The Plaintiff has never been a member of a group that describes itself as a militia. Ex. A, Pl. Dep. 94.

### Contact with Representative Anthony DeLuca's Offices

<u>March 10, 2010</u>

9. On March 10, 2010, the Plaintiff went to Representative Anthony DeLuca's ("Representative DeLuca") office in Springfield to drop off a packet of documents. Ex. A, Pl. Dep. 14; Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 5, 46. [2]

---

[1] "Ex. B. Pl. Affidavit" refers to Plaintiffs Summary Judgment Exhibit B, which is Plaintiff David Rhein's

10. On March 22, 2010, the Plaintiff called Donna Fanning ("Fanning") at Representative DeLuca's Crete office to see if he could leave a copy of the same documents that he provided to the Springfield office, and the Plaintiff later came to the office and slipped them under the door. Ex. A, Pl. Dep. 25-26; Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 5, 46.

11. Fanning alleges that on this date, the Plaintiff stated, "I am ready to start shooting people" over the phone. Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 5, 46.

12. However, Fanning also conceded the "[c]onversation ended peacefully." *Id*.

August 3, 2010

13. On August 3, 2010, the Plaintiff dropped off another packet and Fanning contacted the Crete Police Department regarding the Plaintiff. Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 5, 46.

14. She turned over the packet of documents that the Plaintiff left to Crete Police Department Detective Sergeant Robert Hill. *Id*.

September 30, 2010

15. On September 30, 2010, the Plaintiff allegedly called Representative DeLuca's office, yelled at Fanning and hung up the phone. *Id.*

January 14, 2011

16. On January 14, 2011, the Plaintiff allegedly called Representative DeLuca's office and said he was coming in to the district office. Ex. C, Coffman Dep. Group Ex. No. 3, AGO Bates No. 6, 47.

---

[2] "Def. Coffman Dep. Group Ex. No. 3" refers to Group Exhibit Number 3 from Defendant Coffman's Deposition, and "AGO Bates No." refers to the Attorney General's Bates Stamp Numbering.

17. Fanning called the Crete Police Department and left a message for Detective Hill, but the Crete Police Department did not return her call or follow up with her. *Id.*

18. The Plaintiff arrived, "handed [Fanning] a packet," and then "left without incident." *Id.*

January 25, 2011

19. On January 25, 2011, the Plaintiff allegedly called Fanning and made various statements, including telling her he was "getting angry" because Representative DeLuca called the Plaintiff and "blew smoke up [Plaintiff's] rear end" and "ignored [Plaintiff's] petition." Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 67.

20. The Plaintiff also allegedly stated, "I am not a violent person" and "I am a member of the Illinois State Militia." *Id.*

21. Fanning "told [the Plaintiff] that his writings do not ask a specific question, and they are threatening and disrespectful" and that "he needs to rewrite them to ask specific questions in a respectful way that makes sense." Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 68.

22. The Plaintiff replied that "he would like to come to the office and discuss what changes should be made to his letters to make them more civil so he can get an answer." *Id.*

23. Fanning also alleged that the Plaintiff told her he called the Governor and "threatened to 'kick his ass'" because he would not answer his calls. *Id.*

24. Shortly thereafter, the Plaintiff arrived at Representative DeLuca's office and spoke to Fanning for about an hour and presented her with a copy of the original packet he gave Representative DeLuca's secretary in Springfield on March 10, 2010, containing pages that had

4

previously been received on March 3, 2010 and/or August 3, 2010. Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 35-38, 68.

25. According to Fanning, during this encounter, the Plaintiff "referred to himself as a 'sacrifice lamb'" several times and "kept speaking about 2012 as a year of great significance, of revolution and overthrowing the government and we the people taking it back." Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 68-69.

26. The Plaintiff also allegedly stated he had "never shot anybody in [his] life, and [he] never would shoot anyone, unless [he] is forced to – to protect [his] constitutional rights." Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 69.

## February 1, 2011

27. The last contact with Representative DeLuca's office listed on Fanning's timeline was on February 1, 2011, when the Plaintiff spoke to her over the phone. Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 10.

28. Plaintiff allegedly told Fanning he would "picket [their] parking lot with a group of people who want answers" and that he "cannot understand why the Rep. [sic] won't answer his petition in writing, as many times as he has respectfully asked for answers to his questions." Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 51.

29. At no point in Fanning's narrative of the interaction on this date is there any mention of threats made by the Plaintiff. Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 51.

## The Packages

30. Between March 10, 2010 and January 25, 2011, the Plaintiff visited Representative DeLuca's offices approximately four times and delivered a packet of documents

each time; Plaintiff delivered one package of documents to Representative DeLuca's Springfield office and three to his Crete office. Ex. A, Pl. Dep. 14, 18, 25, 28, 35-36; Ex. C, Coffman Dep. Group Ex. No. 3, AGO Bates No. 46-50.

31. All four packets were exactly the same except for the last one, where, according to Plaintiff, he included the Declaration of Independence. Ex. A, Pl. Dep. 28.

32. These packets were also sent to the Governor, Representative Jesse Jackson, and every representative in the federal government from Illinois. Ex. A, Pl. Dep. 100.

**The Revocation**

33. The first time the Plaintiff was contacted by the police regarding his contacts with Representative DeLuca's office was the day his home was raided in February 2011. Ex. A, Pl. Dep. 121-22.

34. On February 2, 2011, based solely on information from Fanning, the Statewide Terrorism and Intelligence Center ("STIC") assessed the Plaintiff's alleged threats, (Ex. D, Summers Dep. 16-17), and STIC determined that Plaintiff made "inappropriate contact or communication and/or interest in a public official without the apparent immediate capability to commit and act of harm or targeted violence at this time." Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 3.

35. Further, STIC determined that the Plaintiff's communications expressed views "typical of a Sovereign Citizen ideology." *Id.*

36. STIC noted that on March 22, 2010, the Plaintiff was alleged to have said, "I am ready to start shooting people," and that on January 25, 2011, the Plaintiff allegedly told Fanning that he had called the governor and "threatened to 'kick his ass.'" Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates No. 3-4, 11, 57, 59.

37. On February 3, 2011, Defendant Coffman signed a letter to the Plaintiff advising him that his FOID card had been revoked pursuant to 430 ILCS 65/8(f) because the Plaintiff allegedly "possessed a mental condition that presented a clear and present danger." Def. Answer ¶ 13-15, 21, 31.

38. On or before February 4, 2011, the letter was placed into the U.S. Mail. Def. Answer ¶ 13.

39. On February 3, 2011, Illinois State Police Agents Steven Pryor ("Agent Pryor") and Freddie Summers ("Agent Summers") met at the Sauk Village Police Department. Ex. E, Pryor Dep. 14; Ex. D, Summers Dep. 18.

40. Their plan was to interview the Plaintiff and ask him "to explain what he meant by his correspondence with DeLuca." Ex. D, Summers Dep. 21.

41. On February 4, 2011, Officer Vela of the Sauk Village Police Department came to the Plaintiff's home and told him that the Illinois State Police were at the police station. Ex. A, Pl. Dep. 122-23.[3]

42. The Plaintiff then went to the Sauk Village Police Department with Officer Vela and met with Agent Pryor and Agent Summers. Ex. A, Pl. Dep. 123.

<u>Plaintiff's Interview with Agent Pryor and Agent Summers</u>

43. Agent Pryor informed the Plaintiff his FOID card was revoked and he was told to surrender his guns, which the Plaintiff did. Ex. A, Pl. Dep. 126, 128.

---

[3] The Plaintiff testified at deposition that this happened on February 5, 2011. Ex. A, Pl. Dep. 123. However, for the purposes of this motion, and viewing the facts in the light most favorable to Defendant Coffman, we are accepting Agent Steven Pryor's recollection that these events happened on February 4, 2011.

44. On February 4, 2011, when the Plaintiff was interviewed by Agent Pryor and Agent Summers, the FOID revocation letter had already been drafted signed, and the Plaintiff's FOID card had already been revoked. Ex. E, Pryor Dep. 24-25.[4]

45. The Plaintiff told Agent Summers that he wanted to get people's attention and he knew by making those kinds of comments he would accomplish that. Ex. D, Summers Dep. 30; Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 32-34.

46. The Plaintiff told Agent Summers he was prepared to run against Representative DeLuca in the next election if Representative DeLuca did not respond to him, and that he had no plans of inflicting any kind of violence toward Representative DeLuca. Ex. D, Summers Dep. 31.

47. Throughout the interview, Agent Summers observed the Plaintiff to be calm; he was not acting in an irrational matter and had a normal conversation with Agent Summers. Ex. D, Summers Dep. 31; Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 32-34. According to Agent Summers, the Plaintiff was cooperative and did not seem angry or upset. Ex. D, Summers Dep. 52.

48. Agent Summers does not recall whether he or Agent Pryor asked the Plaintiff about any history of mental disease, but the Plaintiff did not appear to Agent Summers to be someone who suffered from mental illness. Ex. D, Summers Dep. 31-32.

49. Agent Summers did not feel he had probable cause to arrest the Plaintiff for any criminal offense at any time during his investigation. Ex. D, Summers Dep. 67.

---

[4] Plaintiff believes that the interview and seizure of his weapons took place on Saturday, February 5, 2011. Ex. A, Pl. Dep. 123, 131. However, for the purposes of this motion, we are viewing the facts in the light most favorable to Defendant Coffman and are accepting the February 4, 2011 date that Agent Pryor testified to at his deposition. Plaintiff denies seeing the revocation letter at the meeting with Agent Pryor and Agent Summers (Ex. A, Pl. Dep. 136), however, for the purposes of this motion only, the Plaintiff is accepting the facts most favorable to Defendant Coffman.

50. According to Agent Summers, the extent of his investigation of the threat was to interview the Plaintiff and review the documents that the Plaintiff sent to Representative DeLuca's office. Ex. D, Summers Dep. 52.

51. Agent Summers believes he spoke to Fanning on the phone "at some point" but is "unsure of the exact date" and it could have been "before or after" his interview with the Plaintiff or "possibly even both" before and after; this possible telephone conversation is not reflected in any documents. Ex. D, Summers Dep. 53.

52. Agent Summers is unsure if he ever spoke with Representative DeLuca. Ex. D, Summers Dep. 62.

53. Agent Pryor testified at deposition that he "believe[s] [he] knew ahead of the interview that [the Plaintiff's] FOID privileges had been revoked . . ." Ex. E, Pryor Dep. 36.

54. Agent Pryor testified that during the interview, the Plaintiff was "calm" and "spoke passionately" but did not say anything for which he could be arrested, nor did he say anything to make Agent Pryor believe he may need to "order an ambulance" to take the Plaintiff to the "mental ward." Ex. E, Pryor Dep. 47-48.

55. Agent Pryor testified that based on what the Plaintiff did, said and wrote, in the totality of his investigation, there was no probable cause to arrest the Plaintiff for any offense prior to taking the Plaintiff's weapons. Ex. E, Pryor Dep. 72.

56. Nothing in Agent Pryor's interaction with the Plaintiff on February 4th, 2011 led Agent Pryor to believe that the Plaintiff had any kind of mental illness. Ex. E, Pryor Dep. 48.

57. Nothing about the Plaintiff's behavior on February 4, 2011, would have led Agent Pryor to believe that the Plaintiff was a clear and present danger to anyone. Ex. E, Pryor Dep.

58. No matter what the Plaintiff told them during the interview, it would not have mattered because the Plaintiff's FOID card had already been revoked. Ex. E, Pryor Dep. 41.

59. After the interview, the police and Agent Pryor entered the Plaintiff's home and seized Plaintiff's firearms. Ex. A, Pl. Dep. 101, 129-30.

60. The Plaintiff received the FOID card revocation letter in the mail on Monday, February 7, 2011. Ex. A, Pl. Dep. 136.

**Plaintiff's Immediate Attempts to Reinstate his FOID Card and Retrieve His Guns**

61. According to Agent Summers, the same day that the Plaintiff had his weapons taken, the Plaintiff asked Agent Pryor how to retrieve them. Ex. D, Summers Dep. 51.

62. Agent Pryor told the Plaintiff the process for getting his guns back was at the bottom of the FOID revocation letter. Ex. E, Pryor Dep. 60.

63. Agent Pryor told the Plaintiff, "there is a phone number to call," and explained that "there is an initial paragraph as to the steps [the Plaintiff] needed to take to get . . . a new FOID card issued to him." Ex. E, Pryor Dep. 60; Ex. C, Def. Coffman Group Ex. No. 3; AGO Bates No. 71.

64. The Plaintiff immediately tried to find a psychiatrist, but had difficulty finding one that would agree to evaluate him, and several months passed before he finally succeeded. Ex. A, Pl. Dep. 157-58.

65. Sometime between August 2011 and September 2011, the Plaintiff hired an attorney to assist him. *Id*.

**Defendant Coffman's Revocation Appeal Procedures**

66. Defendant Coffman was the chief of the Illinois State Police Firearms Services Bureau, charged with deciding on and processing FOID card revocations. Ex. F, Def. Coffman Dep. 29, 30-31.

67. Agent Summers never gave his report regarding his interview with the Plaintiff to the Firearms Services Bureau and never spoke to anyone there at any time during his investigation of the Plaintiff's case. Ex. D, Summers Dep. 56.

68. Agent Pryor may have had a conversation with Defendant Coffman on February 3, 2011 and potentially February 4, 2011, however, Agent Pryor does not remember having interaction with Defendant Coffman anytime after the Plaintiff's interview. Ex. E, Pryor Dep. 60-61.

69. The Illinois State Police has no written directives or policies regarding revocation of FOID Card; it solely relies on the statutory language of the FOID Card Act. Ex. F, Def. Coffman Dep. 22; Ex. G, Def. Coffman's Answers to Pl. Interrog., Interrog. No. 8-9.

70. As a matter of policy, Defendant Coffman does not interview clear and present danger revokees prior to revocation of their FOID cards. Ex. F, Def. Coffman Dep. 64.

71. Defendant Coffman approves revocations based on summaries done by zone investigators and the State Terrorism Intelligence Center. Ex. F, Def. Coffman Dep. 67, 68-69, 72-73.

72. Defendant Coffman approved revocation of the Plaintiff's FOID card and signed the letter sent to the Plaintiff informing him of the revocation. Ex. F, Def. Coffman Dep. 19; Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 71; Def. Answer ¶ 12.

73. The Plaintiff's revocation was based on a summary of what other people said he did. Ex. F, Def. Coffman Dep. 124.

74. The standard revocation letter, the one that the Plaintiff received, instructs revokees to contact FOID program personnel in Defendant Coffman's unit, the Firearm Services Bureau; revokees are not instructed to contact the legal unit. Ex. F, Def. Coffman Dep. 114-15; Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates No. 71.

75. The standard revocation letter also strongly encourages revokees to obtain "letter of recommendation from the police department or sheriff's office who handled [Plaintiff's] incident," a "letter from a psychiatrist . . . attesting to [Plaintiff's suitability to acquire, possess, and use firearms," and "[t]hree or more letters of character reference . . ." Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates No. 71.

76. Given issues of exposing oneself to legal liability, Defendant Coffman acknowledged that complying with the requests outlined in the revocation letter may mean that a revokee may have to contact "six, seven, eight, nine, ten different doctors before they find somebody that's going to indicate they are suitable." Ex. F, Def. Coffman Dep. 123.

77. Defendant Coffman did not provide a psychiatrist or psychologist through the Firearm Services Bureau because of the financial burden it would place on the State; instead Coffman places this burden on the revokee. *Id.*

78. In order for a revokee to receive a hearing, he or she must return the information requested in the revocation letter to Defendant Coffman's Unit, and, if Defendant Coffman's unit believes that the requests were complied with, the information is forwarded to the legal department in order to provide a hearing. Ex. F, Def. Coffman Dep. 115-16.

79. It could be months or years before a hearing is provided to a revokee. Ex. F, Def. Coffman Dep. 127-28.

80. The right to an in-person hearing is not an absolute. Ex. F, Def. Coffman Dep. 130.

**Plaintiff's Attorney's Correspondence with Defendant Coffman**

81. On August 8, 2011, Defendant Coffman received a letter dated August 1, 2011 from the Plaintiff's attorney, Joseph Barbaro, formally requesting reinstatement the Plaintiff's FOID card. Ex. F, Def. Coffman Dep. 137, 139; Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates Stamp No. 79, 81-83.

82. Attorney Barbaro's letter included Dr. Alan Childs' psychological report and three letters of character reference. *Id*.

83. Dr. Alan Childs' report stated, "it is my professional and clinical opinion that [the Plaintiff] does not present as an individual that is dangerous to himself or others." Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates Stamp No. 77.

84. On September 23, 2011, Defendant Coffman received a letter dated September 19th, 2011 from the Plaintiff's attorney requesting a response to his previous letter. Ex. F, Def. Coffman Dep. 135; Ex. C, Def. Coffman Group Exhibit No. 3, AGO Bates Stamp No. 84.

85. On January 24, 2012, Defendant Coffman received a letter from Attorney Barbaro that was addressed to Director Hiram Grau and dated January 16, 2011. Ex. F, Def. Coffman Dep. 143-44; Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates Stamp No. 87.

86. Defendant Coffman did not read the psychological report attached to that letter. Ex. F, Def. Coffman Dep. 136.

87. Defendant Coffman did not interpret the Plaintiff's attorney's letter as a formal request for a hearing. Ex. F, Def. Coffman Dep. 140.

88. However, there was no notice provided to the Plaintiff or his attorney in that letter that he had to use the word "hearing" versus "reinstatement." Ex. F, Def. Coffman Dep. 141.

89. Additionally, the FOID Card Act statute that governs FOID Card reinstatements makes no distinctions between requests for a hearing or requests of reinstatement of a revokee's FOID Card. 430 ILCS 65/10(a).

90. The psychological report was probably placed in the Plaintiff's file since the Plaintiff supposedly did not request a hearing, but rather supposedly requested "reinstatement," which Defendant Coffman considered a request for a document review. Ex. F, Def. Coffman Dep. 136.

91. Other than getting a letter or some sort of approval from the police involved in the case, Plaintiff did everything that Defendant Coffman asked of him. Ex. F, Def. Coffman Dep. 140.

92. Defendant Coffman did not respond to any of Plaintiff's attorney's letters, despite receiving all of them. Ex. F, Def. Coffman Dep. 142.

93. Regardless of whether any of Attorney Barbaro's letters requested a "hearing," one might not have been provided anyway. Ex. F, Def. Coffman Dep. 142.

94. On January 24, 2012, a memorandum regarding the Plaintiff's "request for a hearing" was sent from Colonel Patrick E. Keen to the Firearms Services Bureau, Defendant Coffman's unit. Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates Stamp No. 87.

95. On March 11, 2012, in an email from Kathleen Wood of the Firearm Services Bureau, to Deanna Willner, with Mark Bayless and Linette Metzger copied, Kathleen Wood noted that the Plaintiff's "attorney requested a hearing last year, but did not receive a response." Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates Stamp No. 90, 91.

96. No one in the Firearm Services Bureau, including Defendant Coffman, completed a document review on the Plaintiff's case. Ex. F, Def. Coffman Dep. 136, 138.

97. In fact, Defendant Coffman denied having any knowledge of the Plaintiff's appeal. Ex. G, Def. Coffman Answer Pl. Interrog., Interrog. No. 10.

**Plaintiff's FOID Card Reinstated and Firearms Returned**

98. After getting no response from Defendant Coffman or the Firearm Services Bureau, on April 12, 2012, the Plaintiff initiated a lawsuit in the Circuit Court of Cook County in order have his FOID card privileges reinstated and weapons returned. Ex. H, Def. Coffman Dep. Group Ex. No. 2, 2-5.

99. On June 5, 2012, a letter was signed by Firearm Services Bureau Chief Jessica L. Trame[5] reinstating the Plaintiff's eligibility to retain a FOID card. Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates Stamp No. 98.

100. On June 6, 2012, this letter was faxed to Assistant State's Attorney Nichole Patton by Sergeant Mark Bayless. Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates Stamp No. 100-101.

101. The Plaintiff's firearms were returned on August 29, 2012. Ex. A, Pl. Affidavit ¶ 2.

/s/ Iveliz M. Orellano
One of Plaintiff's Attorneys.

Richard Dvorak
Iveliz Maria Orellano
DVORAK LAW OFFICES, LLC
18W140 Butterfield Road, 15th Floor
Oakbrook Terrace, IL 60181
(312) 593-7146
richard.dvorak@civilrightsdefenders.com

---

[5] Jessica L. Trame took over Defendant Coffman's position after his retirement.

## CERTIFICATE OF SERVICE

I, Iveliz Maria Orellano, an attorney, certify that on September 12, 2014, a copy of Plaintiff's Statement of Undisputed Material Facts, Local Rule 56.1(a)(3), was served upon the attorneys for defendant named below through the Court's electronic filing system.

| | |
|---|---|
| Sunil Shashikant Bhave | Thor Yukinobu Inouye |
| Assistant Attorney General | Assistant Attorney General |
| 100 West Randolph Street, 13th Floor | 100 West Randolph Street, 13th Floor |
| Chicago, IL 60601 | Chicago, IL 60601 |
| sbhave@atg.state.il.us | tinouye@atg.state.il.us |

/s/ Iveliz M. Orellano
One of Plaintiff's Attorneys.