**IN THE UNITED STATES DISTRICT COURT,**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DAVID RHEIN**, | ) | |
| | ) | No. 13 C 843 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Hon. Judge Gary Feinerman |
| | ) | |
| **LIEUTENANT JOHN COFFMAN**, | ) | Hon. Mag. Judge Young B. Kim |
| | ) | |
| Defendant. | ) | |

# **Exhibit F**

1

```
1           IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   KIM RHEIN and DAVID RHEIN,   )
                                 )
4                 Plaintiffs,    )
                                 )
5          vs.                   )  No. 13 CV 843
                                 )
6   AGENT PRYOR, Star Number     )
    4816, an Illinois State      )
7   Police Officer, in his       )
    individual capacity; AGENT   )
8   SUMMERS, Star Number 5706,   )
    an Illinois State Police     )
9   Officer, in his individual   )
    capacity; LIEUTENANT JOHN    )
10  COFFMAN, an Illinois State   )
    Police Officer, in his       )
11  individual capacity; HIRAM   )
    GRAU, Illinois State         )
12  Police Director, in his      )
    official capacity,           )
13                               )
                  Defendants.    )
14

15

16            The deposition of JOHN COFFMAN, taken

17  pursuant to the Federal Rules of Procedure, before

18  Timi M. Fulfs, Certified Shorthand Reporter No.

19  084-003517, at 18W140 Butterfield Road, 15th Floor,

20  Oakbrook Terrace, Illinois, on Friday, June 20,

21  2014, commencing at 1:41 p.m., pursuant to notice.

22

23
```

24

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

2

```
 1    APPEARANCES:

 2         LAW OFFICES OF RICHARD DVORAK, by
           MR. RICHARD J. DVORAK
 3         (18W140 Butterfield Road, 15th Floor
            Oakbrook Terrace, Illinois  60181-4835
 4          richard_dvorak@civilrightsdefenders.com)
              appeared on behalf of the plaintiffs;
 5
           OFFICE OF THE ATTORNEY GENERAL, STATE OF
 6         ILLINOIS, by
           MR. THOR Y. INOUYE
 7         (100 West Randolph Street, 13th Floor
            Chicago, Illinois  60601
 8          tinouye@atg.state.il.us)
              appeared on behalf of the defendants.
 9

10                *  *  *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21
```

22

23

24

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

3

1                           I N D E X

2
  Witness:                                    Page
3
        JOHN COFFMAN
4
            Examination by:
5
                Mr. Dvorak........................    4
6                Mr. Inouye.......................  154
                Mr. Dvorak.......................  156
7

8

9

10

11

12                          E X H I B I T S
13

14
    No.   Description                 Marked/Referenced
15
      1  430 ILCS 65/ Firearm Owners
16       Identification Card Act...............   23
      2  Correspondence.......................   43
17    3  Documents Bate Stamped 1 through 147..  53
      4  Defendant John Coffman's Answers to
18       Plaintiff's Interrogatories...........  153

19        (Exhibits attached/scanned.)

20

                          - - -

21

22

23

24

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

                                                4

1                    JOHN COFFMAN

2  called as a witness herein, having been first duly

3  sworn, was examined and testified as follows:

4                    EXAMINATION

5  BY MR. DVORAK:

6        Q.    Okay.  Sir, could you please state and

7  spell your name for the record?

8        A.    Retired Lieutenant John, J-o-h-n,

9  Coffman, C-o-f-f-m-a-n.

10        Q.    Okay.  Please let the record reflect

11  this is the deposition of Lieutenant John --

12  retired Lieutenant John Coffman.  It's being taken

13  pursuant to notice and pursuant to all the

14  applicable rules of Federal Civil Procedure.  The

15  witness has previously been sworn.

16                    Lieutenant -- do you still want to

17    be called Lieutenant or --

18        A.    John is fine.

19        Q.    I'll say Mr. Coffman, how about that?

20        A.    Either way.

21        Q.    All right.  So, Mr. Coffman, have you

22    ever had your deposition taken before?

23        A.    Yes.

24        Q.    Okay.  Ever as a defendant?

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586


5


1        A.    No.

2        Q.    Okay.  All right.  So just a few rules.

3    One is to make sure I finish my entire question

4    before you begin to answer so the court reporter

5    can get down both the question and the answer.

6                Make sure that any answers that you

7    have are audibles; they're not shakes of the head

8    or uh-huhs or anything like that.

9                If there's any time you want to take

10    a break, you can do so, or speak with your

11    attorney, you can do that.  I would just ask you

12    not do that while a question is pending.  And if

13    there's any misunderstanding or question about the

14   questions I ask you, feel free to ask me to

15   rephrase those questions, and I'll be happy to do

16   so.

17             With that understanding, would you

18   like to proceed with your deposition?

19        A.   Yes.

20        Q.   Okay.  Let's just very briefly get into

21   some background.  You are now retired; is that

22   correct?

23        A.   Yes.

24        Q.   Okay.  And you're living in Florida;

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

6

1   correct?

2        A.   Correct.

3        Q.   Okay.  All right.  How long have you

4   been retired?

5        A.   May 1st.

6        Q.   Of this year?

7        A.   That's correct.

8        Q.   Okay.  When did you first begin your

9   employment with the Illinois State Police?

10        A.   June 1994.

11        Q.   And you ended it on May 1st?

12      A.    That's correct.

13      Q.    Okay.  All right.  While employed, were

14  you ever the subject of any sort of discipline or

15  reprimand?

16      A.    No.

17      Q.    Do you have any other law enforcement

18  training besides your work at the Illinois State

19  Police?

20      A.    I've had training from other federal

21  agencies.

22      Q.    Well, let me start with this.  Had you

23  ever been employed by another law enforcement

24  agency other than the Illinois State Police?

1      A.    No.

2      Q.    Okay.  You said you received some

3  training from other federal agencies.  I'm assuming

4  that means while you worked for the ISP; correct?

5      A.    Yes.

6      Q.    What kind of training would that be?

7      A.    Training in firearms eligibility

8  through FBI.

9    Q.    Okay.

10    A.    Also ATF.

11    Q.    Did any of your training with the FBI

12 center around the subject of determining whether or

13 not to give firearms to someone or revoke the right

14 to own a firearm of someone who may be mentally ill

15 or dangerous?

16    A.    Yes.

17    Q.    Okay.  What kind of training would that

18 be?

19    A.    Standards.

20    Q.    What do you mean by standards?

21    A.    There's federal standards that the

22 government uses to forever prohibit individuals

23 that have been adjudicated as, and this is their

24 term, mental defective, criminally insane, or other

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586


8


1 adjudications.

2    Q.    Okay.  First of all, do you know what

3 the name of that standard or guideline is?

4    A.    Not offhand.

5    Q.    Okay.  Is it part of the Illinois State

6 Police documentation; in other words, could I get

7    it through the Illinois State Police?

8        A.    You might be able to.  It's a federal

9    statute so I believe it's in the compiled statutes.

10       Q.    Oh, it's an actual statute is what

11   you're talking about?

12       A.    Yes.

13       Q.    Do you remember, roughly, the name of

14   that statute?

15       A.    I don't offhand.

16       Q.    Okay.  And, again, the subject of this

17   statute is?

18       A.    There's a variety of factors that would

19   recognize a person's ability or inability to own or

20   possess firearms.  Some are based on criminal

21   convictions, criminal activity, others are based on

22   mental health.

23       Q.    And you're saying this federal statute

24   makes someone unable to legally purchase a firearm

9

1    regardless of the state; is that what you're

2    saying?

3        A.    Correct.

4     Q.    Okay.  Is there a general gun law

5  that's similar to the FOID Act in Illinois, but

6  federally?

7     A.    Just a real bit of brief history.

8  Before the FBI put together its NICS program, it's

9  N-i-c-s --

10     Q.    And what does that stand for?

11     A.    It's the -- I'm trying to think of the

12  actual name, but it has to do with an instant

13  background check system.  How the acronym fits in

14  there escapes me right now, but before that was in

15  existence, FOID was in existence.  And as I

16  understand, since 1968 FOID has been in place.

17              No other state has a program exactly

18  like a FOID, although other states use a permitting

19  process.  The Federal Government used a lot of what

20  FOID was to put in place its NICS program.

21     Q.    You say its NICS program.  You think

22  it's actually called NICS?

23     A.    NICS.  It's administered by the FBI,

24  that's correct.

1     Q.    And you don't remember what that

2   acronym stands for?

3        A.      National Instant Check System.

4        Q.      And do you know how long the NICS

5   system has been in place federally?

6        A.      About mid '80s.

7        Q.      Now, I keep hearing in the news that,

8   you know, they want to pass laws about background

9   checks.  Is that somehow -- I was under the

10  impression that they didn't have a federal system

11  for background checks; is that not correct?

12       A.      That's not correct.

13       Q.      Okay.

14       A.      Most states -- Illinois is one of about

15  12 states that are an exception, but most states go

16  directly through the Federal Government for their

17  background checks.

18       Q.      Okay.

19       A.      It's a dial up system with the Federal

20  Government.  Illinois differs from most of those

21  states in that it's a point of contact state.  And

22  as a point of contact state, both gun purchases

23  through federally licensed dealers and the

24  eligibility to simply own or possess is done

11

1    through the State of Illinois.

2         Q.    All right.  So I guess what I'm trying

3    to clarify is a statute that you are talking about

4    is different than the NICS program; is that

5    correct?

6         A.    The statute -- the federal statute is

7    included within NICS.  It can be found under the

8    statutes.

9         Q.    Okay.  And the statute we're talking

10   about -- okay.  First of all, does that center only

11   on deciding whether or not to give or allow a

12   person who may have a mental defect or be dangerous

13   a weapon, or does it also center around revoking

14   that privilege?

15        A.    Both.

16        Q.    Or right I should say.  Both.  Okay.

17   All right.  Okay.  And you say there's certain

18   standards that law enforcement should use in

19   determining whether or not to deny a permit or

20   revoke a permit; correct?

21        A.    Yes.  There's state statutes.

22        Q.    I'm not going to the state one right

23   now.  I'm just, first of all, talking about the

24   federal?

URLAUB BOWEN & ASSOCIATES, INC.

312.781.9586

12

1       A.      Federal statutes.

2       Q.      Okay.  And -- okay.  And you said you

3  received training on how to implement those

4  standards that are found in that federal statute;

5  is that correct?

6       A.      Yes.

7       Q.      Okay.

8       A.      Actually --

9       Q.      Go ahead.

10       A.      Probably as important, I arranged for

11  training for my staff, my bureau.

12       Q.      Okay.  And just on one occasion or

13  throughout your career?

14       A.      Twice.

15       Q.      And what years?

16       A.      Formal training.  I believe one was in

17  '07.

18       Q.      Okay.  And the other?

19       A.      And probably 2011.

20       Q.      Okay.  Now, you arranged this training,

21  but I'm assuming you also participated in the

22  training?

23       A.      Yes.

24      Q.    Okay.  Do you know when in 2011 you

                                              13

1  would have participated in that training?

2       A.    I don't offhand.

3       Q.    Okay.  Do you happen to know if it was

4  spring, summer, or fall?

5       A.    I'd be guessing.

6       Q.    All right.  And did that training in

7  '07 and 2011 differ in any way that you remember,

8  anything meaningful?

9       A.    No.

10      Q.    Okay.  In -- now, I'm assuming the FOID

11 Act and this federal statute are not identical as

12 it relates to the issue that we're here today

13 about, and that is denying someone the right to own

14 a gun based on a possible mental defect or

15 dangerousness; is that correct?

16      A.    Specifically, clear and present?

17      Q.    That's what I was going to ask you.

18 First of all, there are differences; correct?

19      A.    There are.

20      Q.    Okay.  And what are the differences

21  between the two?

22       A.    I don't believe the Federal Government

23  has a clear and present statute.

24       Q.    So what does that mean?

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

14

1        A.    I'm not clear what you're asking.

2        Q.    Okay.  I've read in the FOID Card Act

3   that the specific provision here deals about

4   whether or not a person is a clear and present

5   danger due to a mental defect, or whatever the

6   language is, and we can get into that later?

7        A.    Sure.

8        Q.    And you're saying that language does

9   not exist in the federal statute; correct?

10       A.    As far as I know, when I left it did

11  not exist.  Now, the Federal Government will defer

12  to a state if its language presents a restriction

13  that it does not have.

14       Q.    And I guess that's what I'm trying to

15  figure out.  So which is more restrictive toward

16  the gun owner; the Illinois statute or the federal

17  statute?

18       A.    I would say Illinois statute.

19      Q.      Okay.

20      A.      With one major exception.

21      Q.      Okay.  What is that?

22      A.      Once prohibited from owning a firearm

23   in Illinois for something like domestic violence,

24   you are forever prohibited federally in owning a

                                                    15

1   firearm.  So even if the State Court, Circuit Court

2   granted an exemption or granted that right back

3   restored that right, Federal Government would not

4   recognize it and while an individual might think

5   they have the ability to carry a gun in the State

6   of Illinois, the Federal Government would not

7   recognize that.

8        MR. DVORAK:  Off the record.

9                       (Discussion off the record.)

10   BY MR. DVORAK:

11       Q.      Back on the record.  Okay.  So -- all

12   right.  So -- and by the way, I think on -- I think

13   off the record we determined the Federal Statue

14   we're talking about is 18 U.S.C. 922.  Does that

15   sound right?

16      A.      Yes.

17      Q.      Okay.  So I'm still a little confused

18 because I understand that Illinois, they have the

19 clear and present danger portion in that statute,

20 and federally they don't.  Does that mean that the

21 federal statute does not allow for revoking

22 someone's gun privileges based on any kind of

23 mental defect at all, or what's the standard

24 Federally?

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

16

1       A.      Well, what would happen would be if

2 another state dialed up the Federal Government

3 eligibility folks, the NICS folks, and they were

4 aware that a person did currently have some other

5 prohibitor in a state like Illinois, they would

6 defer to that State's prohibitor as a reason to

7 deny a purchase.

8       Q.      All right.  I guess what I'm saying is

9 if Illinois had no clear and present danger

10 statute?

11      A.      Uh-huh.

12      Q.      Someone who already has the right to

13 own a gun could not have their gun rights taken

14  away or the right to own a gun under this statute,

15  this federal statute based on a mental defect?

16      MR. INOUYE:  Form.

17      THE WITNESS:  That's not correct.

18  BY MR. DVORAK:

19      Q.    Okay.  Explain.

20      A.    The Federal Government has a long list

21  of prohibitors that involve mental health status.

22  Most of those relate to adjudications.

23      Q.    I guess -- okay.  That's what I'm

24  trying to get into.  Okay.  So just so we're clear,

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

17

1  certainly the Federal Government in that statute

2  allows for taking away the right to own a weapon

3  for someone who has been adjudicated to be

4  dangerous or mentally defective; correct?

5      A.    Correct.

6      Q.    But what you're saying is they don't

7  have a statute for someone who has not been the

8  subject of some sort of adjudication to take away

9  the right to own a gun; is that correct?

10      A.    Well, regarding mental health.

11     Q.     Regarding mental health; correct?

12     A.     Correct.

13     Q.     Or dangerousness?

14     A.     There's other -- there's other

15  instances where a person's right to own a gun could

16  be prohibited and that could be in the case where

17  they renounce citizenship as would be sovereign

18  citizen, a member of a sovereign citizen group,

19  others who have been involved in some other kind of

20  terrorist or --

21     Q.     But would -- would that be -- those

22  would not be subject to adjudications, that would

23  be just evidence-based so to speak?

24     A.     Evidence -- some would be in a court

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586


18


1  finding.  Others would be simply the fact that

2  they've renounced citizenship.

3     Q.     And who makes that decision federally,

4  do you know?

5     A.     That would be a question for -- I don't

6  know.

7     Q.     Okay.  Did you receive any other sort

8  of training regarding making decisions whether or

9   not to revoke or deny gun permits relating to

10  someone who's dangerous or mentally defective other

11  than what we've talked about?

12      A.    When you say dangerous or mentally

13  defective, it's really two separate things.

14  Mentally defective, yes.

15      Q.    Okay.

16      A.    And that was when -- towards the end of

17  my tenure in Firearm Services Bureau, we reviewed

18  and made some changes to the FOID relief program or

19  process.

20      Q.    Okay.  And what sort of changes would

21  that be?

22      A.    There were changes in -- basically,

23  related to not trying to look at all cases as the

24  same, but rather looking at each individual case on

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

19

1   its own merits.

2              It required stricter language from a

3   clinical psychiatrist or psychologist indicating

4   that that person in his or her opinion was suitable

5   to own or possess firearms.

6    Q.    Okay.  Did these changes occur before

7  or after David Rhein's permit was revoked in this

8  case?

9    A.    They were in the process of being

10  changed prior.

11    Q.    Well, put it this way, jumping ahead,

12  you were the person who made the decision to revoke

13  David Rhein's permit; is that correct?

14    A.    I'm not sure it's quite as simple as

15  that, but ultimately, I signed the letter that was

16  sent.  There is a process by which his FOID card

17  was revoked.

18    Q.    Well, put it this way, you approved

19  that revocation; correct?

20    A.    I approved the revocation based on the

21  information presented by the zone agents and

22  through their chain of command.

23    Q.    Okay.  So I guess my question is when

24  you approved that revocation, were you operating

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

20

1  under the -- these changes that went into effect,

2  or had those not yet gone into effect?

3    A.    Those changes really didn't impact the

4    act of revocation.  They impacted the relief

5    process.  I was not aware that Mr. -- is it Rhein?

6         Q.    Rhein, yes.

7         A.    Had requested relief.

8         Q.    Ever, throughout this whole case?

9         A.    I saw an e-mail afterwards where I

10   found that he had gone to court to request it, but

11   I had not seen anything that I recall where he had

12   requested relief.

13        Q.    Okay.  Obviously, we'll have to get

14   into that a little later, but the -- I can show it

15   to you, but do you remember reviewing a letter that

16   you wrote to Mr. Rhein revoking the permit?

17        A.    I remember the letter, and I remember

18   the circumstances by which the decision was made,

19   and I remember for -- for the specific reason that

20   I found the allegations made by the zone agents to

21   be striking.

22        Q.    Okay.  But I guess what I'm getting to

23   on that letter is, you indicate in this letter

24   there were certain recommendations you would make

1    to someone, specifically Mr. Rhein, as to how to

2    get the permit back --

3         A.    Yes.

4         Q.    -- correct?

5         A.    And that's standard within the letter.

6         Q.    Okay.  So I guess my question is, those

7    recommendations, were those based on the old

8    standards or the new standards that we had

9    discussed earlier?

10        A.    They were probably based on the

11   existing standards, the older standards.

12        Q.    Okay.  And what you're saying is

13   actually the standards to get your firearm back

14   actually got more strict, is that what you're

15   saying?

16        A.    I think that there -- it was a more

17   formal process.  I don't know if you would consider

18   it more strict, but it would be more formal.

19        Q.    Okay.  Now, maybe I was not very clear

20   in my discovery requests here, but certainly one of

21   the things that you operate under in making these

22   decisions is the FOID card statute itself; correct?

23        A.    Yes.

24        Q.    Okay.  Are there any other -- and I

1   don't know what they call people in the State

2   Police.  In the City of Chicago Police Department,

3   they would call them general orders.  Do you have

4   that kind of terminology in the Illinois State

5   Police, general orders, directives, guidelines?

6          A.    Yes, we have a variety of extensive

7   directives and policies, but as far as they play

8   into this situation, no.

9          Q.    Okay.  First of all, what do you call

10  them directives, policies; what do you call them?

11         A.    Both.

12         Q.    Okay.  Are there -- are you aware of

13  any directives or policies in place with the

14  Illinois State Police in 2010, 2011 up to when you

15  left the office that deal with the issue of

16  revoking someone's permit based on a possible

17  mental illness or denying the ability to get that

18  permit back based on that same mental illness or

19  clear and present danger; are you aware of any

20  directives like that or policies?

21         A.    Directives, no.  Statute, yes.

22         MR. INOUYE:  And just so the record is clear,

23  by permit, you mean FOID card?

24         MR. DVORAK:  The FOID Card Act.

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

23

1        MR. INOUYE:  I mean, you keep on using the

2   word permit.

3   BY MR. DVORAK:

4        Q.    Oh, yeah.  When I say permit, I meant

5   the FOID card.  Did you have that same

6   understanding?

7        A.    I did.  I did.  And most states do

8   refer to their gun card as a permit.

9        MR. DVORAK:  Okay.  All right.  So let's

10  start with the statute itself then.  Okay.  Call

11  this Coffman Exhibit 1.

12                    (Coffman Exhibit No. 1 marked.)

13  BY MR. DVORAK:

14       Q.    All right.  The only question I'm going

15  to have right now is whether or not you believe

16  that the FOID Card Act, which is 430 ILCS 65 would

17  comprise the totality of statute provisions that

18  would have dealt with the issue here, meaning the

19  revocation or denial of someone's right to have a

20  FOID card based on their mental condition?

21       A.    Yes.

22       Q.    Okay.  Are you also saying this is also

23    referred to as a clear and present danger

24    revocation?

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

24

1        A.    Yes.

2        Q.    It's the same thing?

3        A.    Yes.

4        Q.    Okay.  All right.

5        A.    This specific case.

6        Q.    Yes.  Okay.  Okay.  All right.  And

7    really that's my primary concern here is the --

8        A.    Sure.

9        Q.    -- this case and the provisions under

10    which Mr. Rhein was revoked.  Okay.  And

11    specifically, the provision we're talking about as

12    the basis for revocation with regard to Mr. Rhein

13    was 430 ILCS 65/8; is that correct?

14        A.    /8, and it gets --

15        Q.    Subsection F as well?

16        A.    Yes.

17        Q.    All right.  But I guess what I'm asking

18    you is the reason I'm talking about the larger

19    statute itself is because I just want to make sure

20    there's no other statutes, state statutes that

21    you're aware of that dealt with the issue that

22    brings us here today?

23        A.    That's correct.

24        Q.    Okay.  All right.  And there's no other

1    directives or policies within the Illinois State

2    Police that you're aware of that dealt with this

3    issue here, the clear and present danger

4    revocation; correct?

5        A.    The only other policy -- well, would be

6    the process by which in this specific case, when a

7    perceived threat was made to a state rep, how the

8    division of operations, and, again, that's a

9    division that operates separately from the bureau I

10   operated, it's autonomous, how they prioritize and

11   report that threat.  And it's given the highest

12   priority.

13       Q.    Okay.  But are you saying there's any

14   sort of directives or policies that deal with that

15   issue within the Illinois State Police or the --

16       A.    There's a protocol.

17       Q.    There is a protocol?

18      A.      Right.

19      Q.      And that is an Illinois State Police

20 protocol?

21      A.      Yes.

22      Q.      Okay.  What is it called?

23      A.      I don't know offhand.  Again, it's

24 with -- it resides within a different division, but

26

1 it's how threats are processed, are handled.

2      Q.      And do you know if that protocol

3 existed at the time of the revocation of David

4 Rhein?

5      A.      I believe it did.

6      Q.      Okay.  Did you follow that protocol in

7 this case?

8      A.      That was not my protocol to follow.

9 That's the protocol for the division of operations,

10 those agents.  Those agents are not in my chain of

11 command.

12      Q.      Okay.

13      A.      So I don't know -- you know, to be

14 clear, I don't know what those agents did before,

15 how they became aware of this perceived threat,

16    this threat, how they handled the situation, you

17    know, once the revocation took place and what was

18    done afterwards.

19         Q.    Okay.  But you had mentioned earlier

20    about this sort of change of policy regarding what

21    it takes to actually get your card back once it's

22    revoked; right?

23         A.    The relief process.

24         Q.    The relief process; correct?


                    URLAUB BOWEN & ASSOCIATES, INC.
                              312.781.9586



                                                        27


1          A.    Yes.

2          Q.    So that's what I'm trying to be a

3     hundred percent clear about here.  Are there any

4     kind of protocols, directives, or policies in

5     existence within the Illinois State Police that

6     deal with that issue?

7          A.    Other than what -- the protocol that

8     the bureau operates under, I don't believe there

9     are.

10         Q.    Okay.  So I guess what you're talking

11    about, this is just sort of an oral way things are

12    done, it's not anything in writing?

13     A.    It's written, but I wouldn't call it a

14  directive or a policy.

15     Q.    What would you call it?

16     A.    Well, I hate -- I don't want to sound

17  like I'm mincing words, but for it to be recognized

18  as a formal policy, there's a long process by which

19  that language has to go through and be approved or

20  changed or denied.  That process did not occur.

21  There was an accepted bureau policy that outlined

22  the way the relief process should work.

23     Q.    Okay.  So -- and that's what I'm trying

24  to find out is what's the name of that policy?

1     A.    I would just call it the relief.  FOID

2  relief.

3     Q.    FOID relief policy?

4     A.    Yes.

5     Q.    Okay.  All right.  Okay.  And --

6     A.    Just to expand on that if I could.

7  Really, I think its purpose is to provide clear

8  pathway to ensure that all those seeking relief are

9  treated in a fair, consistent manner and not

10  arbitrary or capricious.

11              That is to say that what's required

12   of one person in similar circumstances would be

13   required of another person in similar circumstances

14   so that the relief process can, number one, begin

15   and, number two, be carried out.  The relief

16   process won't start out unless all of the required

17   documents have been received.

18        Q.    Okay.  Why don't we just get into your

19   first involvement in this case.  How did you first

20   get involved in this case?  And when I say this

21   case, I mean, the incident that -- the incident or

22   incidents that resulted in David Rhein filing a

23   lawsuit in this case, specifically, the revocation

24   of his FOID card and the denial thereafter?  How

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

29

1   did you first get involved in that?

2        A.    I'm not clear about the denial

3   thereafter, but I can talk about how I first became

4   aware.  And that's when the enforcement section

5   within the Bureau of the Firearm Services, that's

6   my bureau, received information from the zone --

7        Q.    I'm going to stop you right there.

8    What is the zone?

9        A.    The zone is what is -- is where the

10   special agents reside within the division of

11   operations.  Around the State, there's several

12   zones.  Their entire chain of command is something

13   that's very, very different and separate from me.

14       Q.    Now, in this case -- do you know who

15   Freddie Summers is?

16       A.    I've heard the name.

17       Q.    Okay.  Do you believe he would be a

18   person who would be in the zone?

19       A.    In -- yeah, his -- as a special agent,

20   he would be assigned to a zone.

21       Q.    Okay.  All right.  Anyway continue.

22       A.    So my first involvement with this would

23   be when the matter was brought to me by the two

24   people in my bureau, one is a code person that is a

30

1    non-sworn.

2        Q.    And who is that?

3        A.    Civilian.  Linette Metzger.  The second

4    would be master sergeant, sworn.  His name is Mike

5    Vorreyer.

6      Q.      How do you spell that?

7      A.      V-o-r-r-e-y-e-r.

8      Q.      Okay.  And you said a code person.

9  What does that mean?

10      A.      Non-sworn.  Not law enforcement, but

11  employed by the State Police.

12      Q.      What would be Ms. Metzger's general job

13  duties?

14      A.      She would be the contact for -- one of

15  her primary responsibilities would be the primary

16  contact for other law enforcement agencies if they

17  had business with my bureau.  That would include

18  folks in the zone.  There is a big distinction

19  between what my bureau did and what the zone does.

20      Q.      I'm going to stop you right there

21  because I forgot to get into -- what was your title

22  back in early 2011?

23      A.      Bureau chief.

24      Q.      And bureau chief of what division?

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

31

1      A.      Not of a division, but of the bureau,

2  and it's a Firearm Services Bureau or FSB for

3   short.

4        Q.    Were you the highest ranking supervisor

5   or member of that unit?

6        A.    Of the unit, yes.

7        Q.    Okay.

8        A.    Now, this unit resides in the division,

9   at the time, in the division of administration, a

10  separate division from the division of operations.

11       Q.    Okay.  First of all, who was your boss?

12       A.    I reported to Lieutenant Colonel Kim

13  Cochran.  And that's C-o-c-h-r-a-n.

14       Q.    And what was her job title?

15       A.    Lieutenant Colonel.

16       Q.    I'm sorry.  What was her general

17  duties?  What was --

18       A.    She was basically the next level up and

19  reported to the deputy director of the division.

20       Q.    Okay.  All right.  And about how many

21  steps would it be between her and Mr. Grau or

22  Director Grau?

23       A.    Three.  It would be her, the deputy

24  director, first deputy, and then the director.

1      Q.     Okay.  Okay.  And I take it your -- one

2  of your duties was to supervise other agents or

3  employees of the FSB; is that correct?

4      A.     In part.  The FSB employed no agents.

5  We were not out on the street.

6      Q.     First of all, are you a sworn officer?

7      A.     Yes, I'm a lieutenant -- or was a

8  lieutenant.

9      Q.     Were the people who worked in your unit

10  sworn officers?

11      A.     There were two.  That changed from time

12  to time as the number of people continually

13  decreased because I think at the time we had one,

14  and that would be Vorreyer.

15      Q.     Okay.  How many people were in your

16  unit in 2011, roughly?

17      A.     It would be a rough number because it

18  fluctuated, but mostly decreasing, and there would

19  be about 28 or 29.

20      Q.     Okay.  And you supervised all of them;

21  correct?

22      A.     Yes.  All but one, being code.  All but

23  one, being civilian.

24      Q.     Okay.  And was it necessary that you

1   approved every revocation of a FOID card?

2        A.    No.

3        Q.    Okay.  Were there others who could

4   approve that?

5        A.    Some were automatic.

6        Q.    Such as?

7        A.    You know, as far as existing FOID cards

8   go, the entire FOID database of 1.4 million cards

9   was run each night against another agency's

10  department of human service mental health database.

11  Anybody that's -- that spent a night in a mental

12  health facility would be flagged the next day, and

13  their card in 99 percent of the cases would be

14  revoked automatically.

15       Q.    Okay.

16       A.    Now, there were other criminal history

17  things that every hour that entire database is run

18  against eight or nine other databases, which

19  include federal databases so if a person went out

20  of state and committed a crime and that was

21  reported or indicted or adjudicated.

22       Q.    Okay.  I'm not sure if I'm using the

23  right term.  I guess how I would determine -- how I

24  would call this decision would be a discretionary

34

1  decision.  Does that seem to be the right word to

2  use in this case?

3       A.    I don't think so.

4       Q.    Okay.  Why not?

5       A.    Because I think that when you recognize

6  a situation that -- where assault of threatening

7  behavior against the public interest is clear,

8  there is no discretion.  We have to act.

9       Q.    Okay.  Then I guess what I'm saying is

10  decisions to revoke a permit based on clear and

11  present danger, that's not some sort of automatic

12  decision; correct?

13       A.    It's not automatic.

14       Q.    Okay.  Unlike some sort of

15  adjudication, like a criminal conviction or even

16  spending the night in a mental health facility will

17  automatically subject someone to revocation;

18  correct?

19       A.    That's correct.  A request for a clear

20  and present revocation is not something that would

21  automatically appear on one of the databases or be

22  flagged automatically for us.  It requires

23  intervention on behalf of another police agency,

24  another law enforcement agency, or the agents or

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

35

1  somebody else within our department on the other

2  side.

3        Q.    All right.  First of all, about how

4  many of these decisions to revoke someone's permit

5  based on clear and present danger have you

6  personally been involved in?  And when I say

7  involved in, any aspect whatsoever?

8        A.    It would average about 30 or 40 a year,

9  and I would have involvement in just about all of

10  them.

11       Q.    Okay.  So although I'll ask a little

12  more precise question than I did before, are you --

13  do you have to approve every clear and present

14  danger revocation?

15       A.    Yes.

16       Q.    Okay.  And what if you're on vacation,

17  do you still have to approve it?

18       A.    It would probably go to the next level

19  supervisor which would be Lieutenant Colonel

20  Cochran.

21      Q.    But as far as your memory is, that's

22  never happened or rarely happened where someone

23  else made that decision; correct?

24      A.    Rarely, if ever.

36

1      Q.    But these automatic revocations, you're

2  not necessarily involved in every one of those;

3  correct?

4      A.    I'm involved in very, very few of

5  those.  Those represent a far, far greater amount

6  of revocations.

7      Q.    Okay.  And about how many of those

8  occur each year?

9      A.    Several thousand.

10     Q.    Okay.  Have you ever not revoked

11  someone's card even though someone's requesting a

12  clear and present danger?

13     A.    Yes.

14     Q.    About how many times has that happened?

15     A.    As a percentage, I'd say it's fairly

16  small, maybe ten percent.

17     Q.    Okay.

18    A.    And, again, that's just an estimate.

19    Q.    And you said 30 or 40 a year so about

20  how many years were you involved in that -- in

21  those decisions?

22    A.    I was the bureau chief for five years.

23    Q.    All right.  Let's put aside this case

24  because I know there's some issue about whether or

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

37

1  not you believe that Mr. Rhein was attempting to

2  get his firearms back.  Have you ever been involved

3  in the process of granting or denying a clear and

4  present danger revocation once that person has

5  requested their FOID card back?

6    MR. INOUYE:  Form.

7  BY MR. DVORAK:

8    Q.    If you understand the question?

9    A.    I'm not sure I do.

10    Q.    Okay.  The questions I asked you were

11  about how often you were involved in the decision

12  to revoke someone's FOID card based on clear and

13  present danger; correct?

14    A.    Okay.

15     Q.    My next question is about how many --

16 put it this way, about what percentage of those

17 people, as far as you're aware of, actually

18 requested their FOID card back?

19     A.    That percentage, probably minimally

20 half, and it could range some percentage above

21 that.

22     Q.    And would you be the person -- would

23 you -- you would be involved in that process?

24     A.    In the relief process?

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586


38


1     Q.    Yes.

2     A.    Not very often.  I became more involved

3 later, but it was not something I was formally

4 involved in on the clear and present revocation.

5     Q.    Who would be involved in that process,

6 the relief process when you were there?

7     A.    Sharon Lawson would be one.  We've had

8 several people over the years.  As they retire, the

9 responsibility shifted.

10     Q.    Okay.

11     A.    There would be a Larry Bredwitch.

12 (Phonetic)  He's also retired, but assistant bureau

13    chief and then Candice Burns, a retired -- I

14    believe she's retired, assistant bureau chief.

15          Q.    Okay.  Was there any kind of protocol

16    or guidance as to who would be involved in these

17    decisions?

18          A.    There was.

19          Q.    Okay.  What kind of --

20          A.    It was a formally assigned task.

21          Q.    And who would assign that task?

22          A.    Generally, I would.

23          Q.    So in other words, just to be clear,

24    when you said that as far as the relief process,

1    you usually would not be involved that often, but

2    later on, you were involved more often.  First of

3    all, is that correct?

4          A.    Yes, and there's a reason for that.

5          Q.    Okay.  Why is that?

6          A.    There's several reasons.  Number one,

7    we were scrutinizing our own processes, and that's

8    everything within the bureau.  And the reason for

9    that, or one of the reasons for it was lack of

10    manpower.  So we wanted to make sure that our

11    highest priorities were being met.  And often that

12    meant reassigning people to different tasks.

13        Q.    Okay.

14        A.    I wanted to ensure that those familiar

15    with those tasks were performing those tasks.

16        Q.    When did you think you got more

17    involved; what year do you think?

18        A.    As time went on, probably beginning the

19    end of '08, all of '09, 2010, 2011.

20        Q.    So in 2011 and 2012, would it be fair

21    to say that you were pretty involved in the process

22    of -- the relief process?

23        A.    I was involved in the mental health

24    relief process.  That's the -- that's not clear and

                    URLAUB BOWEN & ASSOCIATES, INC.
                           312.781.9586


                                                            40


1    present.  That's a separate process.

2                  Those revoked under clear and

3    present were not -- did not go through the same

4    mental health relief as did those that were revoked

5    under the mental health that were flagged

6    automatically.

7        Q.    Okay.  What -- first of all, this

8   process that clear and present danger revocations

9   would go through, is that indicated anywhere in the

10  FOID statute?

11      A.    I'm not clear what you mean by they

12  would go through.  The relief process?

13      Q.    Yes.

14      A.    No.

15      Q.    Would you agree with me that the FOID

16  Card Act itself does not give any provisions for

17  relief, meaning how to get your FOID card back once

18  it's revoked based on a clear and present danger?

19      A.    I would not.  I think the same part of

20  the statute does indicate that those wishing to

21  contest are afforded the right to seek relief

22  through the director.

23      Q.    Okay.  Could you please point me to the

24  section you're talking about?  I'm assuming you're

1   talking 430 ILCS 65/10?

2       A.    10.

3       Q.    Okay.

4       A.    Now, what it doesn't do is outline the

5  specific process, but it does talk about the right

6  that's afforded anyone that wishes to petition.

7      Q.   Okay.  So would you agree with me that

8  Section 10 notifies a person who's been revoked

9  that they can apply for their card to be reinstated

10  to the director; correct?

11      A.   Correct.

12      Q.   Okay.  And I guess this would be all

13  revocations not just clear and present danger

14  revocations; correct?

15      A.   That's correct.

16      Q.   Okay.  Would you agree with me that the

17  statute, the FOID card statute, provides no other

18  guidance as to how a person can go about getting

19  their FOID card back other than requesting it of

20  the director?

21      A.   You're correct.  I don't believe that

22  the Act specifies that, but the letter that's sent

23  to the individual that's been revoked does outline

24  that process.

1      Q.   Okay.  And that's what I'm getting at.

2  Sort of before --

3     A.    Okay.

4     Q.    -- what is that letter based on?  What

5     sort of guidelines; what sort of orders; what sort

6     of directors; what sort of policy?

7     A.    Okay.  Well, the letter does a couple

8     of things.  It notifies the person that their card

9     has been revoked.  That's based on statute.

10    Q.    Okay.

11    A.    The fact that the person is afforded

12    the ability to seek relief through the department,

13    through the director, is also specified by statute.

14    I would agree that the letter doesn't go into

15    detail other than I believe it provides a contact

16    and phone number so if a person has questions or

17    wants to get the process started, they can either

18    contact via mail -- I know that when I was there, I

19    put in place a way to contact us via the web or

20    they can write us.

21    Q.    Okay.  But are you aware of the

22    existence though of any sort of written guidelines,

23    orders, policies, suggestions, anything in writing

24    that would guide employees with the Illinois State

1  Police as to how they can notify revokees of how to

2  get their FOID card back?

3       MR. INOUYE:  Form.

4  BY MR. DVORAK:

5       Q.    Do you understand my question?

6       A.    I think I do.

7       Q.    Okay.

8       A.    But let me restate it, and see if I

9  am -- I'm clear.

10      Q.    Sure.

11      A.    You're asking if there is a process, a

12 formal process by which employees can notify those

13 that have been revoked on how to get their card

14 back?

15      Q.    Not really.  Okay.  I guess what I'm

16 saying is, what -- when an employee with the

17 Illinois State Police, whether it's you or someone

18 else who works for you, writes this letter, what's

19 it based on?  Who decided this is the process that

20 goes through?

21            Let me -- actually, let me start off

22 a different way.  I will call this Group Exhibit 2.

23                 (Coffman Group Exhibit No. 2

24                  marked.)

44

1   BY MR. DVORAK:

2        Q.    I'm going to call this Group Exhibit 2,

3   but you see there's some numbers at the bottom

4   right.  They are just P1 through P22.  Do you see

5   that?

6        A.    Yes.

7        Q.    Okay.  We call those Bate stamps even

8   though they are actually written in in this case.

9   So let's refer to by Bate stamp number.  So as part

10  of Group 2, there's P1 Bate stamp.

11            Is this a true and accurate copy of

12  the letter that you wrote David Rhein on

13  February 3rd, 2011?

14       A.    It appears to be.

15       Q.    Okay.  Now, this letter -- is this

16  essentially the standard same letter that's sent to

17  every clear and present revokee?

18       A.    Yes.

19       Q.    Okay.  Other than the specifics of

20  their names, date of birth, identifying

21  information, is the contents of the letter the

22  exact same for every single revokee based on clear

23  and present danger revocation?

24       A.    I can't imagine a situation where it's

45

1    not.

2         Q.    Okay.  So who -- first of all, was it

3    you; were you the person who essentially drafted

4    this letter and said this is the letter we're going

5    to use?

6         A.    No.  The letter or something like it

7    has been in place for years prior to my arrival at

8    the bureau.  I can tell you that no letter of

9    public dissemination is approved for dissemination,

10   a form letter basically like this, without ISP

11   legal signing off on it.

12        Q.    Okay.  But -- so this letter was in

13   place before you began to be the bureau chief;

14   correct?

15        A.    Yes.  And there might be one change on

16   it -- there isn't -- it was something that I -- it

17   was more specific language regarding the letter

18   from a psychiatrist or registered clinical

19   psychologist, but that has not changed as of that

20   mailing.

21        Q.    In other words, this was based on the

22   new --

23       A.    No, this was based on the existing.

24       Q.    Okay.

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586


46


1        A.    I was -- it was my intent to make the

2   letter a little bit more specific regarding a

3   couple of those items.

4        Q.    All right.  And those changes that you

5   made, was that something that you recommended be

6   changed?

7        A.    Yeah, it -- just to aid, I think, in

8   understanding what is required.

9        Q.    So you would agree with me that you

10   have the authority as the bureau chief of this

11   section to change the form letter if you felt it

12   was deficient in any way; correct?

13       A.    No.  I could suggest changes, and

14   there's a process by which those changes would be

15   reviewed and then approved.  And that would go

16   through, ultimately, my chain of command and then

17   the legal office.

18       Q.    Let me rephrase.  You would agree with

19   me you have the power to suggest changes to this

20  standard form letter if you felt it was deficient

21  in any way?

22      A.    As did anybody working for me.

23      Q.    Okay.  And anyone working for you would

24  first go to you, and you would suggest to your

                    URLAUB BOWEN & ASSOCIATES, INC.
                           312.781.9586



                                                            47



1   higher-ups to make the changes; is that correct?

2       A.    Uh-huh.

3       Q.    Is that correct?

4       A.    Yes.

5       Q.    Is anyone above you, at least in the

6   time 2011, 2012 -- put it this way.  In 2011, 2012,

7   would you be the highest ranking person in Illinois

8   State Police that specifically dealt with the issue

9   of FOID revocations and the relief to get those

10  FOID cards back?

11      MR. INOUYE:  Form.

12      THE WITNESS:  The highest ranking person.

13  There are levels above me that would weigh in on

14  the process.  You mentioned two years there, and

15  there was a change in the process occurring that

16  dealt all the way up to the director's office.

17    BY MR. DVORAK:

18         Q.    Okay.  But you would agree with me that

19    you were the bureau chief of the unit that dealt

20    with FOID revocations and obtaining your card back

21    once it's revoked; correct?

22         A.    Yes.

23         Q.    Okay.  There was no other person above

24    you who specifically had that -- those sort of job

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

48

1    titles or job duties; correct?

2         A.    Duties, yes.  The legal office was

3    involved in the review of the relief process.

4         Q.    Sure.  I understand that.

5         A.    Okay.

6         Q.    Would you agree with me that the

7    director delegated to your unit the authority and

8    responsibility to handle revocations and relief?

9         A.    Yes, that relief -- yes, but -- the two

10   years that you mentioned, that process was

11   changing.  There were people outside my bureau,

12   legal -- lawyers with the department involved in

13   the process.

14         Q.    But they would just -- they would not

15 be persons in charge of the decisions whether or

16 not to revoke or grant relief; correct?

17      A.   Not the decision, but the

18 recommendation.  As I left -- to take this full

19 circle, as I left, that decision was being made in

20 the director's office.

21      Q.   When did that start to happen?

22      A.   As I left.  February -- I left in

23 February of '12.

24      Q.   Okay.

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

49

1      A.   Now, I'm not -- I'm talking about

2 relief.  I'm not talking about clear and present.

3 So clear and present still is handled differently.

4 Two and a half years now that I've been gone from

5 the bureau, I'm not sure what that process is, but

6 clear and present was handled differently, a

7 different process.

8      Q.   How was that process different?

9      A.   What was requested would hopefully be

10 received at once by the person petitioning.  And

11 once that's received, the process could begin.  It

12  wouldn't necessarily begin immediately once that's

13  received because we were backlogged in just about

14  every area within the bureau for the five years and

15  years before I got there because of a lack of

16  manpower.

17          And at the same time record requests

18  for services in every measurable category that we

19  operate.

20      Q.   Okay.  I guess that's what I'm trying

21  to clarify though is the clear and present relief,

22  that's the term I'm using for someone who's been

23  revoked based on the clear and present danger

24  statute provision, Subsection F, now requesting

1  relief to get their FOID card back?

2      A.   Yes.

3      Q.   Were you -- you were still the bureau

4  chief of that unit that handled clear and present

5  relief; correct?

6      A.   Yes.

7      Q.   Okay.  And that didn't -- did that

8  change at all in 2011, 2012?

9      A.   Again, I left -- it didn't change while

10    I was there.

11         Q.    That's what I mean.  Okay.

12         A.    Okay.

13         Q.    So I guess back to the earlier question

14    because maybe I wasn't being specific enough.  Is

15    there anyone above you, back in 2011 or 2012 before

16    you left, that had duties related to clear and

17    present relief in making those decisions other

18    than -- that were outside your unit?  Do you

19    understand the question?

20         A.    Yes.

21         Q.    Okay.

22         A.    And there would be occasion for those

23    people to weigh in.  As a standard practice before

24    relief would be granted, we would contact the

1    requestor, which could be the police chief of

2    another agency, it could be -- as would be the case

3    in this instance, all the way up the chain on the

4    division of operations side of the ISP, the DOO

5    side of ISP.

6              So before -- before reinstatement

7   could occur, those folks would be notified and

8   given an opportunity to weigh in in case there was

9   information that they had that wanted -- and wanted

10  to be considered.

11      Q.   Okay.  But you would agree with me that

12  still it was your unit, and you were the chief of

13  the unit, that actually made the decision regarding

14  relief; correct?

15      A.   Again, in most instances.  Now, this

16  request came through our zone, zone agents.  So the

17  zone would be notified and because it involved the

18  State Rep --

19      Q.   Well, I want to stop you.  I understand

20  there's other people who may have input on the

21  decision, but ultimately the decision was made by

22  your unit; correct?

23      A.   No, not in the case where it went up

24  through the director's office.  I would not act

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

52

1   without approval from either ISP legal, which is in

2   the director's office, or somebody else on the DOO

3   side weighing in.

4       Q.   Okay.  But would you agree with me that

5   it would be your bureau that would actually make

6   the decision and that the director's office or

7   legal would review that decision?

8       A.    No.  It would be almost the opposite.

9       Q.    Would you make a recommendation to the

10  directors?

11      A.    I could make recommendation.

12      Q.    And would you normally make

13  recommendations in the clear and present danger

14  cases that came through the zone?

15      A.    I could.

16      Q.    Did you normally do that?

17      A.    Not every -- not in every instance.

18      Q.    Okay.  Okay.

19      A.    Some didn't rise to that level.  And

20  I'm not trying to be coy, but again, every

21  situation is different.  In this case, it involved

22  a state rep so had this -- had this come through --

23  this request come through our office, I believe I

24  would have been involved in reviewing it.

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

53

1       Q.    Okay.  Let's move on and back to the

2  original question I had a long time was, so how did

3  you first get involved in this case again?

4       A.    Okay.  The zone agents had gone through

5  their chain of command, forwarded a request to deny

6  Rhein on clear and present based on threats he had

7  made to a state representative's office.

8       Q.    Okay.  And how did you know that

9  information; how did that come to you?

10      A.    It came to me through the two

11 employees, Linette Metzger, Master Sergeant

12 Vorreyer, who showed me and explained to me the

13 situation.  It had also come to me through the

14 director's office.

15      Q.    And what do you mean by that?

16      A.    There was a question from the deputy

17 director asking if I was aware of the situation and

18 if it had been handled, and I indicated that I did.

19      MR. DVORAK:  All right.  What was the next --

20 or I'm going to actually -- we'll make this Group

21 Exhibit 3.

22                  (Coffman Group Exhibit No. 3

23                   marked.)

24

1  BY MR. DVORAK:

2      Q.    Okay.  First of all, if you know by

3  Bate stamp number any sort of documentation that

4  would have reflected how you were notified, please

5  identify that.  And if there isn't, that's fine.

6      A.    Well, again, not knowing -- I see --

7  not knowing if this specific copy of this e-mail

8  was forwarded to me, I do remember I'm ready to

9  start shooting people comment.  And I see

10  Vorreyer's and Metzger's, it was sent to them, so

11  it might have been part of what was presented to me

12  in summary.  And I can -- I can go through all of

13  these.  I'm pretty sure that I would have seen most

14  of these e-mails at some point --

15      Q.    Okay.

16      A.    -- prior to making that decision.

17      Q.    Well, let's start with one thing.  Do

18  you see your name either directly on any of these

19  documents or CCd?

20      A.    On --

21      Q.    And I guess what I'm talking about is

22  Bate stamped 1 through 21.

23      A.    No.  I haven't gone through all of

24  them, but I haven't seen it in the first two.

55

1     Q.    Okay.  Did you review any documents

2  prior to testifying today in preparation of your

3  testimony?

4     A.    Other than notes I've made when this

5  first came to my attention, no.

6     Q.    Okay.  You didn't review your own

7  letter that you wrote or no?

8     A.    I don't have a copy of that.

9     Q.    Okay.  All right.  So who was the

10  person apprising you of the situation; was there a

11  point person; was this a group meeting, what?

12     MR. INOUYE:  I'm going to object to form

13  because when you say this situation, which --

14  BY MR. DVORAK:

15     Q.    The recommendation to revoke David

16  Rhein's FOID card?

17     A.    At minimum, it would be Master Sergeant

18  Vorreyer.  Linette Metzger reports to him.

19  Generally, both wouldn't be present in my office at

20  the same time.  There could be additional people,

21  and I do remember conversations with others because

22  this issue had risen as high as it did within the

23  department.  This is, again, prior to the

24  revocation ensuring that or at the time of the

56

1  revocation ensuring action had been taken.

2       Q.    Now, do you -- and by reference I'll

3  point you to Bate stamp 22, which indicates the

4  letter revoking Rhein was written by you on

5  February 3rd, 2011.  Do you see that, Bate stamp

6  22?

7       A.    Yes.

8       Q.    Okay.  Referencing this date, do you

9  know how many days before or what date it was that

10  you would have first been alerted to this situation

11  regarding Mr. Rhein?

12       A.    If this revocation was handled like

13  just about any other clear and present revocation,

14  it would have been the same date.

15       Q.    Okay.

16       A.    This is one of the highest priority

17  things that we do in the bureau aside from the

18  other statutory obligations that we have.

19       Q.    Okay.  All right.  And do you know if

20  you reviewed any documents in -- strike that.

21             I'm just going to kind of, first of

22  all, cut ahead.  Who actually made the decision to

23  revoke David Rhein's FOID card?

24       A.    I did.

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

57

1        Q.    Okay.  And do you remember if you had

2   any sort of documents that you accessed in making

3   this decision?

4        A.    Yes.

5        Q.    Okay.  What documents would those be?

6        A.    It would have been a group of summary

7   or a group of documents received by the zone.

8        Q.    Can you -- I mean, can you identify by

9   Bate stamp any documents that you would have had

10  in -- before you made that decision?

11       A.    I probably would have seen number two.

12       Q.    And of the whole bunch, you can see two

13  through rather than, you know, going individually.

14       A.    Well, I can't say -- you know, without

15  reading them all, I can't say that I received them

16  all.  I can say that the one initially, number two,

17  where it indicates he's ready to start shooting

18  people, quote, unquote.

19    Q.    Was that -- let me ask you that.  That

20    quote, was that a significant factor in you

21    deciding that he was a clear and present danger?

22    A.    Very significant.

23    Q.    Okay.  Did you do any investigation

24    into learning when he made that statement?

1    A.    That's not what we do.  We don't

2    investigate that.  That's what the zone does.

3    Q.    Let me ask you this.  If you learned

4    that the statement that Mr. Rhein made, I am ready

5    to start shooting people, occurred 20 years

6    earlier, would you still have revoked his card?

7    A.    That wouldn't be present.

8    Q.    Okay.  And what point does it not

9    become present?

10    A.    We getting into, I guess, a reasonable

11    person threshold.

12    Q.    All right.

13    A.    And that's what makes what we do in

14    revoking these cards so important, especially given

15    the circumstances that we see today on a daily

16    basis.  A lot of indicators, especially after the

17  fact, seem to be uncovered, and why wasn't

18  something done immediately.  This is certainly, in

19  my opinion, and I would say most reasonable

20  people's opinion a red flag, I'm ready to start

21  shooting people.  And this is presented by the

22  Illinois State Police, division of operations.

23  It's apparently gone up through the chain of

24  command and back, you know, over to me.  At least

59

1  that information has, and it looks like on 2-2,

2  it's gone up to Terry Lemming who was a Lieutenant

3  Colonel on the operations side.

4       Q.    Okay.  Well, let me -- I'm going to

5  direct your attention to Bate stamps 3 -- or 2, 3,

6  and 4.  Do you believe you would have had these

7  documents along with the attachments in making your

8  decision?

9       A.    I can't speak to the attachments.  I

10  believe that these, if they were forwarded, and

11  looks like they were, to Vorreyer and Metzger that

12  they would have been discussed.  And on 4, it goes

13  into further detail.  Threats go into further

14    detail, and all of that would have been considered

15    in making that clear and present revocation.

16         Q.    Okay.  I'm going to direct your

17    attention on Bate stamp No. 4.  Do you see where

18    that indicates on March 22nd, 2010, he, meaning

19    David Rhein, said, quote, unquote, I am ready to

20    start shooting people.  Do you see that?

21         A.    Yes.

22         Q.    Okay.  And you realize that the date

23    that you are -- that you revoked him was

24    February 3rd, 2011; correct?

1         A.    Yes, but I'm not using it, as I just

2    mentioned, I'm not using that comment alone.  I'm

3    looking at the totality of the circumstances.  I'm

4    aware also, I believe, that he had attempted to

5    purchase another gun.  I learned that through the

6    F-TIP system, but he's made comments more recent

7    than that, and I think this was brought to our

8    attention because of the complaint directly from

9    the State Rep's office.

10        Q.    Okay.

11        A.    So as part of the workup, seeing a

12  statement, I'm ready to start shooting people in

13  addition to some of the other things, that clearly

14  would have an impact on our decision to revoke.

15      Q.    Okay.  Well, first of all, you earlier

16  indicated that the statement I am ready to start

17  shooting people is a very significant statement as

18  part of your decision; correct?

19      A.    That's correct.

20      Q.    Would you agree with me that, you know,

21  the fact that it was more than a year old would

22  affect the clear and presentness of that statement?

23      A.    It would effect the present.  It

24  wouldn't make the statement less important in the

61

1  totality of these circumstances.

2      Q.    But you have to just make the decision

3  whether or not Mr. Rhein was a clear and present

4  danger; correct?

5      A.    That's correct.

6      Q.    All right.  Anyway, so take me then

7  through the process of what you did to actually

8  revoke Mr. Rhein's card?

9      A.    Okay.  In addition to that statement,

10  we looked at the other circumstances surrounding

11  this issue.

12      Q.    And what would those be?

13      A.    Any contacts he's had with the State

14  Rep's office, any comments he's made about the

15  State Rep or about his activities planned, you

16  know, combination of other -- any other information

17  that would be developed by the zone.  It's the

18  zone's request to have him have his FOID card

19  revoked.  At the time that they made the

20  revocation, clearly, they thought he was a threat

21  as did, I believe, the representative through his

22  secretary.

23      Q.    All right.

24      A.    So all of those -- all of those

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

62

1  issues --

2      Q.    All right.

3      A.    -- taken together.

4      Q.    All right.  So other than the

5  statement, I'm ready to start shooting people, are

6  there any other statements that you can point to

7    that you considered at the time of the revocation

8    that would have indicated that Mr. Rhein was a

9    clear and present danger?

10        A.    Yes.  He considered himself, I think, a

11   sacrificial lamb at some point.

12        Q.    Okay.

13        A.    In fact, several times.

14        Q.    Well, let me ask you this.  Did you

15   ever do any kind of investigation to determine the

16   context of him saying that?

17        A.    Again, my bureau does not do the

18   investigation.  The zone agents do all the

19   investigation.  That's the distinction.  There's a

20   delineation between the administrative function

21   over FOID and the operational function that the

22   zone agents have.  They do all the investigation.

23   It's vetted up through the chain of command, and

24   then it's forwarded to us as a request.

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

63

1        Q.    Now, let me ask you this.  If you have

2    any questions about what occurred in this case, are

3    you able to ask the investigators to get you

4  information that would clarify the situation?

5      A.    Yes.

6      Q.    Okay.  So, for example, if something is

7  unclear, you could have the investigator do an --

8  more investigation to find out the context of that

9  statement; correct?

10      A.    If in the totality of these

11  circumstances given this request I felt that that

12  was needed, I could do that, yes.

13      Q.    But you did not feel it was needed in

14  this case?

15      A.    That's correct.

16      Q.    Okay.  But you do agree with me that

17  you had the power to ask the investigators to

18  clarify certain matters to you; correct?

19      A.    Yes.

20      Q.    Okay.  And I would assume that you

21  would also have the power to ask investigators to

22  speak with Mr. Rhein; correct?

23      A.    I might have the power to ask them to

24  do that.  I don't have the authority necessarily to

1  ask them to do that, and I think it's also bad

2  judgment when we're talking about something -- you

3  know, threats in this context, taking more time to

4  get information that they've put together and -- in

5  their request.  Things can happen very, very

6  quickly and --

7          Q.    Let me ask you this.  Have you ever --

8  put it this way.  As a matter of policy, do people

9  within your unit not attempt to interview the clear

10 and present danger potential revokees prior to

11 revocation?

12         MR. INOUYE:  Form.

13 BY MR. DVORAK:

14         Q.    If you understand the question?

15         A.    Kind of a double negative in there.

16         Q.    If you want me to rephrase it, I will.

17         A.    Okay.

18         Q.    Is it a matter of policy to not

19 interview these potential revokees?

20         A.    Yes.

21         Q.    In clear and present danger cases;

22 correct?

23         A.    Yes.

24         Q.    Okay.  And why is that?

1      A.     Training.   The zone agents are trained

2  to do that.   Most of the people working for me are

3  code or civilian, and they are not trained.   They

4  are also, you know, not being sworn, they are

5  putting themselves at risk by contacting -- that

6  potential risk by contacting a person, and the zone

7  agents might have other operational interests in

8  not having that person contacted at that time for

9  whatever reason, again, beyond my scope.

10      Q.     Okay.   Are you saying you lack the

11  authority to make such a request of the sworn

12  officers?

13      A.     I can make a request, but it would have

14  to be -- there would have to be an unusual

15  circumstance whereby, for instance, it did not meet

16  what we would consider clear and present.

17      Q.     All right.   All right.   I see that

18  according to this e-mail Ms. Fanning, the district

19  manager for State Representative DeLuca gave

20  information to Illinois State Police specifically

21  STICK; correct, on February 1st, 2011?

22      A.     I don't know who she gave that

23  information to.   If it was -- I don't know who that

24  information went to.

312.781.9586

66

1    Q.    Okay.  Well, put it this way, in making

2  your decisions, do you consider when the last

3  threatening statement was made?

4    A.    Yes.

5    Q.    Okay.  And in this case, at least

6  according to this documentation, when was the last

7  threat that was made or last in time; when did that

8  occur?

9    A.    I see something in this documentation

10  that he refers to himself several times as

11  sacrificial lamb.

12    Q.    Okay.  And that supposedly occurred on

13  January 25th, 2011; correct?

14    A.    I can't glean that from this.  It's --

15  one sentence says on January 25th, 2011, Mr. Rhein

16  told Donna Fanning, he'd call the governor and

17  threaten to kick his ass if he sees him up here

18  again, period.

19         The next sentence he also referred

20  to himself several times as sacrificial lamb so it

21  mentions some contact or involvement with sovereign

22  citizens --

23    Q.    Okay.

24        A.    And sovereign citizen ideology.

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

67

1        Q.    Let me ask you this about that

2  sovereign citizen ideology.

3        A.    Uh-huh.

4        Q.    What evidence did you have that

5  Mr. Rhein was involved or subscribed to the

6  sovereign citizen ideology?

7        A.    The summary that we're looking at on

8  your Page 3.

9        Q.    Okay.  And this summary is from whom?

10        A.    The State Terrorism Intelligence Center

11  analyst Tim Harney.

12        Q.    Okay.  And does any of this

13  documentation indicate where he got that

14  information?

15        A.    Says in communications -- numerous

16  contacts with Representative DeLuca's office over

17  the past year through visits to the office,

18  correspondence dropped off at the office, and

19  telephone calls.  In Mr. Rhein's communications, he

20  expresses views similar to those expressed by

21 individuals subscribing to sovereign citizen

22 ideology.

23      Q.    Okay.  So according to this e-mail,

24 this sovereign citizen ideology subscription would

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

68

1 have been in Mr. Rhein's communications; correct?

2      MR. INOUYE:  Form.

3      THE WITNESS:  It appears that way.

4 BY MR. DVORAK:

5      Q.    Okay.  Did you ever attempt to look at

6 Mr. Rhein's communications?

7      A.    I look at the summary that's presented

8 to me.  I don't investigate or reinvestigate what's

9 done by -- that's why we have the other divisions,

10 the other offices.  I look at the totality of

11 information that's provided, and then based on that

12 I form my opinion.

13      Q.    Okay.  Well, in forming your opinion,

14 wouldn't you want to see what -- those

15 communications for yourself?

16      A.    I see the summary of those

17 communications.

18      Q.    Let me ask you --

19    A.    Clear and present.

20    Q.    I'm sorry.

21    A.    Yeah.  There's a reason -- there's a

22  reason that I don't go and reinvestigate or review

23  all of that documentation.  The nature of clear and

24  present, by it's very name, implies that there is

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

69

1  an issue, an important, high priority issue pending

2  if not acted on, something bad could happen.

3    Q.    Do you know if those communications

4  were available to you?

5    A.    Actually, I don't know if the specific

6  communications would be available to me.

7    Q.    Okay.  So as far as you know, you never

8  had the written communications of David Rhein at

9  your disposal when you made the decision to revoke

10  his FOID card; correct?

11    A.    Other than what's been quoted.

12    Q.    Okay.

13    A.    I'm ready to start shooting people,

14  kick his ass, apparently called the governor and

15  threatened to kick his ass if he sees him up here

16   again.  The reference to himself as, quote,

17   unquote, sacrificial lamb.

18        Q.    Okay.  And you knew that there was

19   correspondence dropped off at the office; correct?

20        A.    At which office?

21        Q.    DeLuca's office; correct?

22        A.    It appears that way, yes.

23        Q.    Okay.  And you also knew that she

24   actually provided documents to the Illinois State

70

1   Police, and that's on Bates Stamp 4; correct?

2        A.    I don't know what documents were

3   provided to the State Police.  If they were

4   provided to the zone, that is a division which

5   operates separately from mine.

6        Q.    Okay.  Well, I'm just asking right now

7   what information you had.  You had this e-mail;

8   correct?

9        A.    Again, I probably saw this e-mail in

10   conjunction with -- there were -- there may have

11   been others, and there were, I'm sure, verbal

12   summary and a summary as to why we took the action

13   we did by my people.

14     Q.    Okay.  But how long -- it would not

15 have taken you any amount of time, significant

16 amount of time to actually just read the documents

17 that Mr. Rhein submitted; correct?

18     MR. INOUYE:  Form.

19 BY MR. DVORAK:

20     Q.    Is that fair to say?

21     A.    I would disagree with that.

22     Q.    Okay.  Why?

23     A.    Because I don't know what amount of

24 time would be required to obtain -- you know, to

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

71

1 request, obtain, and review those documents in a

2 clear and present situation when a summary of those

3 documents has already been provided.

4          If -- if Mr. Rhein was a person that

5 would act on his comments and did, just

6 hypothetically, it would now be, Lieutenant

7 Coffman, liability rests with you for not taking

8 action appropriately.  So that's kind of the other

9 side to this.  Why would you re-request and

10 reinvestigate something that's already been done by

11   the zone, by the agents and run up that chain of

12   command when you, just a lieutenant, was provided

13   that summary.

14       Q.    Okay.  But this summary that says his

15   communications express views similar to those

16   expressed by individuals subscribing to sovereign

17   citizen ideology, there's absolutely no foundation

18   for that statement whatsoever; correct?

19       A.    That's -- I don't know.

20       MR. INOUYE:  Form.

21  BY MR. DVORAK:

22       Q.    You don't know if there's any evidence

23   to back that up; correct?

24       A.    No, I don't know if there's -- if the

1   CIA, the analyst is claiming that there is, I don't

2   know that there isn't.

3       Q.    Okay.

4       A.    That's what the relief process would be

5   for.

6       Q.    Okay.  But you could also find out for

7   yourself before you revoke someone's license if

8   that is true or not; correct?

9      A.      Again, I'd be acting out of the scope

10  of my responsibilities in an administrative

11  function over the FOID card to reinvestigate what

12  was already done at the request of the zone by the

13  CIA analyst at STICK.

14      Q.      I'm not asking you to reinvestigate.

15  I'm asking you as a decision-maker, wouldn't you

16  want to be able to clarify or find evidence that

17  supports these assertions?

18      A.      As a decision-maker, I rely on that

19  summary, all that information that's gathered by

20  the zone prior to it arriving at my office in a

21  different division.  Those zone investigators are

22  trained to look for that information and are

23  considered to be among the best in the State, if

24  not the country, when it comes to this kind of

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586


73


1  investigation.

2                So I rely on that summary and look

3  at the totality of the circumstances.  Given the

4  nature of a clear and present request, it's not for

5  me to spend more time re-looking or reinvestigating

6   what's already been done.

7        Q.    Okay.  Did you know in 2011,

8   specifically February 2011, what the sovereign

9   citizen ideology was?

10       A.    I'm aware of it.

11       Q.    Were you aware of it in 2011?

12       A.    As often a safety issue, very aware of

13  it.

14       Q.    Okay.  And what was the sovereign

15  citizen ideology?

16       A.    It's basically a renouncement of

17  certain forms of government in the United States

18  recognizing, primarily the county, as a seat of

19  government, not the state or federal.

20                 There's been several very high

21  profile instances, where law enforcement officers

22  were shot and killed along with other folks in

23  official governmental capacities over the last few

24  years.

1                 The amount of violence that's

2   occurred in these kinds of incidents has also

3   grown, I would say exponentially compared to the

4   last decade.  There is a movement by some in

5   certain parts of Illinois and in other parts of the

6   country to really grow the sovereign --

7       Q.    Let me ask you this.  Were you aware in

8   2011 of any groups that subscribed to sovereign

9   citizen ideology in Illinois?

10      A.    Sovereign Citizens.

11      Q.    It's called Sovereign Citizens?

12      A.    Yes.

13      Q.    Okay.  And it was based in Illinois in

14  2011?

15      A.    It's based in every state in the

16  country.

17      Q.    And you're aware there were actually

18  groups in Illinois that subscribe to that ideology?

19      A.    Absolutely.

20      Q.    Okay.  And you're saying the ideology

21  centered around the renouncements of the county

22  government?

23      A.    No.  Recognizing the county as the form

24  of -- the recognizable form of government.  The

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

75

1  other forms of government, federal and state, are

2  not considered governmental agencies.

3          Often when those in law enforcement

4  from those agencies confronts, even on a traffic

5  stop, a sovereign citizen -- that sovereign citizen

6  will go through a certain protocol that they have

7  in not cooperating the request for documentation.

8      Q.   So a person who, for example, doesn't

9  believe the county has any legal authority to tax

10 and criticizes local government for not following

11 the federal constitution, that person would not be

12 a member of the sovereign citizens; correct?

13     MR. INOUYE:  Form.

14 BY MR. DVORAK:

15     Q.   That's completely the opposite of the

16 sovereign citizen ideology, isn't it?

17     A.   I'm sure folks express a lot of

18 different political views, the ideology of

19 sovereign citizen is a very distinct ideology.

20     Q.   And it's distinct because it recognizes

21 the county government as legitimate and state and

22 Federal Government as illegitimate; correct?

23     A.   I believe that's -- I believe that's

24 how it was.

1      Q.    So someone who actually believes that

2 the State and Federal Governments are legitimate,

3 but that the county's powers are illegitimate, this

4 would be the very opposite of the sovereign

5 ideology; correct?

6      A.    It could be.

7      Q.    Okay.  And -- all right.  Would you

8 revoke someone's FOID card because they threatened

9 to kick someone's ass?

10     A.    It would depend on the circumstances,

11 but that comment taken on its own would probably

12 not rise to that threshold.

13     Q.    Okay.

14     A.    If the person had a criminal history of

15 assaultive behavior or something like that, that

16 could be considered, you know, in context, but --

17     Q.    Did you do any kind of criminal history

18 check on David Rhein prior to revoking his FOID

19 card?

20     A.    One was done, and I read the results of

21 that.

22     Q.    And he had no criminal history

23 whatsoever?

24     A.    That's correct.

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

77

1       Q.    Okay.  All right.  All right.  This

2   summary that I see, the only possible threats that

3   I see, and tell me if you disagree with me, are the

4   comment of I'm ready to start shooting people.  You

5   would perceive that as a threat; correct?

6       A.    Yes.

7       Q.    Okay.  The comment about that he was

8   going to kick his ass if he sees him up here again.

9   Did you take that as a threat or no?

10      A.    Yes.

11      Q.    Okay.  Referring to himself as a

12  sacri -- well, I think that's a typo, but a

13  sacrificial lamb; correct?

14      A.    Correct.

15      Q.    Now, is that a threat, or is that just

16  a strange statement?  How would you characterize

17  it?

18      A.    I would say in context with everything

19  else, it's -- it's a very serious statement.

20      Q.    And by the way, according to summary,

21  the phrase sacrificed lamb or sacrificial lamb

22  doesn't relate specifically to any event or

23   violence; correct?

24        A.    Well, when I hear a comment like

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

78

1   sacrificial lamb, and I am -- and I am the

2   sacrificial lamb, he's made that comment several

3   times, it sounds like a person who has some kind of

4   plan.

5                I don't know Mr. Rhein.  I know what

6   is provided to me by the zone and by the

7   investigators and their chain of command.

8   Mr. Rhein might be a great guy, but based on what I

9   see here, I have to work in a very objective,

10  timely manner to fulfill my public safety

11  responsibilities and obligations so --

12       Q.    Let me ask you this.  Do you balance

13  that public safety with the person's second

14  amendment right at all?

15       A.    Actually, a very good question.  I

16  don't know if it's a topic here.  I am a pro gun

17  person.  In my official capacity, I remained very

18  apolitical and had to do so because, as you can

19  imagine, I would debate things like the second

20  amendment with folks that just wanted to call and

21 debate it.  And while I didn't really have time to

22 do it, I did it and --

23     Q.    Let me ask you this.  Is there any part

24 of your investigation that involved getting the

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586


79


1 side of David Rhein prior to you revoking David

2 Rhein's FOID card?

3     A.    I have -- I have no way to go out and

4 reinvestigate Mr. Rhein's side of this.  That's

5 what the relief process is for.

6     Q.    Well, let me ask you this.  Are you

7 saying you have no authority to ask an investigator

8 just to simply speak with Mr. Rhein?

9     A.    Again, I think I've answered it, and I

10 hope I did.  I have the authority to ask, but I'd

11 have to have a very, very good reason to delay

12 taking action when, in my opinion, and in the

13 apparent opinion of the chain, the entire chain of

14 command on division of operations, Mr. Rhein

15 presented a threat, a clear and present threat.

16 Taking -- I'm sorry.

17     Q.    Go ahead.

18      A.      Taking more time to do this, I think,

19  would not be a prudent, reasonable strategy for a

20  person in my position to take.

21      Q.      Well, you would agree with me that the

22  last comment that Mr. Rhein made in relation to any

23  of this -- these things was January 25th, 2011,

24  which was about -- over a week earlier; correct?

80

1      A.      Which comment would you be referring

2  to?

3      Q.      Well, the last comment in time, the

4  January 25th, 2011, the kick your ass and

5  sacrificed lamb comments.  I mean, that's the

6  last -- that's the last date in time prior to the

7  revocation that anything occurred that would have

8  indicated to you that he might be a clear and

9  present danger; correct?

10      A.      No.  On January 29th, there was an

11  F-TIP inquiry, which means he -- I wouldn't know if

12  he bought a gun, but he attempted to purchase

13  another gun.  I wouldn't know what kind of gun that

14  is.  We don't necessarily get that information,

15  but -- so just days, literally, I guess you'd say

16  hours before receiving this, he's attempted to make

17  a purchase.  That, in context with these other

18  statements, and the apparent alarm that the

19  investigators have had and the secretary of the

20  State Rep's office made it beyond a reasonable --

21  made it beyond a reasonable doubt for me that he

22  should be in a clear and present status at least

23  for that time.

24            Again, this is where -- and I don't

1  know when and if he attempted the relief process

2  that was available to him, but if he could explain

3  it, the things in a very reasonable way and have

4  justification for the things that he said and the

5  times that he said them, and those kinds of things,

6  that would certainly enter into getting his card

7  back.

8        Q.    Okay.  But it doesn't enter into the

9  revocation process in the beginning?

10       A.    That's correct.

11       Q.    Okay.  But you were aware that he

12  already had several guns in his house; correct?

13      A.      No.

14      Q.      You weren't aware of that?

15      A.      I'm not aware of it unless it was in

16  the report someplace.  But F-TIP does not record --

17  Illinois does not register guns.  There is no way

18  to know for sure unless he admits that he has a

19  gun.  He could have bought a gun and sold it to

20  another person with a FOID card or sold it on the

21  street.  I wouldn't have access to that

22  information.  He could -- anytime there was an

23  F-TIP inquiry, and there were probably several, he

24  may have purchased a gun, or he may have walked out

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

82

1   of a gun shop.  He may have purchased from another

2   FOID card and not gone through a licensed dealer,

3   in which case, I would have no idea how many guns

4   he has.  So to say that he -- that I know he had

5   other guns would not be accurate.  The zone may be

6   aware.

7       Q.      Well, you could have asked the zone,

8   does he already purchase guns?

9       A.      Well --

10      Q.      Does he already own guns; is that

11    correct?

12         A.    Well, I could have, but I'm not sure

13    that that would matter.  He's attempted to purchase

14    just hours before I received this e-mail.

15         Q.    Well, let me ask you this.  If someone

16    has ten guns at home, and now they have an 11th

17    gun, what different does that make?

18         A.    It doesn't.  That's a good question.

19    It doesn't.  But it would stop him or another

20    person from going out and buying a gun if they

21    didn't have one.

22         Q.    Well, put it this way.  If someone

23    already has ten guns in the home --

24         A.    This is a good question.  And it comes

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

83

1    up routinely.

2         Q.    They are no more of a danger to someone

3    if they buy an 11th gun; right?  They are the same

4    danger whether they have ten guns or 11 guns;

5    right?

6         A.    No.  Arguments -- I have been through

7    this before.  There could be arguments on both

8  sides of that.  He could have a lot of guns used

9  for clay or, you know, just recreational kind of

10 things, and he could go out and buy an AK-47.

11      Q.   Let me ask you this.  Did you attempt

12 to find out what kind of gun he was attempting to

13 purchase, or if he was attempting to purchase a gun

14 on January 29th?

15      A.   He was attempting to purchase.  That's

16 what the F-TIP inquiry --

17      Q.   Did you ask what kind of gun he was

18 attempting?

19      A.   I didn't have contact with him.  Again,

20 that's not my -- that's outside the scope of what I

21 do.

22      Q.   What would it take for you to find out

23 what sort of guns someone was trying to purchase --

24      A.   A physical review of the ATF records at

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

84

1  the gun shop if they would let me look at them

2  without a warrant.

3      Q.   Okay.  Okay.  All right.  All right.

4  So you ultimately made a decision to revoke David

5  Rhein's FOID card, and you believe this was

6   February 3rd, 2011; correct?

7       A.    Correct.

8       Q.    And then, what did you do with that

9   letter that you wrote?

10      A.    It's mailed to him and faxed to the

11  division of operations.

12      Q.    And what is the division of operations?

13      A.    That is the division of the State

14  Police under which the zone reports.

15      Q.    Okay.  Do you fax any letter to any

16  agents in the field or any zone agents?

17      A.    If they request a copy.

18      Q.    Do you know if one was requested in

19  this case?

20      A.    I don't.  If it was, that's what

21  Linette Metzger would have done.

22      Q.    Do you see any documentation in this

23  Group Exhibit that would indicate that any zone

24  agent or any agent requested this FOID card letter

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586


85


1   be e-mailed or faxed to them?

2       A.    I haven't reviewed all, you know, 22

3   pages that were just presented to me, but if you

4   say it's not here, then I'll go with that.  That

5   doesn't mean it didn't happen.

6        Q.   All right.  By the way, I want to --

7   sorry.  I think I asked you on Bates stamp No. 4,

8   you did review the summary of the e-mail; correct?

9        A.   I said that it's very, very likely that

10  I saw this.

11       Q.   Okay.  But you're not sure if you read

12  the attachments?

13       A.   That's correct.

14       Q.   Okay.

15       A.   I don't know what the attachments are.

16       Q.   Okay.  Well, you see Bate stamp 5

17  through --

18       A.   Okay.

19       Q.   Well, at least some of the -- one of

20  the attachments is 5 through 10; correct?

21       A.   Uh-huh.

22       Q.   Okay.  And do you see on the first page

23  where in bold letters it indicates that Mr. Rhein

24  told Donna Fanning that he believes welfare

1  violates the 14th Amendment to the constitution.

2  Do you see that?

3        A.    I see several highlighted areas, but

4  yes.

5        Q.    Okay.  That would indicate that someone

6  does recognize the viability and the supremacy of

7  the Federal Government; correct?

8        A.    I think you're asking me to get into

9  the state of mind of another individual, and I

10 can't do that.

11       Q.    Well, actually, wasn't that your --

12       A.    Well, you're talking about in a

13 sovereign citizen situation?

14       Q.    Yeah.

15       A.    To me, I can -- you know you could look

16 at it that way, or I could see a bias where -- and

17 I think he goes on later to talk about, quote,

18 unquote, niggers so --

19       Q.    Well, let me ask you this.  Does --

20 obviously, someone's racism is deplorable, but does

21 that make them a clear and present danger?

22       A.    No, but it -- in the totality of these

23 circumstances, it would probably be something I

24 would look at.  Doesn't mean it would be considered

1  in making the decision, but, you know, the British

2  are back, the redcoats are next, hanged for

3  treason, piss and shit all over the people and all

4  over, we, the people's individual rights.  I get

5  colorful language, and, you know, I get wanting to

6  be expressive, but I can't take a chance when

7  there's other comments made that speak more clearly

8  towards a specific threat to others.

9      Q.    Okay.  All right.  Okay.  And I --

10  forgive me if I have not been clear about this.

11  Yes or no, did you read the attachments or no, or

12  you don't know?

13      A.    I don't know.

14      Q.    Okay.  So you can't say one way or

15  another whether you actually read the attachments?

16      A.    February 3rd, 2011, I can't recall if I

17  read the attachments or not.  I do recall

18  specifically how striking the comments were.  I

19  recall that to this day without looking at any

20  documents so --

21      Q.    But what comments?  The comments in the

22  summary that's contained in the e-mail Bate stamped

23  3 and 4?

24      A.    In the summary, it was -- I wouldn't be

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

88

1  at all surprised if these documents are printed out

2  in his file and if I saw them, but I'm pretty sure

3  that I wouldn't have to get completely through all

4  of this to make the determination that he should be

5  considered clear and present.

6      Q.    Okay.  But I need to know a very

7  important question.  I need to know whether or not

8  you actually considered the attachments in your

9  decision to revoke the FOID card?  And if the

10  answer is I don't know, it's I don't know.

11      A.    At this point, the answer would be I

12  don't know.

13      Q.    Okay.  And would anything refresh your

14  memory at a later date?

15      A.    Certainly.

16      Q.    Okay.  And what would refresh your

17  memory?

18      A.    Well, you said anything.

19      Q.    Can you think of anything that would

20  refresh your memory at a later date as to that?

21      A.    If there was additional summaries that

22  referred to these documents, and if there were

23    comments made by either Vorreyer or Metzger, if the

24    agents conveyed comments about other things that,

89

1    you know, might be included in here.  So I guess

2    there's a variety of things that could probably

3    refresh my memory.

4                      I've never shot anybody in my life,

5    quote, unquote, and I never would shoot anyone

6    unless I'm forced to to protect my constitutional

7    rights.

8         Q.    That's what I need to know though.   In

9    my opinion, the attachments are irrelevant unless

10   you actually considered them.  So I'm trying to

11   figure out if you actually considered them?

12        A.    This would be -- I can say this now.  I

13   just don't -- you know, I don't know if I -- if I

14   read through all of these.  I doubt I've read

15   through the entire attachments going 21 pages here

16   so -- but I do know that some of these comments

17   were presented to me either verbally or in some

18   other summary and --

19        Q.    Well, which comments?  That's what

20  we're trying to get to.

21      A.    Well, here's one I recognize.  We, the

22  people, are organizing a militia.  I hope the rep

23  is ready for what's coming.

24      Q.    You remember receiving that

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586


90


1   information?

2       A.    Yes, in some form or another.

3       Q.    Did you remember any other comments

4   being made to you that are part of these

5   attachments?

6       A.    I haven't.  As I'm going through, this

7   is on Page 9, I'm just still going through the

8   attachments that were just presented so -- there's

9   phone calls in here or communications on

10  February 1st of '11.

11      Q.    What Bate stamp?

12      A.    10.

13      Q.    Okay.

14      A.    Clearly, he is in an agitated -- seems

15  to be in a very agitated state.

16      Q.    I'm just asking you if there's any

17  specific comments that you remember taking into

18    consideration in making your decision?

19        A.    I would -- I would say that

20    communications as late as February 1st, '11 would

21    solidify the threat was present.

22        Q.    What specific comments on Bate

23    Stamp 10?

24        A.    The first sentence at the top of the

91

1    page, 2-1-11, David Rhein called at 11:15.  He said

2    the rep called me this weekend.  He blew more smoke

3    up my rear end.  He told me that everything in my

4    petition has to do with Congressman Jackson; that

5    it's not his, capital, H-I-S job.  He told me that

6    he was appointed and not elected.  Mr. Rhein went

7    on to say, quote, unquote, his responsibility is

8    still to we the people.

9        Q.    You remember having that information

10    when you made the decision?

11        A.    Well, I remember, as a matter of

12    practice, ensuring that comments are -- you know,

13    that things are in the present.

14            You asked me before if I've denied

15  clear and present requests because they were not

16  present or not clear, and I mentioned I have.  But

17  I was satisfied based on what was communicated to

18  me by the zone and the division of operations chain

19  that this was -- met those thresholds.

20      Q.    And that's what I need to know is what

21  information you actually considered?  You indicated

22  earlier you don't remember whether or not you saw

23  these attachments; correct?

24      A.    That's correct, but it doesn't mean

1  that they weren't provided in another form.  They

2  could have been summarized somewhere else.

3      Q.    And that's what I need to know.

4      A.    I can't tell you.  The answer is I

5  can't tell you.

6      Q.    Okay.  So let me summarize this.  Okay.

7  You can tell me that you read the summary that's

8  contained in the e-mail and the Bate stamp 2 and 3;

9  correct?

10      A.    Correct.

11      Q.    You can't tell me whether or not you

12  actually viewed the attachments to that e-mail;

13  correct?

14       A.    That's correct.

15       Q.    Okay.  And you can't tell me any other

16  specific information that you received other than

17  what's the summary that's in the e-mail; correct?

18       MR. INOUYE:  Form.

19       THE WITNESS:  That's correct.  Many of the

20  last pages refer to personal information, car

21  registrations, criminal history, lack thereof,

22  driving records, things like that.

23            I can't say whether I saw these

24  specific attachments.  I can say that much of what

1  is in these attachments sounds very, very familiar.

2  BY MR. DVORAK:

3       Q.    Okay.  But you can't say for sure

4  whether or not you actually had any of -- any of

5  these -- specific information brought to your

6  attention or not that's in the attachments;

7  correct?

8       A.    I believe there was one comment that I

9  identified as recognizing.

10      Q.    And what comment was that?

11      A.    Actually, there's a couple.  If he

12  comes up here, I'll kick his ass.  If he comes up

13  here, again, I'll kick his ass referring to the

14  governor.

15            As he was leaving he said, quote,

16  unquote, we, the people, are organizing a militia.

17  I hope the rep is ready for what's coming.

18      Q.    Okay.  What Bate stamp is that?

19      A.    9.

20      Q.    Okay.  Anything else?

21      A.    Other than comments which really didn't

22  factor in on their own, comments about welfare and,

23  quote, unquote, niggers.

24      Q.    All right.  Well, first, any comments

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

94

1  about welfare or niggers you did not consider in

2  your decision?

3      A.    Not on its own.

4      Q.    Well, did you as part of the totality

5  of the circumstance?

6      A.    As part of the totality -- as part of

7  the total circumstances, I considered it, yes.

8     Q.    Okay.  But -- so then you're saying you

9 did receive that specific information; correct?

10     A.    In one form or another I did, yes.  I

11 recall it.

12     Q.    Okay.  Did you document your decision,

13 the reasons for your decision on any sort of

14 document or piece of paper?

15     A.    Yes.  I don't.  My staff does.  Once

16 the revocation is made, the enforcement section,

17 consisting of Linette Metzger and Master Sergeant

18 Vorreyer complete the file.

19     Q.    Okay.  What document would that be that

20 indicated why you revoked the license?

21     A.    It would be a standard part of the

22 file.

23     Q.    What is it?  Is there a form that you

24 have to fill out?

1    A.    No.  Just a summary.

2    Q.    There's a summary?

3    A.    Summary.

4    Q.    And you've not seen it in any of these

5    pages so far?

6         A.    I haven't seen it in this packet.

7         Q.    Okay.  And that would indicate --

8    what's that document called?

9         A.    What goes into his file after the

10   revocation might very well be all of this, I don't

11   know.  I have a feeling that based on the

12   seriousness of this threat, that file is pretty

13   thick.  I'm guessing that if there's information

14   that came to our attention at any point, it would

15   be included in this.  That's also used, again, in a

16   review of the relief process.

17        Q.    Okay.  So you're saying you believe

18   there's actually a file in the Illinois State

19   Police about this revocation that is not contained

20   in the Group Exhibit that I showed you?

21        A.    Now --

22        MR. INOUYE:  Form.  I think that -- just to

23   clarify, I think that the witness has only looked

24   at Pages 1 through 22.

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

96

1         THE WITNESS:  That's correct.

2    BY MR. DVORAK:

3      Q.    Okay.  Look through 1 through -- I'll

4  ask you to look through the entire Group Exhibit,

5  which is actually 1 through 147.

6      A.    Okay.  Well, I'm going to guess that

7  this -- all of this is in that file.

8      Q.    Okay.  But what I'm asking you right

9  now is, is there any kind of document that you

10  would fill out that would explain your decision to

11  revoke?

12      A.    Staff would complete that

13  documentation.  It would be a very concise summary.

14  It would reference information that's been provided

15  by the division of operations and the special

16  agents.

17      Q.    Okay.  What's the name of that

18  document?

19      A.    David Rhein.  David Rhein.

20      Q.    No, but what's that document called?

21      A.    That's the file.  That would be the

22  revocation file.

23      Q.    Okay.  But the report or document that

24  they would fill out explaining why --

1      A.      Would be called --

2      Q.      -- why the revocation occurred would be

3  called what?

4      A.      I'm sorry.  A revocation file.  David

5  Rhein.  That's how it would be listed.

6      Q.      Okay.

7      A.      It would have a FOID card number

8  probably associated with it.

9      Q.      Okay.  The file is the entire file;

10  correct?

11      A.      That's correct.

12      Q.      Okay.  I'm asking you if you or your

13  staff at all would normally document the reasons

14  for your revocation in any sort of particular

15  document?

16      A.      There would be a sheet attached to the

17  file as part of the file that would summarize the

18  reasons for the revocation.  They would summarize

19  it, and then it would refer to documents -- refer

20  to these documents.

21      Q.      What's that sheet called?

22      A.      There's no name for it.

23      Q.      Okay.  When you ask someone to fill it

24  out, what do you say?  Fill out the sheet?

98

1      A.    It's a revocation sheet.

2      Q.    Okay.  You call it a revocation sheet?

3      A.    Yeah.  I don't -- well, I don't refer

4  to it as that.  I say, it's in the revocation file.

5  What does the summary on the revocation file say?

6  It's not more scientific than that.  There really

7  isn't a name.

8      Q.    The summary or the revocation sheet or

9  whatever you would call it, do you see that

10 anywhere in any -- in this Group Exhibit?

11     MR. INOUYE:  Can we take a short break while

12 he's looking through the file?

13     MR. DVORAK:  Sure, sure.

14              (Recess taken.)

15 BY MR. DVORAK:

16     Q.    All right.  I believe before we took a

17 break, the question I was asking you is whether or

18 not you believe there is any documentation at least

19 in the Group Exhibit I showed you, and that's Group

20 Exhibit 3, that would be a summary of or some sort

21 of documentation as to why you decided to revoke

22 David Rhein's FOID card?

23     A.    No.

24     Q.    There is no documentation like that;

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

99

1  correct?

2      A.    No.

3      Q.    Do you believe it exists someplace

4  else?

5      A.    Yes.

6      Q.    Okay.  What -- and where do you believe

7  it exists?

8      A.    It might be attached to the file

9  folder.

10     Q.    Okay.

11     A.    As prepared by Linette Metzger or Mike

12  Vorreyer.

13     Q.    So in other words, maybe whoever copied

14  this file copied the folder, but there might be

15  like a piece of paper attached to the outside of

16  the folder?

17     A.    Could very well be.

18     Q.    Okay.  And best you know, the name of

19  it's called revocation sheet or summary?

20     A.    That's it correct.

21     Q.    All right.  Now, who came up with that?

22    I mean, who -- is that just something that's done;

23    do you direct your underlings to do this; how does

24    that work?

100

1        A.    It's -- as a standard practice, it's

2    just done to summarize the last status change on

3    the physical file for anybody that's been revoked.

4        Q.    And does that summary indicate the

5    reasons why the revocation occurred?

6        A.    I'm not sure to what extent, you know,

7    what kind of detail it would go into, but it would

8    have enough there that would meet the standard.

9        Q.    Well, okay.  And does it indicate what

10    evidence or what documents were considered in

11    making the revocation?

12        A.    Probably not specifically.

13        Q.    Okay.  So let me get this straight

14    then.  There really is no policy or procedure

15    whereby the decision-maker or any other agent of

16    the decision-maker to revoke would need to document

17    the reasons for the revocation; correct?

18        A.    No, I'm not sure I'd say that.  I think

19    the reasons are documented on the file.

20      Q.      Okay.  On the document that doesn't --

21  that is not here today; correct?

22      A.      That I can't see, that's correct.

23      Q.      So how do you know it's documented?

24      A.      Well, I've seen files in the past where

1  we've had individuals that were revoked and

2  attempting to reinstate or go through the relief

3  process, and I've seen that information on there.

4  We also document any other contact that we have

5  with the individual so that it's up to date.

6      Q.      Okay.  But you don't know if that

7  summary actually occurs -- actually exists with

8  regard to David Rhein; correct?  You're assuming it

9  does, but you don't know if it does?

10      A.      I'm assuming it does.

11      Q.      Okay.  But my question is when whoever

12  is filling out that document, it could -- I take it

13  sometimes it's you and sometimes it's a member of

14  your staff?

15      A.      It's never me.

16      Q.      Never you.

17     A.    It would be somebody that -- one of the

18  two people, Linette or Vorreyer.

19     Q.    Okay.  And do you give them guidance as

20  to what they should put down as to the reasons why?

21     A.    I trust their abilities to summarize.

22     Q.    Okay.  So you've never given them any

23  kind of guidance on that regard; correct?

24     A.    Basically, it would concur with what

102

1  was presented to me.

2     Q.    Okay.  And what do you use for your

3  standard as to when you made the decision to revoke

4  someone's FOID card based on clear and present

5  danger?

6     A.    Everything that's presented to me

7  through DOO.  That's all the work of the zone

8  investigators, the concerns that -- the chain of

9  command DOO has, and any other information that is

10  summarized and presented to me that is significant.

11     Q.    Okay.  But there's no specific factors

12  that you're -- that you consider; is that correct?

13          Put it this way.  Is there anything

14  that limits your discretion in making your decision

15    whether to revoke a FOID card based on clear and

16    present danger?

17         A.    I don't understand the question.

18         Q.    Okay.  Do you have complete discretion

19    as to what sort of evidence to use and what

20    standard to use in determining whether to revoke

21    someone's FOID card on the clear and present danger

22    basis?

23         A.    If I have a question, I could reach out

24    to the department legal office.

1          Q.    Okay.  But you have a hundred percent

2     discretion in making that decision, I take it;

3     correct?

4          A.    Yes.

5          Q.    Okay.  Is there anything that guides

6     that discretion?

7          A.    The statute.

8          Q.    Okay.  Anything else?

9          A.    Any information that's provided to me

10    at the time of the request for the revocation.

11         Q.    Okay.  What I guess I'm saying what

12 guides you, there's no -- there's no written

13 policies, procedures, rules, guidelines that would

14 assist you in making that decision whether to

15 revoke someone based on a clear and present danger

16 other than the statute itself; correct?

17     A.    Other than the statute itself.  I think

18 the statute is fairly clear in terms of assaultive

19 or threatening behavior.  The language that it uses

20 outlines what should be considered.

21     Q.    Okay.  And the statute itself gives no

22 guidance on whether you should make any attempts to

23 get the revokee's side of the story; correct?

24     A.    That's what occurs during the relief

1 process.

2     Q.    Okay.  But it doesn't provide for that

3 in the statute itself; correct?

4     A.    That's correct.

5     Q.    Okay.  And you don't normally do that

6 prior to the revocation; correct?

7     A.    That's correct.

8     Q.    All right.  And someone challenging

9 your decision, is there any way that person would

10    know the basis for your decision?

11        A.    They would understand the specifics as

12    they went through the relief process.

13        Q.    Okay.  Let me ask you this.  In the

14    letter that's sent to the revokee, there is no

15    reason stated for why the revokee was found to be a

16    clear and present danger; is that correct?

17        MR. INOUYE:  Form.

18    BY MR. DVORAK:

19        Q.    Is that correct?

20        A.    I would disagree.  I think the reason

21    is specific.  It refers to ICS 430 -- ILCS 65-8,

22    paragraph F.

23        Q.    Okay.  But I guess what I'm saying is,

24    it doesn't indicate the evidence that was used --

1     A.    That's correct.

2     Q.    -- as to why he was revoked; correct?

3     A.    That's correct.

4     Q.    Okay.  So anyone reading this letter

5     would have no idea what evidence was used against

6     him in this administrative decision to take away

7   their FOID card; correct?

8       MR. INOUYE:  Form.

9   BY MR. DVORAK:

10      Q.    Is that fair to say?

11      A.    I'm not sure I'd agree with that.

12  That's -- you know, in the case where the agents

13  decide to go pay him a visit, I'm sure there's a

14  discussion as to why the revocation occurred.  It's

15  based on the information they presented me.  So

16  nobody in the world would probably have greater

17  access to why it was revoked than them.

18      Q.    Well, but the person reading the letter

19  wouldn't know what evidence you have considered in

20  the revocation; correct?

21      A.    That's correct.

22      Q.    All right.  And -- okay.  What sort of

23  procedure then is -- that's part of the review

24  process to get your FOID card back, is provided to

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

106

1   show that person that evidence?  Is there any

2   provision in the statute or in your guidelines or

3   procedures?

4       A.    In the context of the hearing,

5   information would be shared as to why the

6   revocation occurred.  And I believe that to ensure

7   that there's a full understanding that those points

8   are still not a factor, they would be discussed.

9        Q.   Let me ask you this.  When you say

10  hearing, do you actually provide in-person hearings

11  as part of the review process?

12       A.   Yes.

13       Q.   Okay.  And who's present at these

14  hearings?

15       A.   That would depend -- now, the clear and

16  present side, if they request a hearing, we could

17  provide a hearing.  But typically on the clear and

18  present, if enough information is provided, and

19  there's no objections by those making the request

20  to revoke, then the card can be reinstated.

21            In certain cases, and this is a high

22  profile case because of the nature of the threat,

23  others might want to be present or certainly have

24  that option if a hearing was requested.

1        Q.   Let me ask you this.  If an -- if some

2   sort of hearing is requested, okay, does the

3   Illinois State Police have full discretion to give

4   someone an oral hearing or not give them an oral

5   hearing?

6        A.   Yes.  And I think we've moved more

7   towards that at the end of my tenure in firearms.

8        Q.   Okay.  You would agree with me that

9   someone revoked based on a clear and present danger

10  revocation has no right to have an actual in-person

11  hearing to challenge that decision; correct?

12       A.   I would not agree with that.

13       Q.   They do have that right?

14       A.   I would think that anybody who requests

15  a hearing could probably get a hearing.

16       Q.   Well, let me stop you right there.

17       A.   Sure.

18       Q.   You would think -- you just said, you

19  would think that anyone who requests a hearing

20  would probably get that hearing; okay.  That's not

21  the same thing as having the right to have that

22  hearing; correct?

23       A.   Let me restate it.  I can't recall a

24  time when somebody requesting a hearing was denied

1   a hearing.

2        Q.    Okay.

3        A.    I can say, though, that in a lot of

4   cases because of staffing, we don't have the

5   manpower to address each of these requests in a

6   very, very timely manner.  I think that's a

7   state-wide employment issue, but --

8        Q.    All right.  How long does it typically

9   take a person who requests a clear and present

10  danger reinstatement hearing to actually get one of

11  those hearings in your experience?

12       A.    It could take months.  It could take

13  over a year.

14       Q.    Okay.

15       A.    And, again, it depends on the

16  individual circumstances that surround that case.

17       Q.    Why would one circumstance take shorter

18  and one circumstance take longer?

19       A.    If it's apparent that the threat still

20  exists or additional threats have been made, it

21  would not be a high priority to engage in a

22  hearing.

23       Q.    Who decides what's a high priority and

24  a lower priority?

109

```
 1        A.    Most of the hearings are attended by

 2  somebody in the legal office.  There's a full panel

 3  that sits on those.  Some higher priority cases

 4  involve situations where there might be employment

 5  involved where the threat is not as high as what

 6  this was when it was made, those kinds of things.

 7        Q.    Okay.  So the more serious the

 8  allegation, the longer you wait to give a hearing;

 9  is that what you're saying?

10        MR. INOUYE:  Form.

11        THE WITNESS:  No, no.

12  BY MR. DVORAK:

13        Q.    Okay.  Well, you're saying the more

14  clear it is from the documentation that you had

15  prior to the revocation, the longer it might take

16  you to give that person a hearing?

17        A.    It might take longer because there's

18  other folks that have provided all of the

19  information that was requested in a timely manner.

20  Their threat or threat level was not as high.

21  There's other priorities that the department has

22  and other priorities that the bureau has.

23        Q.    All right.
```

24      A.      Some --

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

110

1       Q.      Who decides whether or not to grant a

2  hearing?

3       A.      Some of these requests are done as a

4  simple document review.  So if the person is

5  compliant in forwarding everything that needs to be

6  there, and there are no other issues that the

7  bureau is aware of, and they reach out -- the

8  folks -- we reach out to the zones or the

9  requester, the agency that made the request, as I

10  stated before, to ensure that there's nothing

11  ongoing or continuing that would keep the clear and

12  present present.

13      Q.      Okay.  Who decides whether or not to

14  give someone an actual hearing, an in-person

15  hearing?

16      A.      Usually the legal office would be

17  involved in that.

18      Q.      Okay.  Who else would be in that

19  decision-making process?

20      A.      For a hearing, it would be the legal

21  office.

22      Q.      Are you saying you have no input on

23   whether or not someone should actually get a

24   hearing?

111

1        A.      Well, compiling a staff, a panel to

2    review is not -- is not something done entirely

3    within my bureau.  Again, as I mentioned before,

4    the panels are comprised of other individuals.

5                     We also wait for feedback before

6    engaging in a hearing from the requester.

7    Requester in this case being the division of

8    operations or the zones.  So information would

9    be -- a question would be asked of the division, is

10   there anything outstanding, and we would include

11   the representative's office.  Is there anything

12   that still concerns you about this individual

13   he's --

14      Q.      I'm still confused who makes the

15   decision to grant a hearing or not?

16      A.      The legal office.

17      Q.      They 100 -- who's the legal office?

18      A.      Chief legal.

19      Q.      Who is that?

20      A.      Currently, Suzanne Yokely-Bond.

21      Q.      Was that the same person back in 2011,

22 2012?

23      A.      There was a change in that office.  I'm

24 not sure when she assumed chief legal.  There was

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

112

1 an interim chief legal person, John Hostin

2 (phonetic) prior to that.

3      Q.      Okay.  Okay.  So -- and someone

4 receiving this letter, okay, you're the one who

5 writes this letter; correct?

6      A.      Well, again, I signed the letter.

7      Q.      Okay.  All right.  And --

8      A.      The legal office approves the language.

9 That language has been in place for years before I

10 came to the bureau.

11      Q.      All right.  So what you put in this

12 letter is, please contact FOID program personnel,

13 and then you give the phone number if you have

14 further questions; correct?

15      A.      Uh-huh.

16      Q.      Okay.  Who is FOID program personnel?

17      A.      It could be Sharon Lawson.

18      Q.      And who is that?

19      A.      She would be one of the people engaged

20 in the document review.

21      Q.      But what is her title?

22      A.      Document review.

23      Q.      Her title is document review?

24      A.      Yeah.  I mean, she has -- there's a

113

1 code title.  I don't recall what that is.  It's

2 just a labor --

3      Q.      Is she in your unit?

4      A.      Yeah.

5      Q.      So you're her supervisor?

6      A.      I'm not her supervisor.  The assistant

7 bureau chief is her supervisor.

8      Q.      She's part of the unit that you're a

9 chief of; correct?

10      A.      Right.

11      Q.      Okay.

12      A.      It's like clerk one or accountant one

13 or, you know.  It's some labor code classification.

14  Right now I don't recall what her classification

15  was.

16      Q.   But she's an employee in your unit that

17  you're a chief of; correct?

18      A.   That's correct.

19      Q.   And you would agree you are a

20  supervisor of hers; correct?

21      A.   No.

22      Q.   How is that not true?

23      A.   I'm in her chain.  I'm not her

24  supervisor.

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

114

1      Q.   I'm not asking whether you're her

2  direct supervisor.  You are one of her supervisors?

3      A.   Okay, but I'm not mincing words.

4  Within the State Police, for me to say I'm her

5  supervisor would be a misnomer.  It would be a

6  mischaracterization.  I am not her supervisor.  The

7  chain operates differently.

8          So either Mike Vorreyer would be her

9  supervisor in the absence of an assistant bureau

10  chief or Candice Burns would have been her

11  supervisor when she was there.  Larry Grubb was her

12    supervisor prior to that.  He's the assistant

13    bureau chief.  It's not as simple as I think you

14    might think it is.

15                 And I'm not trying to be

16    condescending.  I'm frustrated sometimes with the

17    way government operates as well.  So just from a

18    personnel point of view, she has a personnel

19    classification that I can't recall what her exact

20    title is.

21        Q.    All right.  Either way, when you put

22    please contact FOID program personnel, you mean a

23    person within your unit; correct?

24        A.    That's correct.

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

115

1        Q.    Okay.  So someone reading this letter

2    wanting to challenge this decision, you direct them

3    to contact your unit; correct?

4        A.    That's correct.

5        Q.    Okay.  Do you tell them to contact the

6    legal office for a hearing?

7        A.    No.

8        Q.    Okay.  So you -- your unit would have

9   to forward the information to the legal unit in

10  order for someone to get a hearing; correct?

11          A.    And that would only be done upon

12  receipt of all the documents and the requested

13  information from the zone, from the division of

14  operations, and from, in this case, DeLuca's

15  office.

16          Q.    So someone reading the letter that you

17  provide to the revokee, Bate stamp P1?

18          A.    Uh-huh.

19          Q.    Okay.  They are not told to go directly

20  to legal office, they are told to go to your unit?

21          A.    That's correct.

22          Q.    And in order for them to get a hearing,

23  okay, they're directed to make their request to

24  your unit and provide the documentation that you

1   asked for in the letter; correct?

2           A.    Correct.

3           Q.    Okay.  And then if you believe that

4   they've complied with that or that they are a good

5   candidate, then you can forward that information on

6   to the legal office; is that correct?

7      A.    That's correct.

8      Q.    And then the legal office can decide

9 whether or not to give a hearing; correct?

10     A.    That's correct.

11     Q.    But unless the legal office first

12 receives this documentation in this request for

13 your unit, they are not going to be able to give a

14 hearing; correct?

15     A.    That's right.  And they wouldn't

16 receive it until we've received all the documents

17 we've requested from the other offices including,

18 in this case, as I mentioned DeLuca's or the

19 division of operations, the investigators.

20     Q.    Okay.  Now you indicated -- you

21 indicate in this letter that you sent to Mr. Rhein

22 that you strongly encouraged that he provide the

23 office with the following documents.  One is a

24 letter of recommendation from the police department

1 or sheriff's office who handled your incident.  Do

2 you see that?

3      A.    Uh-huh, yes.

4      Q.     Okay.  Where do you get that

5   information from?  Why do you say that in your

6   letter?  Why is that in the letter?

7      A.     For reasons that I stated before, they

8   would be the requester that initiated the

9   revocation process.

10      Q.     Okay.  Are you saying that you would

11   not believe someone complied with your request

12   until they get that letter?

13      A.     Yes.

14      MR. INOUYE:  Form.

15   BY MR. DVORAK:

16      Q.     Okay.  So in other words, if the person

17   could not get a letter of recommendation from the

18   same agency that recommended that they be revoked,

19   you would not consider them for a hearing?

20      MR. INOUYE:  Form.

21      THE WITNESS:  That's -- yeah.  That's not

22   always the case.  And the reason being because I

23   understand, and I think the State Police

24   understands that often that requester will be

1   reluctant forever to provide that kind of a

2  recommendation.

3         But if they voice a stringent

4  objection, that might be something that we would

5  certainly want to consider.  So there's a

6  difference there.

7         If they can't get it, and they state

8  they can't get it and everything else is in

9  compliance, and there's no other issues, then that

10  can be considered.

11         If there is an objection from the

12  law enforcement agency that initiated the request

13  for revocation, that too is considered and that's,

14  obviously, not favorable.

15  BY MR. DVORAK:

16     Q.    Okay.  But this is information just to

17  get a hearing; correct?

18     A.    Correct.

19     Q.    Okay.

20     A.    Now, but it's -- as I just said, if

21  it's not there, and there's a reason they can't get

22  it and everything else is in place, and there are

23  no other issues, we can move forward.  It doesn't

24  mean, you know, the results of the hearing would

1   necessarily be favorable.  I can't predict that.

2       Q.    It means you can move forward, but you

3   don't have to move forward; correct?

4       MR. INOUYE:  Form.

5   BY MR. DVORAK:

6       Q.    Do you understand the difference?

7       A.    I do, but I think that's almost beyond

8   the scope.  It would be -- it would be my opinion

9   that we would move forward if there were no other

10  objections from any other folks and what was -- the

11  other items that were requested were obtained.

12      Q.    I'll move on to the second thing first.

13  You say a letter from a psychiatrist or registered

14  clinical psychologist attesting to your suitability

15  to acquire, possess, and use firearms.  Do you see

16  that?

17      A.    Yes.

18      Q.    Okay.  Where do you get that request

19  from?

20      A.    Again, that's been something that's

21  been requested for years.

22      Q.    Okay.

23      A.    And I believe remains in place to this

24  date.

312.781.9586

120

1    Q.    Okay.  But, again, it's not based on

2  any kind of written policy, guideline, protocol, or

3  anything; right?

4    A.    No, but there is a reason that it's in

5  there, and it's because as a state police officer,

6  I can't accept the responsibility for saying that a

7  person who may have exhibited some kind of mental

8  instability for a time is now normal, is now okay,

9  or now better.

10    Q.    Because you're not qualified to do

11  that; right?

12    A.    That's correct.

13    Q.    You're not qualified to opine on

14  someone's mental condition; correct?

15    A.    A mental condition other than what they

16  demonstrate openly in terms of a threat, as the

17  statute says, in a threatening or assaultive kind

18  of situation.

19          One thing that I came in contact

20  with quite commonly on the road were despondent

21  people and/or very violent people, and it wasn't

22  hard to determine that those people were either

23  despondent and wanted to hurt themselves or

24  somebody else or other violent folks that were bent

1  on hurting somebody else.

2           So in all those years, I've been

3  able to be a pretty good judge of those kinds of

4  things.

5      Q.    So you feel yourself qualified to make

6  a decision whether someone's mental condition

7  presents a clear and present danger in order to

8  revoke someone; correct?

9      A.    Correct.

10     Q.    But you don't feel you're qualified to

11  opine on whether someone's mental condition makes

12  them a clear and present danger after revocation?

13     A.    I feel that I'm qualified to make that

14  determination as it is listed in the statute, and

15  the language is pretty clear, pretty simple.

16     Q.    Okay.

17     A.    Threatening and assaultive behavior.

18  In the statute, it lists mental condition as

19  exhibited by that threatening or assaultive

20  actions, and that's what we use.  That's, I think,

21    a fairly a simple way of -- a simple standard.

22          Q.    Let me ask you this.  I'm going to get

23    the third factor first.  Three or more letters of

24    character reference from friends and/or

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

122

1    acquaintances not relatives in your community.

2    That's another thing that you strongly suggest;

3    correct?

4          A.    Yes.

5          Q.    Okay.  Again, all three of these things

6    that you strongly recommended in the letter, are

7    these the three things that have just been part of

8    this standard letter for years even before you

9    became bureau chief; correct?

10          A.    Yes.

11          Q.    And their not based on any kind of

12    written guideline, protocol, anything like that

13    within the Illinois State Police; correct?

14          A.    Well, the only protocol is what's

15    approved in this letter is approved through the ISP

16    law office as I indicated earlier.  So the legal

17    office and ISP approves this letter, approves

18    what's being asked in this letter and as a result

19    that's why that's there.

20        Q.    Okay.  Now, your office is the one

21    taking the action to revoke someone's license;

22    correct?

23        A.    Yes.

24        Q.    But your office does not see to it that

1    that person is evaluated through your own

2    psychiatrist or psychologist; correct?

3        A.    That's correct.

4        Q.    Okay.  Why?

5        A.    I actually suggested that that would be

6    an option that we would have, but I'm sure that if

7    the person -- this was discussed at the end of my

8    time there -- that if the person was found to be

9    unsuitable, they would still object to that.

10            We also know that folks can go

11   around to six, seven, eight, nine, ten different

12   doctors before they find somebody that's going to

13   indicate that they are suitable.  So if that --

14   that really doesn't have a bearing.  The other

15   reason we don't use our own is because of the cost.

16  Who's going to pay for that, and we --

17      Q.    You'd rather put the cost on the person

18  who's revoked; correct?

19      A.    It's not me putting the cost on the

20  person.

21      MR. INOUYE:  Form.

22  BY MR. DVORAK:

23      Q.    Well, that person has to pay for it;

24  right?  You're not paying for it; right?


                URLAUB BOWEN & ASSOCIATES, INC.
                        312.781.9586



                                                124


1      A.    Well, I don't believe it's the State's

2  responsibility to do that.

3      Q.    Well, the State was the one who took

4  away the FOID card without any kind of hearing;

5  right?

6      A.    Based on the actions --

7      MR. INOUYE:  Form, argumentative.

8      THE WITNESS:  Based on the -- but it was

9  based on the actions of the revokee.

10  BY MR. DVORAK:

11      Q.    Okay.  Based on your summary of what

12  other people say he did; correct?

13      A.    Correct.

14      Q.    I mean, you knew that when you revoked

15  this FOID card, you don't know if he actually

16  committed those acts; right?

17      A.    The investigators that do these

18  investigations are highly trained.  They are State

19  Police officials.  These issues were vetted up

20  through the chain of command for those

21  investigators.  Several different offices within

22  the State Police were contacted to provide

23  additional background, and input was provided by

24  the representative's office where, at the time, the

125

1  secretary felt, and I believe in the middle of '12

2  still felt threatened by this individual.  So

3  there's a lot of information that went into it.

4      Q.    Except the side of the revokee?

5      A.    And that's what the relief process is

6  for.

7      Q.    Okay.  Where in this -- where in

8  this -- but you'd agree with me that the revokee

9  has no right to give his side of the story;

10  correct?

11          A.    I'm sorry?

12          MR. INOUYE:  Form.

13   BY MR. DVORAK:

14          Q.    Okay.  The revokee has no right to a

15   hearing where he can explain his side of the story;

16   would you agree with me?

17          MR. INOUYE:  Form.

18          THE WITNESS:  Could you rephrase that?

19   BY MR. DVORAK:

20          Q.    Okay.  If a revokee asked to have his

21   FOID card back who's been deemed a clear and

22   present danger, they have no absolute right to have

23   a hearing to give their side of the story; correct?

24          A.    They can petition for a hearing, they

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586


126


1   can go to court, or they can go through the

2   document review process by which they provide the

3   documents that are requested.

4          Q.    I'm not talking about court now.  You

5   understand that there's an administrative process

6   that you have to go to before you go to court;

7   correct?

8          A.    Yes.

9      Q.    And, in fact, the statute says you have

10   to exhaust the administrative remedies before you

11   even go to court; correct?

12     A.    Correct.

13     Q.    Okay.  I'm just talking about the

14   administrative process.

15     A.    I do understand you have to exhaust

16   that.  That doesn't mean that's what's done in all

17   cases.

18     Q.    Well, okay.  But as far as the

19   administrative process, a revokee, a clear and

20   present danger revokee has no absolute right to

21   actually have a hearing; would you agree with me?

22     A.    I don't know that there's an absolute

23   right.  I don't know of a case where a hearing has

24   been denied.

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

127

1      Q.    Well, this case it was denied; correct?

2      A.    I don't know that.

3      Q.    Well, we'll get into that.  But what

4    I'm saying is that you -- the Illinois State Police

5    does not have any kind of policies or procedures or

6    guidelines that would give a revokee the right to

7    have a hearing administratively before going to

8    court based on a clear and present danger

9    revocation; correct?

10        A.    It's my understanding that if a hearing

11   is requested, one would eventually be provided.  I

12   can't say, you know, when that's going to happen.

13   I know that -- I do know that when attorneys are

14   used and hearings are requested, there's an

15   administrative judge that is involved in that as

16   well.  Their schedule is about twice a year.  So

17   there's usually a long delay for people that have

18   both requested those hearings and to get on a

19   waiting list to have that hearing occur.  I don't

20   know what that waiting list was like at this time.

21        Q.    Well, you would agree with me, first of

22   all, that there is no timeframe that a person has

23   for having a hearing to get their FOID card back?

24        A.    I would agree that I don't think there

1    is a timeframe spelled out.

2        Q.    Okay.  It could be months; it could be

3    years; correct?

4      A.     And I think that's been the case, yes.

5      Q.     And that is the case; it could be

6  months; it could be years?

7      A.     Correct.  I said that earlier.

8      Q.     Okay.  All right.  But what I'm -- also

9  too, there is no absolute right to actually have

10  the hearing though; right?

11      A.     I think the statute spells out the

12  right to a hearing.

13      Q.     Okay.

14      A.     To appeal to the director of the State

15  Police.

16      Q.     That doesn't mean it's an in-person

17  hearing; correct?

18      A.     Again, I think that gets into the

19  language of law.  And as an attorney, I would guess

20  that if you requested a hearing and everything was

21  in place, a hearing would eventually be scheduled.

22      Q.     Okay.  You just added the language and

23  everything was in place.  Okay.  You agree that you

24  will not even forward it on to the legal department

1 for a hearing unless they first get everything in

2 place; correct?

3      A.    By everything if you mean those items,

4 the three dot points in the letter, I think we just

5 went over that, and I did explain that oftentimes a

6 revokee is not going to be able to get a letter

7 from the agency that requested his revocation in

8 the first place.

9           We understand why that happens so we

10 can take that into consideration.  We know a person

11 is usually going to be able to get three letters

12 from friends outside or associates outside his

13 family.

14           The thing that he may or may not be

15 able to get in a timely way is going to be a letter

16 from a psychiatrist.  And I understand the reasons

17 why, you know, from the cost of doing it, to maybe

18 being denied or -- a psychiatrist not wanting to

19 weigh in and put his license or reputation on the

20 line.  So I understand all those reasons why that's

21 not going to happen.  I also understand why the

22 State isn't going to provide that.

23           So that doesn't preclude a person

24 from necessarily getting a hearing or having his

1  file moved forward.  There are going to be other

2  folks that do have all those things.  And in most

3  cases, they will probably be given priority, and

4  that's just the way it works.

5      Q.    All I'm asking for is absolutes.

6  Everything that you've explained so far in that

7  answer is most and probably; okay?

8      A.    There are no absolutes that -- you

9  know, I really can't say.  Do they have a right to

10  a hearing?  Yes.  The statute says they have a

11  right to petition the director of the State Police.

12      Q.    Okay.  So that does not say they have a

13  right to an in-person hearing, does it?

14      A.    It does not say that.

15      Q.    Okay.  Do you interpret it to mean that

16  a person has the right to an in-person hearing?

17      A.    No.

18      Q.    Okay.  So you would agree that your

19  unit uses discretion on whether to grant a hearing,

20  in-person hearing?

21      A.    There are times when discretion is

22  used.  And one of those times or some of those

23  times might be for the reasons I just enumerated.

24  There might still be objections from those involved

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

131

1   during the initial revocation.

2               In this case, as I mentioned before,

3   somebody from DeLuca's office might object.

4   Somebody from the division of operations might

5   object.

6       Q.    Okay.  What happens when people object

7   to someone getting their license back; do they not

8   get a hearing?

9       A.    They probably wouldn't get a hearing.

10  That's not an absolute though.

11      Q.    They might get a hearing?

12      A.    They might get a hearing.

13      Q.    They might not?

14      A.    Right.

15      Q.    Okay.  And if a person gets a letter

16  from a psychiatrist, they might get a hearing; they

17  might not?

18      A.    That's correct.

19      Q.    If a person gets three or more letters

20  from character references, they might get a

21  hearing; they might not?

22      A.    That's correct.

23    Q.    Okay.  All right.  Let me talk about --

24    A.    Just if I could?


URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586


132


1     Q.    Sure.

2     A.    That doesn't mean that the process is

3  arbitrary or capricious, it just means that there

4  are other factors that must be considered.

5     Q.    Like what?

6     A.    One you didn't mention is that there's

7  an objection from either DeLuca's office or the

8  zone.  And if that's the case, they won't get a

9  hearing.

10    Q.    Couldn't they make their objections

11  known at a hearing?

12    A.    Couldn't the -- DeLuca's office?

13    Q.    Yes.  Have a hearing, and then they can

14  object at the hearing?

15    A.    That's possible.  The reason -- the

16  reason that that's probably not going to happen

17  because of this particular type of revocation

18  that's clear and present, and if they're still

19  objecting to it for the same reasons as before, it

20  probably indicates that the concern they have is

21    still present.  It doesn't -- speaking in

22    absolutes, it doesn't mean that it's necessarily

23    legitimate, but it's still a concern that they

24    have.

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

133

1         Q.    Okay.  But if you have a hearing, you

2    could find out if it's legitimate; right?

3         A.    That's correct.

4         Q.    Okay.

5         MR. INOUYE:  Counsel, I just want to make

6    sure we're going to be done by 5:00.  I have a

7    child care issue.

8         MR. DVORAK:  Sure.  I'm getting --

9                    (Discussion off the record.)

10   BY MR. DVORAK:

11        Q.    All right.  So I think we've talked

12   pretty well about the process.  Now, let me talk

13   about this particular case.

14        A.    Okay.

15        Q.    Are you saying that you never once

16   got -- well, what's the first time you ever learned

17   that David Rhein was attempting to get his FOID

18    card back?

19         A.    I may have seen a letter from an

20    attorney.  It's typical that we get letters usually

21    from attorneys and -- requesting that consideration

22    be given to the individual's situation.

23         Q.    Okay.  So you admit you may have

24    received a letter from Joseph Barbaro, David

134

1    Rhein's attorney, requesting a hearing?

2         A.    Yes.  In fact, I do recall that.

3         Q.    Okay.  Okay.  And what -- did you also

4    receive the letter from the psychiatrist?

5         A.    That I don't recall.

6         Q.    All right.  Let's go to Group

7    Exhibit -- Bates 84.  Do you see Bate stamp 84?

8         A.    Yes.

9         Q.    Okay.  Is this the letter that you

10    received from Mr. Barbaro requesting a hearing?

11         A.    It appears to be.

12         Q.    Okay.  All right.  And do you

13    indicate -- do you see in the letter where he

14    references the -- that he had Mr. Rhein evaluated

15    by Dr. Childs, a licensed clinical psychologist?

16      A.      Yes.

17      Q.      And do you see in here where he

18 indicated that Mr. Rhein was subject to a battery

19 of psychological tests?

20      A.      Yes.

21      Q.      And that based on Dr. Childs' opinion,

22 he believed that Mr. Rhein did not present a danger

23 to himself or others?

24      A.      Yes.

135


1       Q.      Okay.  All right.  You know, I'm going

2 to take that back because this is actually one -- I

3 was saying 85, wasn't I?

4       A.      You said 84.

5       Q.      84.  Yes.  Okay.  All right.  And that

6 was all contained in that letter Bate stamped 84;

7 correct?

8       A.      The only thing that wasn't there was, I

9 think the battery, looking over it.  I do see in

10 the letter dated January 16th, 2012, he was -- he

11 underwent a battery of tests.

12      Q.      Okay.  And this is addressed to you on

13   September 19th, 2011; correct?

14        A.    On September 19th, yes.

15        Q.    Okay.  And there's actually a stamp on

16   here that says FSB date received September 23rd,

17   2011; correct?

18        A.    Yes.

19        Q.    Okay.  And you would admit that you did

20   receive this letter; correct?

21        A.    Yes.

22        Q.    Okay.  What did you do -- so then you

23   did receive Dr. Childs' report; correct?

24        A.    Whether or not I received the report, I

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

136

1   don't know if it came to me or -- if it didn't, I

2   wouldn't read the report.

3        Q.    You wouldn't read the report?

4        A.    No, I'm not -- it would be placed in

5   his file.  The folks that work relief, whether it's

6   doc review, we named all the names of folks that

7   could be involved in it from Cheryl Lawson to Lynn

8   Metzger and Mike Vorreyer.  But once they have what

9   they need in their file, it's moved forward for

10   consideration.  If it's a doc review, we can do it

11    internally.

12              If it's a request for a hearing, it

13    would be something else.  And as far as I

14    understand, this looks like it was a request for

15    reinstatement, which would be a doc review,

16    document review, which means that given the clear

17    and present nature of the revocation, requests to

18    DeLuca's office would go out and requests to the

19    zone would go out.  Information -- we would then

20    wait for information to come back.  I do remember

21    receiving information back that indicated that

22    there was still some issue.

23         Q.    Let me ask you this.  First of all, you

24    see Bate stamped 76, the Alan Childs' letter?

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

137

1         A.    Yes.

2         Q.    Okay.  It looks like that was received

3    August 8th, 2011, by the FSB; correct?

4         A.    Yes.

5         Q.    Okay.  And did -- so that would have

6    gone in his -- in David Rhein's file; correct?

7         A.    Yes.

8      Q.    Okay.  And Dr. Childs' report was

9  actually written July 24th, 2011, correct?

10     A.    Yes.

11     Q.    Okay.  All right.  And the date

12 received on the Childs' letter, August 8th, 2011,

13 would have been the same date that Barbaro's letter

14 to you was received by you; correct?

15     A.    I'm sorry.  What Bate stamp was --

16     Q.    Bate stamp 79.

17     A.    Yes.

18     Q.    Okay.  So I mean that would indicate to

19 you that the Childs' report was received by your

20 unit the same day as the letter; correct?

21     A.    Yes.

22     Q.    Okay.  And if you put the letter in

23 David Rhein's file, I'm sure you also put Childs'

24 report in David Rhein's file; correct?

138

1      A.    Yes.  Somebody from my staff would have

2  done that, yes.

3      Q.    Well, it was addressed to you, and you

4  remember seeing the letter; right?

5      A.    Yes.

6     Q.    Are you saying you don't remember

7  seeing the Childs' report?

8     A.    I did not look at the -- I didn't look

9  the psychological report.

10     Q.    You didn't even look at it; correct?

11     A.    That's correct.

12     Q.    Okay.  Now, what did you do with this

13  information; you put it in the file?

14     A.    It goes to the doc review person,

15  whoever that might be at that time, and it's marked

16  as received, and it's documented, and it's included

17  in the file.

18     Q.    Okay.  And this doc review person, this

19  would still be someone within your unit; correct?

20     A.    Yes.  Probably Sharon Lawson.

21     Q.    Okay.  And you have no idea what

22  happened to this information, the letter and the

23  report after that?

24     A.    I'm assuming it was placed in the file.

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

139

1     Q.    Okay.  What happens to it after that?

2     A.    It's filed.

3      Q.     Does anyone look at it?

4      A.     Well, look at it once everything is

5  complete and in this case if it was determined that

6  everything was complete and a request has been sent

7  out to the zones and information from the zone and

8  from DeLuca's office has been returned, then we

9  would evaluate that.  I don't believe at this time

10  we received anything back from the zones.

11  Certainly, no way we'd get it back that quickly,

12  and I know we didn't get anything back from

13  DeLuca's office that quickly.

14      Q.     Let me ask you this.  Also, if you look

15  at these references, the three letters Bate stamped

16  81, 82, and 83.  Do you see that?

17      A.     Yes.

18      Q.     Okay.  And that's also date received

19  August 8th, 2011, the same date as the Childs'

20  report and the letter; correct?

21      A.     Correct.

22      Q.     All right.  And that would indicate

23  that you had received these three letters and put

24  those in the file too; correct?

1      A.      Correct.

2      Q.      So would you agree with me that other

3  than getting a letter or some sort of approval from

4  the police involved in this, David Rhein did

5  everything that was asked of you; correct?

6      MR. INOUYE:  Form.

7      THE WITNESS:  It appears, yes.

8  BY MR. DVORAK:

9      Q.      Okay.  And you -- the decision would be

10  that he still wouldn't receive a hearing because

11  DeLuca's office hadn't cooperated with not --

12  hadn't -- you hadn't heard back from DeLuca's

13  office, and you hadn't heard back from the police

14  agency involved in the investigation; correct?

15      A.      Most likely that's the case, yes.

16      Q.      Okay.  And you interpreted this as a

17  doc review; correct?

18      A.      That's what the process is referred to

19  with these kinds of revocations unless a formal

20  hearing is requested.

21      Q.      Okay.  And you're saying that you

22  didn't interpret Mr. Barbaro's letter as a formal

23  request for a hearing; is that correct?

24      A.      Nope.

141

1    Q.    Okay.  Where did you give notice to

2  Mr. Rhein or Mr. Barbaro that they have to use the

3  words hearing versus reinstatement?

4    A.    I'm not sure that that was provided.

5    Q.    And so an attorney or Mr. Rhein just

6  requesting that the FOID card be reinstated, unless

7  they use the word hearing, you're going to

8  interpret that as just a doc review; correct?

9    MR. INOUYE:  Form.

10  BY MR. DVORAK:

11    Q.    Is that correct?

12    A.    There is a distinction.  And if one

13  requests a hearing, a hearing is normally -- the

14  request for a hearing is evaluated and the request

15  is forwarded.

16        Typically, it's a doc review that

17  happens in a clear and present situation.  And,

18  again, I said that's typically.  You asked about

19  absolutes.  There are no absolutes.

20    Q.    By the way, even if Mr. Barbaro asked

21  for a formal hearing, you wouldn't have necessarily

22  given him one; right, could have been just doc

23  review?

24    A.    Well, let's just say Mr. Rhein was

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

142

1  anybody, depending on the totality of the

2  circumstances, a doc review could occur or a

3  hearing could occur.

4      Q.    Okay.  And that would be regardless of

5  whether or not the letter requested a hearing or

6  just reinstatement; correct?

7      A.    Correct.

8      Q.    Okay.  All right.  Now, there was

9  another letter, Bate stamp 84, September 19th,

10  2011.  Do you see that?

11      A.    Yes.

12      Q.    And you see this is, again, addressed

13  to you; right?

14      A.    Uh-huh.

15      Q.    And it looks like it was received by

16  your unit September 23rd, 2011; correct?

17      A.    Right.

18      Q.    And you see where Mr. Barbaro is saying

19  they've yet to hear anything from your office

20  regarding reinstatement; correct?

21      A.    Yes.

22      Q.    What happened to this letter; what kind

23   of response did you give?

24        A.    Apparently, there was none.


                    URLAUB BOWEN & ASSOCIATES, INC.
                            312.781.9586



                                                             143



1         Q.    Okay.  All right.  You did receive this

2    letter though; correct?

3         A.    Yes.

4         Q.    All right.  Now, Bate stamp 85, January

5    16th, 2012, do you see that letter?

6         A.    When I say apparently there was none,

7    that doesn't mean that a phone call wasn't made.  I

8    don't know that that was the case.  So a phone call

9    could have been made to his office.  If so, it

10   should have been documented on the file folder.

11        Q.    Do you see -- have you seen any kind of

12   documentation --

13        A.    As we said before, no.  If it's a file

14   folder documentation, it's not here.

15        Q.    Okay.  Then you see January 16th, 2012,

16   Bate stamp 85.  Do you see that?

17        A.    Yes.

18        Q.    Okay.  And this one is actually

19   directed to Hiram Grau; correct?

20      A.      Yes.

21      Q.      And it references letters that he sent

22  to you.  Do you see that?

23      A.      Yes.

24      Q.      Okay.  Did you ever receive this

144

1  letter?

2      A.      On the 24th, I received, I believe, and

3  I believe this was attached to it, a request for a

4  hearing from the deputy director's office.  That

5  would be Patrick Keen.

6      Q.      Okay.  That one is Bate stamp 87;

7  correct?

8      A.      Yes.

9      Q.      Okay.  And attached to it would have

10  been Bate stamps 85 and 86, the January 16, 2000

11  [sic] letter to Hiram Grau; correct?

12      A.      I believe so, yes.

13      Q.      Okay.  What did you do after this

14  request for a hearing?

15      A.      In my writing at the bottom of Bate

16  stamp 87, we had a new person in Vorreyer's place,

17  Master Sergeant Willner, and I asked her to make

18  formal contact with the attorney and advise legal.

19  Also, let Lieutenant Outlaw know when this has

20  occurred and provide a status.

21      Q.    That's your writing?

22      A.    Yes.

23      Q.    Whose writing is on the to FSB,

24  Christina, please handle and PS.  Whose writing is

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586


145


1  that?

2      A.    It looks like Lieutenant Colonel

3  Cochran's.

4      Q.    But the bottom part of starting with

5  1-25-12, that's all your writing to the end;

6  correct?

7      A.    That's correct.

8      Q.    Okay.  All right.  So why did you write

9  this?  What were you attempting to accomplish?

10      A.    To move the process forward.

11      Q.    Okay.  And how were you trying to move

12  the process forward?

13      A.    Well, by contacting the attorney and

14  advising legal that a request for some action has

15  been made.  Given the nature of this issue, is

16  important, that because this request for revocation

17  went up the division of operation chain and came

18  back down to me that the requests go back that way

19  as well.

20      Q.    Did you do anything other than write

21  this note that the attorney should be contacted,

22  legal should be contacted?

23      A.    I don't know.  I do know that -- I

24  believe that I then worked for the division of

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586


146


1  operations, was transferred, I think it was

2  February 1st of '12.

3      Q.    Okay.  All right.  Did you take any

4  steps to actually make sure that there was a

5  hearing?

6      A.    I could never ensure that there was a

7  hearing.

8      Q.    Okay.  Why not?

9      A.    Because that's beyond my scope.  I

10  could ensure that the requests that I made to

11  Master Sergeant Willner were completed.  I asked

12  her to do that and to let Lieutenant Outlaw, who

13  was the chief of staff for the division of

14  administration, know when this has occurred so that

15  he could notify the proper folks in that chain.

16        Q.    Okay.  Did you follow up on this

17  request at all?

18        A.    I wasn't there, no.

19        Q.    Who was your replacement by the way?

20        A.    Jessica Trame.

21        Q.    And according to you, who would be

22  responsible for actually giving Mr. Rhein a hearing

23  after Bate stamp 87 was received and the note that

24  you wrote on it?

1        A.    That wouldn't change unless the process

2  changed.  So I guess that's beyond the scope.  It

3  would be -- it would have to be something that's

4  scheduled through the legal office if it couldn't

5  be done as a document review.

6              I think during the course of all

7  this, we were still receiving information, at least

8  initially, that he had -- Mr. Rhein had still been

9  contacting DeLuca's office and complaining to them

10    or blaming them for the revocation.

11        Q.    Okay.

12        A.    They've -- as a result, they contacted

13    or sent something to us, and I believe it's in this

14    stack here somewhere that he is still making

15    threats.

16        Q.    Where is that documented?

17        MR. INOUYE:  Page 75.

18        THE WITNESS:  And that would be it.

19    BY MR. DVORAK:

20        Q.    Okay.  And this would have been a --

21    what is this, an e-mail?  What is this?

22        A.    E-mail.

23        Q.    Okay.  From whom to whom?

24        A.    From Kristy Bond to Christina Hibbert,

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586


148


1    both are administrative assistants.

2        Q.    And with what offices?

3        A.    Kristy Bond was with the division of

4    operations.  Christina Hibbert is with the division

5    of administration, the division in which FSB

6    resides.

7        Q.    Is there a date on this?

8      A.      5-23-2011.

9      Q.      Okay.  And did this ever make it into

10 David Rhein's file?

11     A.      I believe so.

12     Q.      And it looks like you were actually CCd

13 on it, John Coffman?

14     A.      Yes.

15     Q.      Okay.  You're saying he was continuing

16 to make threats?

17     A.      I'm not saying that.

18     Q.      Oh, I thought that's what you just

19 said?

20     A.      I'm saying I saw a document that

21 indicated that -- it says, now that his card and

22 guns have been confiscated, he's threatening the

23 rep again for getting them taken away.

24              The rep is angry because I guess

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

149

1 they tried to fight for him to keep his guns?  But

2 Rhein is convinced it's the rep's fault.  The

3 representative wanted ISP to contact Rhein and

4 advise him that it was the ISP and not the rep.

5      Q.     What relevance does this have in your

6  decision-making, I guess?

7      A.     Well, if I saw this, I think it would

8  show that his improper contact with the rep's

9  office is ongoing.  I believe that when the agents

10 met with him, there was an agreement that any

11 contact with the representative would be done

12 through one of the agents in which Mr. Rhein agreed

13 to, apparently.

14     Q.     Where do you see that documented?

15     A.     There was something after the

16 revocation so it wouldn't be in this pile.

17     Q.     Something after the revocation.  Well,

18 this file I believe is the only documentation that

19 I have related to this incident.  Are you saying

20 there would be some other document?

21     A.     I remember an e-mail from the division

22 of operations, in which I had a copy, it indicated

23 that Rhein had been advised and agreed to make any

24 further contact through one of the agents.

1      Q.     Okay.  And you're saying because he was

2  even contacting his own State Representative that

3    would somehow factor in your decision whether to

4    give a hearing or not?

5         A.    Not simply because he was contacting

6    his own State Representative, but because this

7    State Representative was the focus of some threats,

8    he agreed not to contact that representative and

9    had gone against that agreement and was contacting,

10   apparently, the representative anyway.

11        Q.    Okay.  And are you saying that factored

12   into your decision about whether or not to give him

13   a hearing or have his FOID card reinstated?

14        A.    It would have factored into whether or

15   not I would have recommended his FOID card being

16   reinstated, but I was no longer at the bureau after

17   the end of January '12.

18        Q.    Okay.  So this e-mail is dated -- okay.

19   But I'm asking you whether or not it would have

20   factored in your decision to give him a hearing?

21        A.    No.

22        Q.    No, it would not have?

23        A.    It would not.

24        Q.    Okay.

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

1      A.    I think that's precisely the kinds of

2  things that would have -- should be discussed at a

3  hearing.

4      Q.    Okay.

5      A.    Got it.

6      Q.    And then do you remember having any

7  sort of contact about this case or at all after

8  this Bate stamp 87?  I mean, other than getting

9  notified of a lawsuit?

10      A.    Nothing significant.  Again, I haven't

11  seen many of these documents for two years, two and

12  a half years, you know, since this occurred.  And

13  that's why, you know, it's important to kind of

14  review some of this, but I can't think of anything

15  else.

16             I think that the key -- the point I

17  would make is that just given the nature of the

18  comments made by Mr. Rhein without knowing

19  Mr. Rhein led us to make that decision, again,

20  based on information provided by the agents and the

21  division of operations.

22      Q.    Okay.  So I take it you were never

23  notified that Mr. Rhein filed a lawsuit in Cook

24  County requesting a hearing to challenge his

152

1  revocation?

2      A.    No, I wasn't there.  I think when this

3  was filed, I was not there, and I was not notified

4  that this occurred until I was notified of this

5  particular action.

6      Q.    You mean this particular lawsuit?

7      A.    This lawsuit.

8      Q.    Okay.  So no one involved in the

9  administrative process or that hearing ever

10  contacted you; correct?

11      A.    That's correct.

12      Q.    Okay.

13      A.    You should understand too that there

14  are, not surprisingly, quite a few lawsuits related

15  to revocations or FOID denials, and I am probably

16  rarely notified until one is ready to go to court,

17  at which time the case file is assembled, and

18  that's a formal, as you know, a formal file, a

19  formal process.

20      Q.    Oh, I forgot to ask you, do you know

21  how many states have clear and present danger

22  statutes besides Illinois?

23      A.    I don't.

24      MR. DVORAK:  Okay.  Identify these as true

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

153

1   and accurate copies of your interrogatory

2   responses.  Just so we can get this part of the

3   record.  What are we on exhibit?

4        MR. INOUYE:  4.

5        MR. DVORAK:  4.

6        THE WITNESS:  Yes.

7                    (Coffman Exhibit No. 4 marked.)

8   BY MR. DVORAK:

9        Q.    Okay.  On Interrogatory Response No.

10  10, the question was, did you ever become aware

11  that plaintiff, David Rhein, was challenging the

12  revocation of his FOID card pursuant to 430 ILCS

13  65/8 F.  Do you see that?

14       A.    Yes.

15       Q.    Okay.  And other than the objection,

16  you put that you were not made aware of the appeal?

17       A.    I think as I just mentioned, we receive

18  a number of lawsuits, and it didn't stand out at

19  the time.  Now that I've seen the letter, it does

20  jog my memory so --

21       Q.    Okay.  So that answer is incorrect;

22  correct?

23      A.    Well, it's more accurate now, yeah.

24      Q.    All right.


URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586



154



1       A.    I mean, it's -- I don't think the

2   answer was necessarily incorrect at the time.

3   That's, you know.

4       MR. DVORAK:  All right.  So -- okay.  All

5   right.  Nothing further.

6                         EXAMINATION

7   BY MR. INOUYE:

8       Q.    Okay.  I just want to clarify a couple

9   things.  When you talk about your role in these

10  revocation letters, your job isn't to investigate

11  these reports or these statements, you get the

12  summaries from Vorreyer or Metzger or whoever else,

13  and you just decide if it reaches a certain level

14  and threshold; is that right?

15      A.    That's correct.  The investigation is

16  done by the trained agents out on the street

17  whether it's from our department or it's from other

18  agencies.  We don't have an investigative function.

19      Q.    And so I'm clear, these other officers

20     like in zone one when you talked about zone one,

21     even though you're a higher level officer, doesn't

22     mean that you can actually command them to do

23     anything?

24         A.     That's correct. And as we got into in

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586

155

1     our discussion previously, the State Police has a

2     rigid chain of command. And if I were to intercede

3     and ask them to do something that is beyond the

4     scope of what my responsibilities are, it could

5     impede something else they may be working on that

6     I'm not aware of. That would be counterproductive,

7     and there could be officer safety issues related to

8     that.

9         Q.     Oh, and also on Page 2 of Exhibit 3, so

10     it's probably the first page right here actually.

11         A.     Oh, okay.

12         Q.     This appears to be an e-mail from

13     Steven Pryor to Michael Vorreyer and Linette

14     Metzger, and it says, sir, in the attachments

15     you'll see from the information for DeLuca's

16     secretary. And then if you go to the last page

17   which is Page 4, three are attachments; correct?

18      A.    Correct.

19      Q.    Okay.  So is it safe to assume that

20   Michael Vorreyer and Linette Metzger would have

21   seen the attachments?

22      A.    Yes, sir.

23      MR. DVORAK:  Objection, calls for

24   speculation.

156

1 BY MR. INOUYE:

2      Q.    Okay.  And they are the ones who would

3  have actually summarized what the information was

4  and whether or not that was sufficient to revoke

5  his FOID cord; is that right?

6      A.    That would have been included in that

7  summary along with any other factors that would be

8  collected.

9      MR. INOUYE:  Okay.  Nothing further.

10               EXAMINATION

11 BY MR. DVORAK:

12      Q.    But just to be clear, you don't have

13  any memory of what information they actually

14  provided you other than the summary that's

15  contained in the e-mail at 3 and 4, Bate stamp 3

16  and 4?

17       A.    Well, I think to be clear, I do

18  remember some of the comments that were made.

19  Again, whether that was provided orally from those

20  documents or whether it was conveyed in some other

21  manner, I do recall those comments and --

22       Q.    And those are the comments you referred

23  to earlier in the deposition; correct?

24       A.    That's correct.

157

1        Q.    Okay.  But no others that you can

2   remember?

3        A.    That I can remember.

4        Q.    Okay.  Or that are documented anywhere;

5   correct?

6        A.    That calls for an absolute that I

7   can't --

8        Q.    But you're not aware it's documented

9   anywhere what information you considered in making

10  your decision to revoke; correct?

11       A.    I am aware that it's going to be

12    documented in a case file that's maintained at DOO.

13    There's going to be -- by the agents that put all

14    this together, they are going to have a detailed

15    file.

16              And it is my experience that this

17    file that's maintained then over at FOID mirrors

18    pretty closely now what would have been assimilated

19    in that file in DOO.

20    Q.    Okay.  But, again, you don't know what

21    documents you actually viewed from that file prior

22    to revocation; correct?

23    A.    In a file as thick as this is, I don't

24    recall which documents I reviewed firsthand.


URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586


158


1         MR. DVORAK:  Okay.  Thank you.

2         MR. INOUYE:  I will handle signature.  If I

3    can get an E-tran, PDF exhibits.

4         MR. DVORAK:  I'll take a copy or whatever.  I

5    guess I'm ordering, I suppose.  Same thing.

6         THE REPORTER:  Okay.

7              FURTHER DEPONENT SAITH NOT ...

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

URLAUB BOWEN & ASSOCIATES, INC.
312.781.9586


159


1        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION

3   KIM RHEIN and DAVID RHEIN,  )
                                )
4               Plaintiffs,     )
                                )
5          vs.                  )  No. 13 CV 843
                                )
6   AGENT PRYOR, et al.,        )
                                )

7          Defendants.    )

8

9        This is to certify that I have read my

10   deposition taken on Friday, June 20, 2014, in the

11   foregoing cause, and that the foregoing transcript

12   accurately states the questions asked and the

13   answers given by me, with the changes or

14   corrections, if any, made on the Errata Sheet

15   attached hereto.

16

17                              JOHN COFFMAN

18   No errata sheets submitted (Please initial)
     Number of errata sheets submitted        pages
19
     Subscribed and sworn to
20   before me this      day
     of           2014.
21

22
        Notary Public
23

24


              URLAUB BOWEN & ASSOCIATES, INC.
                     312.781.9586



                                                  160



1   STATE OF ILLINOIS   )
                         ) SS:
2   COUNTY OF K A N E   )

3

4          I, Timi M. Fulfs, a Certified Shorthand

Reporter and notary public in and for the County of
5  Kane and State of Illinois, do hereby certify that
   JOHN COFFMAN was duly sworn to testify the whole
6  truth, and that the foregoing deposition was
   recorded stenographically by me and was reduced to
7  computerized transcript under my direction, and
   that the said deposition constitutes a true record
8  of the testimony given by said witness.

9         I further certify that the reading and
   signing of the deposition was not waived, and the
10 deposition was submitted to the deponent's counsel
   for signature.  Pursuant to Rule 30(e) of the Rules
11 of Civil Procedure, if deponent does not appear or
   read and sign the deposition within 30 days, or
12 make other arrangements for reading and signing,
   the deposition may be used as fully as though
13 signed, and this certificate will then evidence
   such failure to appear as the reason for signature
14 not being obtained.

15        I further certify that I am not a
   relative or employee or attorney or counsel of any
16 of the parties, or a relative or employee of such
   attorney or counsel, or financially interested
17 directly or indirectly in this action.

18        IN WITNESS WHEREOF, I have hereunto set
   my hand and affixed my seal of office at Chicago,
19 Illinois, this 30th day of June, A.D. 2014.

20

21                    Illinois CSR No. 084-003517
22

23

24


             URLAUB BOWEN & ASSOCIATES, INC.
                    312.781.9586