IN THE UNITED STATES DISTRICT COURT,
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **DAVID RHEIN**, | ) | |
| | ) | No. 13 C 843 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Hon. Judge Gary Feinerman |
| | ) | |
| **LIEUTENANT JOHN COFFMAN**, | ) | Hon. Mag. Judge Young B. Kim |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

The Plaintiff, David Rhein, through his attorneys, DVORAK LAW OFFICES, LLC, and pursuant to Federal Rule of Civil Procedure 56, moves this Court for entry of summary judgment in his favor and against the Defendant Lieutenant John Coffman ("Defendant Coffman"). The Plaintiff submits the following memorandum of law in support of his motion for summary judgment. Plaintiff's Local Rule 56.1(a)(3) Statement of Undisputed Material Facts is filed separately and the facts contained therein are incorporated herein by reference.

## STANDARD OF REVIEW

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For purposes of this motion only, the Plaintiff is assuming many of the facts presented in Donna Fanning's documentation and by Defendant Coffman, Agent Steven Pryor, and Agent Freddie Summers at deposition are true. Since both parties move for summary judgment, and it appears there are no significant factual disputes that are necessary to resolve the issue, it is appropriate that this Court (rather than a jury) should decide this case on the pleadings. See, e.g., *Spinelli v. City of New York*, 579 F.3d 160 (2d Cir. 2009) (in a denial of a

gun permit hearing case, reversing the district court's decision granting summary judgment for the defendants, and instead ordering the district court to grant summary judgment for the plaintiffs).

## SUMMARY OF MATERIAL FACTS

Between March 10, 2010 and February 1, 2011, a period of 11 months, the Plaintiff made contact with his state representative's office seven times, making phone calls and/or leaving packages of documents expressing his political views (Pl. F. 9-22). On one occasion, on March 22, 2010, the Plaintiff allegedly said, "I am ready to start shooting people" in a phone call with Donna Fanning, the representative's assistant, and on another occasion, on January 25, 2011, the Plaintiff allegedly told Fanning that he called the Governor's office and "threatened to kick his ass" because he would not answer the Plaintiff's calls (Pl. F. 23). On February 2, 2011, the Illinois State Police was contacted regarding the Plaintiff's contacts with his state representative's office, and these two comments in particular were examined by the ISP Statewide Terrorism and Intelligence Center (Pl. F. 34, 36). Even though Fanning notified the Crete police about the Plaintiff making alleged threats, the Crete police never returned any of her calls, nor did they contact the Plaintiff (Pl. 13, 14, 17). The only sworn police officers who investigated the case, Illinois State Police Agents Summers and Pryor, both concluded they did not have probable cause to arrest the Plaintiff for any crime related to these allegations (Pl. F. 49, 55). Agents Summers and Pryor also did not believe the Plaintiff was suffering from any sort of mental illness nor was he acting in an irrational manner during their interaction with the Plaintiff (Pl. F. 54, 56).

On February 3, 2011, Illinois State Police Lt. John Coffman, based on a summary of others' documentation of Fannings' allegations, signed a letter revoking the Plaintiff's FOID

Card (Pl. F. 37). The next day, Agents Summers and Pryor interviewed the Plaintiff, but by this time Defendant Coffman had already made the decision to revoke the Plaintiff's FOID Card (Pl. F. 44, 58). That same day, Agents Summers and Pryor seized the Plaintiff's FOID card and all of the firearms the Plaintiff otherwise lawfully kept in his home (Pl. F. 59). The same day, the Plaintiff expressed his desire to Agent Pryor that he wanted to appeal this decision, and Agent Pryor directed the Plaintiff to follow the dictates of Coffman's letter (Pl. F. 61). The letter written by Coffman notifying the Plaintiff of his decision to revoke the Plaintiff's FOID Card contained his recommendations to the Plaintiff of what needed to be done to get his FOID Card reinstated (Pl. F. 75). This letter arrived in the mail to the Plaintiff on February 7, 2011 (Pl. F. 60).

In an attempt to comply with Coffman's recommendations, the Plaintiff immediately sought out mental health professionals to complete the required evaluation (Pl. F. 64). However, the Plaintiff had difficulty finding a psychiatrist or psychologist willing to perform an evaluation attesting to the Plaintiff's suitability to own firearms, and thus several months passed before he finally found one willing to do such an evaluation (Pl. F. 64). Defendant Coffman knew this would be a problem for individuals in the Plaintiff's position, testifying in his deposition that, due to liability concerns, a "clear and present danger" revokee may need to contact six to 10 different doctors before he may find one willing to do such an evaluation (Pl. F. 76). Further, Coffman knew this would be a financial burden on the revokee, a cost he states he did not want to place on the State because of the State's supposed financial limitations (Pl. F. 77).

At some point between August of 2011 and September of 2011, the Plaintiff hired an attorney, Joseph Barbaro, to assist him in his attempt to reinstate his FOID Card (Pl. F. 65). On August 1, 2011, Attorney Barbaro drafted a letter requesting reinstatement of the Plaintiff's

3

FOID Card, and he enclosed in that letter a report written by Dr. Alan Childs, a psychologist who wrote a report attesting that the Plaintiff is not a danger to himself or others (Pl. 81-83). Defendant Coffman acknowledged in his deposition that he received Barbaro's letter on August 8, 2011, including Dr. Childs' attached report, but Defendant Coffman admitted he never read Dr. Childs' report (Pl. F. 86). Defendant Coffman ignored the letter and the report, and, as a result, Barbaro wrote Defendant Coffman another letter, dated September 19, 2011, requesting a response to his earlier letter (Pl. F. 84). Defendant Coffman received this letter on September 23, 2011, and, once again, Defendant Coffman ignored the letter (Pl. F. 84, 85, 92). Defendant Coffman explains he ignored Barbaro's letters because the letters did not request a "hearing" but instead requested "reinstatement" of the Plaintiff's FOID Card (Pl. F. 87). Defendant Coffman's initial letter to the Plaintiff gave no notice that one must request a "hearing" rather than reinstatement, and the FOID Card Act does not make such a distinction (Pl. F. 88-89). In any event, Defendant Coffman still considered the request for reinstatement as a request for a document review (Pl. F. 90), yet neither Coffman nor anyone else in his unit completed a document review of the Plaintiff's case (Pl. F. 96). Had Barbaro requested a "hearing" in his letters, he may not have been provided one anyway (Pl. F. 93).

After receiving no response from Coffman or any other Illinois State Police official, Barbaro filed a lawsuit in the Circuit Court of Cook County to have his FOID Card privileges reinstated, and to have his firearms returned (Pl. F. 98). On June 5, 2012, Plaintiff's FOID card was finally eligible for reinstatement (Pl. F. 99). August 29, 2012, Plaintiff's firearms were finally returned (Pl. F. 101).

# ARGUMENT

I. **The Plaintiff is Entitled to Summary Judgment on His Procedural Due Process Claims Against Defendant Coffman.**

The Plaintiff's procedural due process rights were violated because Defendant Coffman failed to provide the Plaintiff with adequate pre-deprivation and post-deprivation process. It is undisputed that the Plaintiff was denied both pre- and post-deprivation hearings, and that, after several attempts to contact Defendant Coffman, the Plaintiff received no response until the Plaintiff filed a lawsuit in state court demanding reinstatement of his FOID card and return of his weapons. First, pursuant to the United States Supreme Court's decision in *Zinermon v. Burch*, 494 U.S. 113 (1990), in this case it was not "[in]feasibl[e]" or "impracticable" (*Id*. at 132) for the State to have given the Plaintiff a pre-deprivation hearing, and thus the Plaintiff's due process rights were violated. Second, even if it were not feasible or practicable to do so, the Plaintiff was not given a "prompt" post-deprivation hearing, as required by the Court. *FDIC v. Mallen*, 486 U.S. 230, 246 (1988). At least one federal Circuit Court of Appeals has ruled that a 58-day delay in providing a plaintiff a post-deprivation hearing, also in a seizure of a gun license case, violates due process, requiring the entry of summary judgment on behalf of the plaintiff. *See Spinelli v. City of New York*, 579 F.3d 160 (2nd Cir. 2009). Third, even if the pre-deprivation seizure was justified (which it was not), and it could be found that there was a "prompt" post-deprivation hearing (which there was not), Defendant Coffman failed to provide any meaningful due process, employing the three-part test mandated by the United States Supreme Court's decision in *Mathews v. Eldrige*, 424 U.S. 319 (1976).

    A. **It was Feasible and Practicable for Defendant Coffman to Provide the Plaintiff with a Pre-Deprivation Hearing.**

The United States Supreme Court "usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon*, 494 U.S. at 127 (emphasis in original); *see e.g., Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985) ("'[T]he root requirement' of the Due Process Clause" is "'that an individual be given an opportunity for a hearing *before* he is deprived of any significant protected interest'"; hearing required before termination of employment (emphasis in original)); *Parham v. J.R.,* 442 U.S. 584, 606-07 (1979) (determination by neutral physician whether statutory admission standard is met required before confinement of child in mental hospital); *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 18 (1978) (hearing required before cutting off utility service); *Goss v. Lopez,* 419 U.S. 565, 579 (1975) (informal hearing required before suspension of students from public school); *Wolff v. McDonnell,* 418 U.S. 539, 557-558 (1974) (hearing required before forfeiture of prisoner's good-time credits); *Fuentes v. Shevin,* 407 U.S. 67, 80-84 (1972) (hearing required before issuance of writ allowing repossession of property); *Goldberg v. Kelly,* 397 U.S. 254, 264 (1970) (hearing required before termination of welfare benefits). "In short, 'within the limits of practicability,' a State must afford to all individuals a meaningful opportunity to be heard if it is to fulfill the promise of the Due Process Clause." *Boddie v. Connecticut*, 401 U.S. 371 (1971) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

None of the exceptions where the Supreme Court has excused the lack of a pre-deprivation process applies in this case. First, this is not a "special case" where a post-deprivation tort remedy is the only remedy the State could be expected to provide because it is "impossible to predict such deprivations." *Zinermon*, 494 U.S. at 128-29; *See e.g., Parratt v. Taylor*, 451 U.S. 527, 543-44 (1981); *Hudson v. Palmer*, 468 U.S. 517 (1984). In those instances, State actors are not acting pursuant to any established state procedure, but instead are

6

acting negligently (as in *Parratt*) or deliberately and maliciously (as in *Hudson*). *Zinermon*, 494 U.S. at 130. Here, Defendant Coffman was not acting outside of any established state procedures, and therefore it was certainly possible, and at least practical, to provide a pre-deprivation hearing.

Next, there was no necessity for quick action by the State. Under this exception, the Court has upheld a summary seizure and destruction of drugs without a pre-seizure hearing where there has been a finding of probable cause (*Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594 (1950), and where an investigation revealed substantial questions about the competence of a bank's management, the public interest against economic harm justified the immediate seizure of its property (*Fahey v. Mallonee*, 332 U.S. 245 (1947)). In the first case, a finding of probable cause preceded the deprivation, and in the second, the plaintiffs refused to participate in a pre-deprivation hearing, making it impossible to provide pre-deprivation process. *Id*. Another exception based on health and public safety was upheld where there was a "threat of imminent danger" due to mining operations that created a "reasonable expectation of death or serious injury." *Hodel v. Virginia Surface Min. and Reclamation Ass'n Inc.*, 452 U.S. 264 (1981).

In this case, the Plaintiff allegedly made the statement, "I am ready to start shooting people," on March 22, 2010 (Pl. F. 10), *11 months* prior to the revocation of the Plaintiff's FOID card in February 2011. However, this statement also was made during a phone call that involved a political discussion with a person who works for an elected representative, and it "ended peacefully." (Pl. F. 9-12). The last contact the Plaintiff had with the state representative's office was on February 1, 2011, when he called and spoke to Fanning to tell her he would "picket [their] parking lot with a group of people who want answers" and that he "cannot understand why the Rep. [sic] won't answer his petition in writing, as many times as he has respectfully

asked for answers to his questions." (Pl. F. 28). At no point in Fanning's narrative of the interaction on this date is there any mention of threats made by the Plaintiff. (Pl. F. 29). In other words, there was no "clear and present danger" in this case because the initial shooting remark, in context, is not a particularly dangerous statement (and is nevertheless stale), and, moreover, the most recent interaction provided nothing of significance to the "clear and present danger" equation.

Significantly, the Crete police were notified of Fanning's allegations and the Crete police did not even find it warranted a follow up phone call or investigation (Pl. F. 13, 14, 17). Nor did the Illinois State Police agents who actually investigated Fanning's allegations (Agents Summers and Pryor) believe that there was probable cause to believe the Plaintiff had committed a crime (Pl. F. 49, 55). In addition, Coffman had no evidence that the Plaintiff had any sort of dangerous mental condition or evidence that he suffered from a mental illness, and Agents Summers and Pryor did not believe he had one (Pl. F. 54, 56). This is significant because the FOID Card Act's "clear and present danger" revocation provision requires that the revokee have a "mental condition" that would pose such an immediate danger. 430 ILCS 65/8(f).

In this case, the Plaintiff cites the Second Circuit's decision in *Spinelli*, *supra*, for support of his position that Coffman denied the Plaintiff his due process rights in not granting him a prompt and meaningful post-deprivation hearing (see below). In that case, the *Spinelli* Court also ruled the plaintiffs were not entitled to a pre-deprivation hearing. *Spinelli*, 579 F.3d at 170-71. However, the Court did so based on facts that are distinguishable from the case at bar. In *Spinelli*, the plaintiffs (a group of gun dealers at a particular gun shop), sued, *inter alia*, a New York City Police sergeant, for revoking their gun-shop permits and then not giving them a prompt, meaningful hearing. *Id*. at 163. Within only a month of the greatest terrorist attack in

United States history (9/11), in New York City, the City responded by taking emergency measures to ensure gun dealers were complying with all previously issued gun-licensing requirements designed to secure weapons found in gun shops. *Id*. at 164. Upon inspection, New York police found the security at the gun shop was "grossly inadequate," which included an unwatched counter area, a large hole in the backyard fence, and two unlocked safes. *Id*. However, in this case, unlike in *Spinelli*, Defendant Coffman was reacting to an incident involving stale allegations involving a political dispute between a constituent and his elected representative. Whatever comments were made or not made during these conversations was not enough to warrant an arrest, or even a follow up from the local police department. There is no reason why Defendant Coffman could not have waited until Pryor and Summers completed their investigation before revoking the Plaintiff's gun permit. "[A]bsent 'the necessity of quick action by the State or the impracticality of providing any pre[-]deprivation process,' a post-deprivation hearing here would be constitutionally inadequate." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982).

**B. Defendant Coffman Failed to Provide the Plaintiff a Prompt and Meaningful Post-Deprivation Due Process Remedy.**

Next, even assuming that a pre-deprivation hearing was not required under these facts, Defendant Coffman still failed to provide the Plaintiff with a prompt and meaningful post-deprivation hearing. The United States Supreme Court has held that "[a]t some point, a delay in [a] post-[deprivation] hearing would become a constitutional violation." *Loudermill*, 470 U.S. at 547; *see also Suboh v. Dist. Attorney's Office of Suffolk Dist.*, 298 F.3d 81, 94 (1st Cir. 2002) (holding that "there must be must be an adequate post-deprivation hearing within a reasonable time" in order to satisfy due process). In *Spinelli*, *supra*, the Second Circuit held that a 58-day delay between the deprivation of gun dealer's firearms license and a post-deprivation hearing

9

violated due process, noting that "once the [defendant] took possession of [plaintiff's] property pending investigation, it was incumbent upon the [defendant] to provide a prompt hearing." *Id*. at 174. In this case, the Plaintiff suffered over a one-year-and-fourth-month delay from the time of the revocation on February 3, 2011 (Pl. F. 37) to when his FOID card was reinstated on June 5, 2012 (Pl. F. 99), and thus this time frame is not within the permissible bounds of constitutionality. *Id.* Here, Defendant Coffman cannot offer any legitimate reason for the delay of over one and a half years in responding to the Plaintiff's request for reinstatement of his FOID card, despite the Plaintiff's statutory right to a post-deprivation hearing. See 430 ILCS 65/10(a) (an "aggrieved party may appeal to the Director of the Illinois State Police for a hearing upon such denial, revocation, or seizure . . .")

### C. Applying the *Matthews v. Eldrige* Factors, the Plaintiff was Denied his Procedural Due Process Rights.

Although it is clear the Plaintiff was denied a pre-deprivation hearing, and there was no prompt hearing provided thereafter, ultimately this Court nevertheless must address what process was due in light of the three distinct factors set forth by the United States Supreme Court in *Mathew v. Eldridge*, 424 U.S. 319, 335 (1976). "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* Additionally, while "the concept of due process generally demands fewer procedural safeguards at informal administrative proceedings than during formal judicial hearings[,]" "there is a procedural floor below which even informal proceedings cannot go." *Cooper v. Salazar*, 196

F.3d 809, 814 (7th Cir. 1999). Here, the utter lack of any meaningful process both before and after the Plaintiff's deprivation falls well below this procedural floor.

To begin, the first *Mathews* factor favors the Plaintiff because he has a strong private interest in his FOID card and the concomitant right to the use of his firearms for self-defense and other recreational uses. The right to use his firearms for self-defense is not only a strong interest, but a fundamental right. The Second Amendment generally guarantees an individual the right to possess a weapon for protection in case of confrontation. *District of Columbia v. Heller*, 554 U.S. 570 (2008). In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the United States Supreme Court held that the right to bear arms is "fundamental" to the American "scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Id.* at 3036. That right encompasses the right to possess a weapon within one's own home that may be used for personal protection. *Heller*, 554 U.S. 570. The Court identified "[s]elf-defense as a basic right" and, moreover, has held "individual self-defense . . . 'the *central component*' of the Second Amendment right." *McDonald*, 130 S.Ct. at 3036 (citing *Heller*, 554 U.S. at 599). Additionally, under the Illinois Constitution, "[s]ubject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed." Ill. Const. Art. 1 § 22. Further, the Second Circuit has addressed this particular issue, and in *Kuck v. Danaher*, 600 F.3d 159 (2d Cir. 2010) the Court held that when dealing with the deprivation of a firearms permit "the private interest at stake remains significant." *Id.* at 165.

Here, the Plaintiff's private interest in his FOID card is indeed significant because, in addition to his ability to use his guns for hunting and enjoyment, it is intertwined with his basic Second Amendment right to bear arms for self-defense. The Plaintiff and his wife legally owned several firearms that they used for various reasons, including for self-defense in the home. The

11

Plaintiff was deprived of the use and protection of all his weapons immediately and without notice or an opportunity to be heard. Therefore, the first factor weighs squarely in Plaintiff's favor.

The second *Mathews* factor also weighs in the Plaintiff's favor because there was a high risk of erroneous deprivation in not giving the Plaintiff any pre-deprivation hearing, then failing to give him any prompt hearing thereafter. Without a hearing before the deprivation, there was simply no way the Plaintiff could have challenged the information Coffman was considering in making his determination. This was something that Coffman does in every "clear and present danger" case. In some cases, that might be the right avenue to take. However, in this case, the denial of a hearing was not warranted because Coffman was dealing with stale allegations involving an individual with no history of mental illness whose acts did not even rise to the level of probable cause for an arrest.

Regarding the Plaintiff's post-deprivation opportunity to be heard, it is clear that there was a tremendous risk of erroneous deprivation because Coffman placed the burden of proving the lack of a "clear and present danger" on the Plaintiff, then after the Plaintiff attempted to comply with Defendant Coffman's burdensome request, ignored his pleas for due process thereafter, ostensibly based on some fine distinction between a request for a "hearing" rather than a request for "reinstatement," a distinction made nowhere in Coffman's letter, or the FOID Card Act. Regardless, Coffman still interpreted the request as one for document review, which he still did not do, and he further admitted that, had Attorney Barbaro requested a "hearing," rather than reinstatement, he still may not have granted him one. Defendant Coffman ignored *all* of the Plaintiff's request for post-revocation relief, even when the Plaintiff complied with virtually all of Defendant Coffman's requirements for a hearing, including the expensive, time-

12

consuming, humiliating, and onerous task of not only getting character references, but also of finding and paying for a psychiatrist who could attest to his ability to possess weapons. Had Coffman simply read Dr. Childs' report, he would have had proof that the Plaintiff did not have a mental condition that made him a danger to himself or others.

In considering the second *Mathews* factor, the *Spinelli* case is instructive. In *Spinelli*, the Second Circuit reversed a grant of summary judgment, and directed entry of summary judgment in favor of the plaintiffs, who were denied post-deprivation due process when they were not provided with a prompt hearing following the revocation of their gun dealer license. There, one of the plaintiffs received a letter notifying her of the revocation based on "a failure to provide adequate security" for her gun shop. *Id.* at 164. The letter provided the name of a sergeant assigned to her case and provided his phone number, but did not notify her of her opportunity for a hearing under the law. *Id.* at 164-65. The plaintiff hired an attorney and, instead of formally requesting a hearing, the attorney, contacted members of the licensing division through correspondence requesting the immediate return of plaintiff's property. *Id.* at 165. The chief of the licensing division informed plaintiff that suspending a dealer's license and retaining their property throughout the duration of their investigation is "the norm." *Id.* Eventually, 58 days later, the plaintiff was able to reinstate her gun license and retrieve her property. *Id.* at 172.

In holding that the plaintiff's right to post-deprivation process was violated, the Second Circuit noted that the fact that plaintiff voluntarily opted out of pursuing a formal hearing through the administrative process and instead chose to negotiate with the city through her attorney, did not bar her from pressing a claim, because the administrative process was not available to her pending the city's investigation. *Id.* at 173. There, the court held that the city's

13

"blanket policy of providing a hearing after the investigation is completed cannot be squared with due process," and entered summary judgment in favor of the plaintiff. *Id.* at 173.

Similarly, in the instant case, the Plaintiff repeatedly requested reinstatement of his FOID card through correspondence with Coffman's unit, the same unit he was instructed to contact to appeal the revocation. Pl. F. 64-72. Although Coffman denied he was aware of Plaintiff's appeal in his interrogatory, he admitted during his deposition to receiving each piece of correspondence from Plaintiff's attorney requesting reinstatement of his FOID card. Pl. F. 64-66. Coffman simply turn a blind eye to requests for reinstatement after instructing revokees like the Plaintiff to contact his unit for appeals; this kind of practice is unconstitutional. And, no matter what language Plaintiff or his attorney used in the correspondence sent to Defendant Coffman's unit, Coffman was required, per statute, to do some sort of review upon request, and he admitted he did not even do this simple document review task.

Finally, the third *Mathews* factor addresses "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. The Plaintiff will not re-iterate his arguments (above) regarding the lack of urgent need to dispense with the ordinarily required pre-deprivation hearing, but regarding any claim that Coffman had to act quickly in response to the perceived threats in order to secure the public interest is "irrelevant" for the determination of what post-deprivation process is due. *See Spinelli*, at 579 F.3d at 174. The relevant inquiry is whether the Defendant Coffman has a "legitimate interest in not providing [the Plaintiff] with meaningful post-deprivation process." *Id.*

In this case, a post-revocation hearing would entail minimal fiscal and administrative burdens, and any additional burdens would be outweighed by the value of avoiding unnecessary

14

litigation.  It certainly does not make sense to put the burden on the revokee to find and pay for a psychiatrist to determine he is not a "clear and present danger."  Rather, this burden should fall on the State to have a licensed psychiatrist or psychologist to conduct the evaluation, since it is the entity revoking the property right without a pre-deprivation hearing.  Revokees who wait for months, or over a year, as the Plaintiff did, would not have to resort to litigation if meaningful due process were provided in the first instance.  Moreover, it certainly does not serve any legitimate governmental interest to require a revokee to obtain a psychiatric report, then not bother to read that report.  Therefore, the third *Mathews* factor also weighs in favor of the Plaintiff.

## **CONCLUSION**

In sum, for all these reasons, the Plaintiff requests that summary judgment be entered in his favor and against Defendant Coffman.

        Respectfully submitted,

        /s/ Richard Dvorak,
        One of Plaintiff's Attorneys.

Richard Dvorak
Iveliz Maria Orellano
DVORAK LAW OFFICES, LLC
18W140 Butterfield Road, 15th Floor
Oakbrook Terrace, IL 60181
(312) 593-7146
richard.dvorak@civilrightsdefenders.com

**CERTIFICATE OF SERVICE**

      I, Richard Dvorak, an attorney, certify that on September 12, 2014, a copy of Plaintiff's Memorandum of Law in Support of His Motion for Summary Judgment was served upon the attorneys for defendants named below through the Court's electronic filing system:

| | |
|---|---|
| Sunil Shashikant Bhave | Thor Yukinobu Inouye |
| Assistant Attorney General | Assistant Attorney General |
| 100 West Randolph Street, 13th Floor | 100 West Randolph Street, 13th Floor |
| Chicago, IL 60601 | Chicago, IL 60601 |
| sbhave@atg.state.il.us | tinouye@atg.state.il.us |

                                          /s/ Richard Dvorak,
                                          One of Plaintiff's Attorneys.