UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID RHEIN, | ) | |
| | ) | |
| Plaintiff, | ) | 13 C 843 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| JOHN COFFMAN, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

David and Kim Rhein brought this suit under 42 U.S.C. § 1983 against Agent Steven

Pryor, Agent Freddie Summers, and Lieutenant John Coffman of the Illinois State Police ("ISP")

in their individual capacities, and ISP Director Hiram Grau in his official capacity. Doc. 29.

The official capacity claim alleged that § 8(f) of the Illinois Firearm Owners Identification

("FOID") Card Act, 430 ILCS 65/8(f), is facially unconstitutional, while the individual capacity

claims alleged that the revocation of David's FOID card and seizure of his and Kim's firearms

from their home violated the First, Second, Fourth, and Fourteenth Amendments. The court

dismissed for lack of Article III standing the constitutional challenge to § 8(f). Docs. 42-43

(reported at 2014 WL 1099157 (N.D. Ill. Mar. 20, 2014)). Then, by agreement, the remaining

claims were dismissed except for David's Fourteenth Amendment due process claim against

Coffman, which alleges that Coffman failed to provide constitutionally adequate process before

and after revoking David's FOID card. Doc. 64. Coffman and David (who henceforth will be

referred to as "Rhein") have filed cross-motions for summary judgment. Docs. 65, 69. For the

following reasons, Coffman's motion is granted and Rhein's motion is denied.

**Background**

When considering Coffman's summary judgment motion, the facts are considered in the light most favorable to Rhein, and when considering Rhein's summary judgment motion, the facts are considered in the light most favorable to Coffman. *See In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) ("With cross summary judgment motions, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012). That said, many of the following facts are undisputed.

Until his FOID card was revoked, Rhein owned firearms and maintained them at his home in his Sauk Village, Illinois, a suburb south of Chicago. Doc. 77 at ¶ 3; Doc. 75 at ¶ 2. On March 10, 2010, Rhein visited the office of State Representative Anthony DeLuca in Springfield to drop off a packet of documents that included a petition requesting answers about why the Constitution was being violated. Doc. 77 at ¶ 9; Doc. 75 at ¶ 6. On March 22, Rhein called DeLuca's district office in Crete, a suburb close to Sauk Village, to ask whether DeLuca had received those documents and to inquire about delivering another set to the Crete office. Doc. 77 at ¶ 10; Doc. 75 at ¶ 6. Rhein spoke with Donna Fanning, DeLuca's District Manager, who reported that Rhein told her that he was "ready to start shooting people." Doc. 77 at ¶¶ 10-11; Doc. 75 at ¶ 6. Rhein left a set of documents at the Crete office later that day. Doc. 77 at ¶ 10. On August 3, Rhein dropped off another set of documents at the Crete office; one document stated that DeLuca should "hang for treason for allowing this state and federal government to piss and shit all over we the people's individual rights." *Id*. at ¶ 13; Doc. 75 at ¶ 8. This prompted Fanning to call the Crete police and turn over the documents to them. Doc. 77 at

¶¶ 13-14.  On September 30, Rhein called DeLuca's office and yelled at Fanning.  *Id*. at ¶ 15; Doc. 75 at ¶ 9.

On or about January 14, 2011, Rhein called Fanning and said that he was going to visit the Crete office.  Doc. 75 at ¶ 10; Doc. 77 at ¶ 16.  Fanning alerted the Crete police.  Doc. 77 at ¶ 17.  Rhein delivered another packet of documents and left.  *Id*. at ¶ 18.  The outside of the packet read, "WHATS IN THIS ENEVELOPE ARE FACTS NOT FICTION," "LEARN TO READ THE TRUTH THE WHOLE TRUTH AND NOTHING BUT THE TRUTH SO HELP YOU (GOD)," "IT ALSO EXPLAINS WHY THERE ARE SO MANY FATASS & LAZYASS PEOPLE IN THIS COUNTRY AND STATE," "1812-2012," "WHAT MITE THESE TWO DATES HAVE IN COMMON?" "NEED A HINT."  Doc. 75 at ¶ 10 (original spelling preserved).  The packet contained, among other things, copies of the Declaration of Independence, the Constitution, and a biography of the Attorney General of Illinois.  *Id*. at ¶ 11.  On various pages, Rhein wrote, among other things, "Now you know why so many of your people or going to be shot because your too selfish too understand the truth," "Constitutional Convention—Artical XII State Second Amendment Fed Now you know why you may be next," "You all need to take a step back and take a look at what you are doing to this state.  Befor[e] we the people go Second Amendment on your assess."  *Id*. at ¶¶ 11-12 (most original spelling preserved).  Rhein drew a crosshairs symbol on one page.  *Id*. at ¶ 11.

Rhein does not remember contacting DeLuca's office after January 14, 2011.  *Id*. at ¶ 14. However, Fanning avers in a sworn statement that Rhein called and visited DeLuca's office again on January 25.  Doc. 67-6 at ¶¶ 9-13.  Fanning further avers that Rhein told her he was a member of the Illinois State Militia and that she feared that he posed a threat, which prompted her to ask her husband to join her at the office.  *Id*. at ¶¶ 9-10; Doc. 77 at ¶ 20; Doc. 75 at ¶ 13.

Fanning described Rhein's body language during his hour long "rant" as "very animated," and recalled him yelling "for extended periods of time" and referring to 2012 as "a year of revolution and overthrowing the government." Doc. 67-6 at ¶¶ 11-12. Although Rhein disputes that he did this on January 25, the parties agree that he referred to himself as a "sacrifice lamb" and also that he told Fanning, "I have never shot anybody in my life, and I never would shoot anyone, unless I am forced to—to protect my constitutional rights." Doc. 75 at ¶¶ 15-16. Fanning informed the Crete police and the ISP Statewide Terrorism Intelligence Center about her interactions with Rhein. *Id*. at ¶ 17.

ISP special agents told Lieutenant Coffman, who at the time was Chief of the ISP's Bureau of Firearm Services, that Rhein had made threats to DeLuca's office. *Id*. at ¶¶ 1, 4. The agents sent Coffman a written summary prepared by Fanning of Rhein's statements and actions, together with documents that she had received from Rhein. *Id*. at ¶¶ 5, 18. Fanning's summary indicated that Rhein told her that he was "ready to start shooting people" and would "kick the Governor's ass," and that he referred to himself as a "sacrifice lamb." *Id*. at ¶ 5.

On February 3, 2011, based on the information provided to him, Coffman revoked Rhein's FOID card pursuant to § 8(f) of the FOID Card Act, and wrote a letter to Rhein to that effect. *Id*. at ¶¶ 19-20; Doc. 77 at ¶ 37. Section 8(f) allows the ISP to revoke the FOID card of an individual "whose mental condition is of such a nature that it poses a clear and present danger to [the individual], any other person or persons or the community." 430 ILCS 65/8(f). Section 1.1 of the Act defines "[c]lear and present danger" as "a person who: (1) communicates a serious threat of physical violence against a reasonably identifiable victim …; or (2) demonstrates threatening physical or verbal behavior, such as violent … or assaultive threats, actions, or other behavior, as determined by a … law enforcement official." 430 ILCS 65/1.1. ISP policy is to

not interview a cardholder prior to revocation under § 8(f). Doc. 75 at ¶ 21. ISP agents handle

pre-revocation investigations, and decisionmakers rely on the investigations when deciding

whether revocation is appropriate. *Ibid*. Due to the nature of the risks to public safety involved,

Coffman did not conduct an independent investigation before revoking Rhein's FOID card. *Id*.

at ¶¶ 21-22.

On or about February 4, 2011, a local police officer visited Rhein's home and told him

that ISP agents were waiting for him at the police station. Doc. 77 at ¶ 41. Rhein accompanied

the officer to the station, where he was interviewed by Agents Pryor and Summers and informed

that his FOID card had been revoked and that he would need to surrender his firearms. *Id*. at

¶¶ 42-43. Rhein "spoke passionately" but remained calm during the interview. *Id*. at ¶ 54. He

expressed readiness to challenge DeLuca in the next election and said that his comments had

been meant to get people's attention. *Id*. at ¶¶ 45-46. Local police and Agent Pryor then

removed Rhein's firearms from his home. *Id*. at ¶ 59. Rhein immediately asked about retrieving

his firearms and was told to consult the FOID card revocation letter. *Id*. at ¶¶ 61-62.

The standard revocation letter, which Rhein received, instructs an individual who desires

reinstatement to contact the ISP's Bureau of Firearm Services. *Id*. at ¶ 74. It further states that

the recipient should obtain a letter of recommendation from the local police department or

sheriff's office, a letter from a psychologist attesting to his suitability to acquire, possess, and use

firearms, and at least three letters of recommendation from character references. *Id*. at ¶ 75. If

those documents show that the clear and present danger no longer exists, the individual's FOID

card may be reinstated without an in-person hearing. Doc. 75 at ¶ 26. If a an in-person hearing

is requested, the Bureau forwards to ISP's legal department the individual's documents along

with relevant information from any objecting parties, local law enforcement officers, and ISP

agents.  *Id*. at ¶ 27.  The decision whether an individual is entitled to an in-person hearing rests with ISP's legal department.  *Id*. at ¶ 28.  It can take over a year after a request to receive a hearing.  *Id*. at ¶ 25.

On August 1, 2011, Rhein's attorney sent a letter to Coffman requesting reinstatement of Rhein's FOID card; the Bureau received the letter on August 8, 2011.  Doc. 77 at ¶ 81; Doc. 68-3 at 79.  The letter included a psychological report written by Dr. Alan Childs and three character reference letters.  Doc. 77 at ¶ 82.  Dr. Childs's report concluded, "[I]t is my professional and clinical opinion that [Rhein] does not present as an individual that is dangerous to himself or others."  *Id*. at ¶ 83.  The materials were placed in Rhein's file.  Doc. 75 at ¶ 37.  On September 19, 2011, Rhein's attorney sent Coffman a follow-up letter.  Doc. 77 at ¶ 84.

Rhein's attorney sent another letter on January 19, 2012.  Doc. 75 at ¶ 41.  That letter was the first communication in which Rhein (through his attorney) formally requested a hearing.  *Id*. at ¶ 40.  After receiving the letter, Coffman told ISP staff to contact Rhein's attorney and forwarded the hearing request to ISP's legal department.  *Id*. at ¶ 41.  On January 24, 2012, ISP Colonel Patrick Keen sent the Bureau of Firearm Services a memorandum regarding Rhein's hearing request.  Doc. 77 at ¶ 94.  In February 2012, Coffman was transferred out of the Bureau of Firearm Services to ISP's Division of Operations, at which point he had no further involvement with Rhein's request for a hearing or reinstatement.  Doc. 75 at ¶¶ 42-43.

On March 11, 2012, an internal ISP email noted that Rhein's attorney had requested a hearing "last year" but had not received a response.  Doc. 77 at ¶ 95.  On April 12, 2012, Rhein filed suit in state court seeking reinstatement of his FOID card and return of his weapons.  *Id*. at ¶ 98.  On June 5, 2012, ISP reinstated Rhein's FOID card, and his firearms were returned to him on August 29, 2012.  *Id*. at ¶¶ 99-101; Doc. 75 at ¶ 44.  Rhein filed this suit on February 1, 2013.

**Discussion**

Rhein argues that Coffman violated procedural due process by not conducting a hearing before revoking his FOID card and in his handling of Rhein's post-revocation requests for reinstatement. Coffman seeks judgment on both components of Rhein's claim, contending that Rhein was not constitutionally entitled to a pre-deprivation hearing and that he did not unconstitutionally delay Rhein's post-deprivation hearing, and that even if he did violate Rhein's due process rights, those rights were not clearly established when the violations occurred. For the following reasons, Coffman is correct that due process did not entitle Rhein to a pre-deprivation hearing. Coffman also is correct that even if his post-revocation conduct violated Rhein's due process rights, he is entitled to qualified immunity because he did not violate clearly established law.

**I.       Pre-Deprivation Claim**

 "The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). "When confronted with a claim for qualified immunity, [the court] must address two questions: whether the plaintiff's allegations make out a deprivation of a constitutional right, and whether the right was clearly established at the time of defendant's alleged misconduct." *Ibid*. "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *Ibid*.

The first question in the qualified immunity analysis asks whether, viewing the record in the light most favorable to Rhein, Coffman violated Rhein's procedural due process rights by

revoking his FOID card under § 8(f) of the FOID Card Act without first holding a hearing. "A procedural due process claim requires a two-fold analysis. First, [the court] must determine whether the plaintiff was deprived of a protected interest; second, [the court] must determine what process is due." *Leavell v. Ill. Dep't of Natural Res.*, 600 F.3d 798, 804 (7th Cir. 2010). Coffman does not dispute that Rhein had a protectable interest in his FOID card, so the court must resolve whether Rhein was entitled to a pre-deprivation hearing.

"[The] general rule [is] that individuals must receive notice and an opportunity to be heard before the Government deprives them of property." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993). However, the Supreme Court "has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (collecting cases); *see also James Daniel Good*, 510 U.S. at 53; *Siebert v. Severino*, 256 F.3d 648, 659 (7th Cir. 2001) ("Absent exigent circumstances, or a random or unforeseen act, a pre-deprivation procedure is generally required before the government may deprive a person of [his] property."). The question, then, is whether the revocation of Rhein's FOID card under § 8(f) justified such an exception.

The three-part standard articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976) guides the inquiry. *See Siebert*, 256 F.3d at 659-60. The *Mathews* test requires consideration of: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used, and the probable value of additional safeguards; and (3) the Government's interest, including the administrative burden that additional procedural requirements would entail. *See Mathews*, 424 U.S. at 335; *Armstrong v. Daily*, 786 F.3d 529, 545 (7th Cir. 2015). "The relevant inquiry is not what additional procedures might be helpful but

whether the existing procedures are constitutionally defective because they present an unreasonable risk of an erroneous deprivation of the private interest, in light of the particular situation …." *Clancy v. Office of Foreign Assets Control*, 559 F.3d 595, 600 (7th Cir. 2009).

As for the first *Mathews* factor, the parties agree that Rhein had a protectable interest in in his FOID card, but they disagree about its weight. No person in Illinois "may acquire or possess any firearm" without a valid FOID card, 430 ILCS 65/2(a)(1), so Rhein's FOID card was the key to possessing his guns. As a general rule, an individual's interest in possessing his guns is strong, as explained at length in *McDonald v. City of Chicago*, 561 U.S. 742, 767-80 (2010), and *Moore v. Madigan*, 702 F.3d 933, 935-42 (7th Cir. 2012). However, the Supreme Court has cautioned that this interest, while strong, is "not unlimited," and made clear that it did not intend to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The record does not indicate that Rhein is felon, and he may not have technically qualified as mentally ill when his FOID card was revoked in February 2011. But the Supreme Court emphasized that its list of "lawful regulatory measures … does not purport to be exhaustive," *id*. at 627 n.26, and the threats that Coffman was told that Rhein had made—including "Now you know why so many of your people or going to be shot because your too selfish too understand the truth," and "You all need to take a step back and take a look at what you are doing to this state. Befor[e] we the people go Second Amendment on your assess"—could have prompted the reasonable conclusion that Rhein was mentally imbalanced and that allowing him to keep his weapons posed too much of a risk to tolerate. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (noting that a report identified by *Heller* as a "highly influential precursor to the Second Amendment" "asserted that citizens have a personal right to bear arms 'unless for crimes

committed, or real danger to public safety'") (internal quotation marks omitted); C. Kevin Marshall, "Why Can't Martha Stewart Have A Gun," 32 *Harv. J.L. & Pub. Pol'y* 695, 698 (2009) ("actual 'longstanding' precedent in America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that … its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger").

The second *Mathews* factor is the risk of an erroneous deprivation of the private interest inherent in the procedures used and the probable value of additional safeguards. Coffman decided to revoke Rhein's FOID card based on information gathered and an investigation conducted by ISP agents, which indicated that Rhein had threatened DeLuca, including with strong and repeated suggestions of gun violence, over the course of several months. ISP agents relied on Fanning's statements to ISP and local police about her interactions with Rhein, as well as the documents that Rhein himself dropped off at DeLuca's offices. As far as Coffman knew, Rhein had said he was "ready to start shooting people," that he would "kick [the Governor's] ass," and that he was a "sacrifice lamb." Coffman also had information that Rhein stated that DeLuca should "hang for treason," and said "Now you know why so many of your people or [sic] going to be shot" and that he might "go Second Amendment on your assess"; given the subject matter of the Second Amendment, the phrase "go Second Amendment on your assess" is most naturally understood as a reference to shooting people with a gun. Nothing in the record indicates that there was any reason to doubt the information that ISP had gathered, and it was reasonable for Coffman to treat Rhein's statements and conduct as presenting a "clear and present danger" under § 8(f) in that he had communicated a "serious threat of physical violence against a reasonably identifiable victim." 430 ILCS 65/1.1. Not allowing a FOID card holder to

rebut evidence of a serious threat of gun violence before revoking his FOID card involves some risk of an erroneous deprivation based on misunderstanding or misinterpretation. However, the value of additional pre-deprivation procedures is low—particularly where, as here, many of Rhein's threatening statements were in his own hand—and the burden on law enforcement and the costs to society are potentially high and possibly fatal. *See Mackey v. Montrym*, 443 U.S. 1, 13 (1979) ("The Due Process Clause simply does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations.").

The third *Mathews* factor is the government's interest, including the administrative burden that additional procedural requirements would entail. The government's interest in ensuring public safety is extremely important. *See Skoien*, 614 F.3d at 642 ("no one doubts that … preventing armed mayhem … is an important governmental objective"). It provides perhaps the quintessential example of when not providing a pre-deprivation hearing is constitutionally permissible. *See Gilbert*, 520 U.S. at 930 ("where a State must act quickly … post-deprivation process satisfies the requirements of the Due Process Clause"); *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 300 (1981) ("[D]eprivation of property to protect the public health and safety is one of the oldest examples of permissible summary action.") (internal quotation marks omitted). The interest in preventing a threatening and perceivably dangerous person from using firearms in acts of violence is equally, if not more, important as other governmental interests held substantial enough to justify summary action without pre-deprivation hearings, such as assuring the integrity of horse racing, *see Barry v. Barchi*, 443 U.S. 55, 63-64 (1979); removing drunk drivers from highways, *see Mackey*, 443 U.S. at 17; seizing mislabeled drugs, *see Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 600 (1950); and destroying spoiled food products, *N. Am. Cold Storage Co. v. City of Chicago*, 211 U.S. 306, 319-20 (1908).

The government's interest in protecting public safety is particularly acute where time is of the essence and the delay involved in conducting a pre-deprivation hearing could mean the difference between life and death. *See Spinelli v. City of N.Y.*, 579 F.3d 160, 170 (2d Cir. 2009) (finding that "exigent circumstances necessitating very prompt action on the part of the City were sufficient to justify the City's failure to provide [the plaintiff gun shop] with pre-deprivation notice or hearing" before revoking the plaintiff's gun dealer license) (internal quotation marks omitted). This factor weighs heavily in favor of Coffman, whose decision to revoke Rhein's FOID card was based on an ISP investigation indicating that Rhein was prepared to use gun violence. That information warranted immediate action and exemplifies circumstances where the necessity of quick state action can override the general preference for a pre-deprivation hearing. *See Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 618 (7th Cir. 2002) ("[T]he practical exigencies of a situation may often counsel against affording plenary pre-deprivation process to an individual."); *Hightower v. City of Boston*, 693 F.3d 61, 85 (1st Cir. 2012) (collecting cases) ("The revocation of a firearms license, particularly a license to carry a concealed, large capacity weapon, without a predeprivation hearing is justified by concerns as to public health and safety."). We are all too familiar, in Illinois and elsewhere, with tragedies in which public officials—and, at times, their staffs and family members—are seriously injured or killed by armed individuals upset with decisions that the officials have made or actions they have taken, and Rhein appeared to be presenting just such a risk to DeLuca and his staff.

Balancing the benefits and costs of a pre-deprivation hearing under these circumstances leads inexorably to the conclusion that Rhein was not constitutionally entitled to such a hearing. It was permissible for Coffman to act quickly, without a pre-deprivation hearing, and it probably would have been irresponsible of him to act with any less dispatch. That a pre-deprivation

hearing was not required, however, does not mean that Rhein was entitled to no hearing at all; it means only that the lack of a pre-deprivation hearing did not violate due process so long as he had the right to a post-deprivation hearing. *See FDIC v. Mallen*, 486 U.S. 230, 240 (1988) ("An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation.").

Rhein did have that right, as the FOID Card Act clearly sets forth procedures available to those whose FOID cards are revoked. Section 9 requires the ISP to provide such a person with "a written notice … stating specifically the grounds upon which … his Identification Card has been revoked … [and setting forth] the person's right to administrative or judicial review under Section 10 and 11 of this Act." 430 ILCS 65/9. Coffman complied with this requirement in his letter to Rhein of February 3, 2011. Doc. 75 at ¶ 20, Doc. 67-9. Section 10 states that a person whose FOID card is revoked "may appeal to the Director of State Police for a hearing upon such … revocation." 430 ILCS 65/10(a). Section 10 further provides:

> The Director shall grant the relief if it is established by a preponderance of the evidence that the person will not be likely to act in a manner dangerous to public safety and that granting relief would not be contrary to the public interest. In making this determination, the Director shall receive evidence concerning (i) the circumstances regarding the firearms disabilities from which relief is sought; (ii) the petitioner's mental health and criminal history records, if any; (iii) the petitioner's reputation, developed at a minimum through character witness statements, testimony, or other character evidence; and (iv) changes in the petitioner's condition or circumstances since the disqualifying events relevant to the relief sought. If relief is granted under this subsection or by order of a court under this Section, the Director shall as soon as practicable but in no case later than 15 business days, update, correct, modify, or remove the person's record in any database that the Department of State Police makes available to the National Instant Criminal Background Check System and notify the United States Attorney General that the basis for the record being made available no longer applies.

430 ILCS 65/10(f).  Section 11 provides for *de novo* judicial review of the Director's decision: "Any final administrative decision by the Director of State Police to deny a person's application for relief under [§ 10(f)] of this Act is subject to de novo judicial review by the circuit court, and any party may offer evidence that is otherwise proper and admissible without regard to whether that evidence is part of the administrative record."  430 ILCS 65/11(b).  These procedures offer substantial opportunity to challenge the revocation of a FOID card, first in an administrative setting and then through judicial review.

Weighing the *Mathews* factors and considering the post-deprivation procedures available through the FOID Card Act, the court concludes that Coffman did not violate Rhein's procedural due process rights by revoking his FOID card without first conducting a hearing.  *See Doyle*, 305 F.3d at 618.  Accordingly, Coffman is entitled to summary judgment on Rhein's claim that the lack of a pre-deprivation hearing violated due process.

## II.     Post-Deprivation Claim

Rhein next claims that Coffman violated his procedural due process rights by failing to provide "a prompt and meaningful post-deprivation hearing."  Doc. 70 at 9.  Rather than decide whether the delay in providing post-deprivation hearing violated due process, the court will exercise its discretion to answer the second qualified immunity question, which is whether the delay violated clearly established law.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Mordi v. Zeigler*, 770 F.3d 1161, 1165 (7th Cir. 2014).  That issue turns on whether a reasonable officer in Coffman's position would have known that his role in delaying Rhein's post-deprivation hearing violated due process.  *See Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012).

14

As noted above, even when due process does not demand a pre-deprivation hearing, it requires a post-deprivation opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *see also Barry*, 443 U.S. at 66. "While there is no specific time frame within which a hearing must be held to qualify as 'prompt,' lack of a speedy resolution to proceedings may result in a denial of due process." *Baird v. Bd. of Educ. for Warren Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685, 692 (7th Cir. 2004). The delay here was between August 8, 2011, when the Bureau of Firearm Services stamped "received" on a letter from Rhein's attorney requesting reinstatement of his FOID card, Doc. 68-3 at 79, and early February 2012, when Coffman was transferred to ISP's Division of Operations and no longer involved with Rhein's request for a hearing, Doc. 75 at ¶¶ 42-43. Although Rhein's FOID card was not reinstated until June 5, 2012, Coffman's responsibility ceased with his personal involvement in the matter. *See Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014) ("A damages suit under § 1983 requires that a defendant be personally involved in the alleged constitutional deprivation."); *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003); *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003); *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996).

To overcome qualified immunity, Rhein must show that it was clearly established that the six-month delay between his initial request for reinstatement and Coffman's leaving the Bureau—or, if Coffman were held responsible through June 2012, the ten-month delay between Rhein's initial request and his FOID card's reinstatement—was an unconstitutionally lengthy delay. *See Nanda v. Moss*, 412 F.3d 836, 844 (7th Cir. 2005). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. In other words, existing precedent must have placed the statutory or

constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal citations, quotations marks, and alterations omitted).

The trouble with Rhein's position is that the question of how long is "too long" for an individual FOID cardholder to go without a hearing after revocation was not clearly established in 2011 and 2012, and the precise answer remains unclear even today. The Supreme Court has held that, "though there is a point at which an unjustified delay in completing a post-deprivation proceeding would become a constitutional violation, the significance of such a delay cannot be evaluated in a vacuum." *Mallen*, 486 U.S. at 242 (internal quotation marks and citation omitted). Whether the delay in providing a post-deprivation hearing violates due process depends upon an assessment of *Mathews*-like factors: "[I]t is appropriate to examine the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying government interest; and the likelihood that the interim decision may have been mistaken." *Ibid*.; *see also Zinermon v. Burch*, 494 U.S. 113, 127 (1990); *Dupuy v. Samuels*, 397 F.3d 493, 509 (7th Cir. 2005).

That multi-factor standard, which necessarily involves the balancing of various considerations, does not clearly establish that the six-month (or ten-month) delay at issue here fell below the constitutional line. As the Seventh Circuit has explained: "It would appear that, whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under the *Harlow* [qualified immunity standard]. With *Harlow*'s elimination of the inquiry into the actual motivations of the official, qualified immunity typically casts a wide net to protect government officials from damage liability whenever balancing is required." *Benson v. Allphin*, 786 F.2d 268, 276 (7th Cir. 1986), *superseded by statute on other grounds as stated in Laborers' Pension*

*Fund v. A&C Envtl., Inc.*, 301 F.3d 768, 778 (7th Cir. 2002); *see also Crue v. Aiken*, 370 F.3d 668, 688 (7th Cir. 2004) ("Here, both *Pickering/Connick* and *NTEU* involve balancing tests and, unless there is 'very closely analogous' case law, the balance struck by the official will not remove qualified immunity."); *Gustafson v. Jones*, 117 F.3d 1015, 1021 (7th Cir. 1997) (noting "an undeniable fact about balancing tests, which is that they produce a wide gray area between the clearly legal and the clearly illegal," meaning that "the rules of qualified immunity require giving the benefit of the doubt to the reasonable public official if the particular case falls within that gray area"); *Shinault v. Hawks*, 782 F.3d 1053, 1059 (9th Cir. 2015) ("Because the *Mathews* test boils down to an ad hoc balancing inquiry, procedural due process requirements can rarely be considered clearly established at least in the absence of closely corresponding factual and legal precedent.") (internal quotation marks omitted); *Comprehensive Addiction Treatment Ctr., Inc. v. Leslea*, 552 F. App'x 812, 817 (10th Cir. 2014) ("the *Mathews* balancing test renders it difficult … for state officials to know that they have violated clearly established law") (internal quotation marks omitted, ellipses in original).  There is no analogous case that would have put Coffman on notice that the six-month or ten-month delay in providing Rhein a post-revocation hearing violated due process.  *See Collvins v. Hackford*, 523 F. App'x 515, 520-21 (10th Cir. 2013) (holding that the defendants were entitled to qualified immunity on the plaintiff's claim that an *eleven-month* delay in providing a post-deprivation hearing was constitutionally excessive, explaining that "the determination of the constitutionality of a delay is a fact-intensive analysis based on the [*Mallen*] factors" and that "[t]here is no precedent sufficiently on point with this case that could have put Defendants on notice that the delay was unconstitutional"); *Torbeck v. Zoon*, 1997 WL 532496, at *2-3 (4th Cir. Aug. 29, 1997) (citable pursuant to 4th Cir.

Rule 32.1) (same, where there was a *two-year* delay in holding a hearing after the plaintiff's business license was suspended).

In an effort to find a closely corresponding case, Rhein cites *Spinelli*, where the Second Circuit in 2009 held that a 58-day delay in providing a post-deprivation hearing following the suspension of the plaintiff's gun dealer license violated due process given that the plaintiff could not earn income while it awaited a hearing. 579 F.3d at 173-74. In so holding, the Second Circuit placed great emphasis on the strength of the plaintiff's interest in "pursuing a particular livelihood," quoting *Mallen* for the proposition that "[t]he Supreme Court has repeatedly recognized the severity of depriving someone of his or her livelihood," and observing that "the interim period between the erroneous deprivation and reinstatement can be financially devastating to the licensee." *Id*. at 171 (internal quotation marks omitted). The fact that the business license at issue in *Spinelli* allowed the plaintiff to engage in the business of selling guns was entirely incidental to the analysis; *Spinelli* is a business license case, not a gun ownership case. *Spinelli* would not have put Coffman on notice that the delay in *this* case was too long, given differences in the nature of the private interests at stake. Although Rhein's interest in his FOID card was substantial, Coffman reasonably could have believed, in light of *Spinelli*'s reliance on *Mallen* and focus on the financial aspects of the license suspension, that Rhein's interest did not rise to the level of the interest in pursuing one's livelihood at stake in *Spinelli*.

Thus, even if Coffman could fairly be charged with knowing that the Second Circuit had held that a 58-day delay in providing a hearing after the revocation of a gun dealer license necessary to the plaintiff's livelihood would violate due process, the same could not be said of a six-month or ten-month delay in processing an application to restore a FOID card. *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) ("We do not require a case directly on point, but

existing precedent must have placed the statutory or constitutional question beyond debate.");
*Lewis v. Downey*, 581 F.3d 467, 478 (7th Cir. 2009) ("the right that [the defendant] allegedly
violated must be clearly established in a particularized sense") (internal quotations marks
omitted); *cf. Shepard v. Madigan*, 734 F.3d 748, 749 (7th Cir. 2013) (noting that the court in
*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2013), had given the State of Illinois "210 days in
which to enact a new gun law that would impose only reasonable restrictions on carrying guns
outside the home, rather than the restrictions that we held [under the Second Amendment] to be
unduly severe"). Even if that delay ultimately could be held to violate due process, the question
is certainly not "beyond debate," which means that qualified immunity is appropriate. *Reichle*,
132 S. Ct. at 2093. Qualified immunity protects "all but the plainly incompetent or those who
knowingly violate the law." *Al-Kidd*, 131 S. Ct. at 2085. Given the state of the law, Coffman
was neither plainly incompetent nor a knowing violator of the law, and thus he is entitled to
qualified immunity on the post-deprivation claim.

### Conclusion

For the foregoing reasons, Coffman's summary judgment motion is granted. Given this
disposition, Rhein's summary judgment motion necessarily is denied.

August 6, 2015

_____
United States District Judge